UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
VIJAY BEDASIE, RUDDY DIAZ,
and JOSE ROSARIO,

                                         Plaintiffs,

                     - against -

MR. Z TOWING, INC., FRANK
ANDREOPOLOS, and HELEN MUSTAKAS,

                                         Defendants.

----------------------------------------------------------X

**MEMORANDUM
AND ORDER**

13 CV 5453 (CLP)

**POLLAK**, United States Magistrate Judge:

On October 2, 2013, plaintiffs Vijay Bedasie, Ruddy Diaz, and Jose Rosario (collectively,

"plaintiffs") commenced this action against defendants Mr. Z Towing, Inc. ("Mr. Z"), Frank

Andreopolos,[1] and Hellen Mustakas[2] (collectively, "defendants"), seeking unpaid overtime

wages, minimum wages, and spread-of-hours pay, pursuant to the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 et seq., and New York Labor Law ("NYLL") § 650.  In addition,

plaintiffs seek damages stemming from defendants' alleged failure to comply with the notice and

record keeping requirements of the NYLL, liquidated damages under both the NYLL and FLSA,

and prejudgment interest under the NYLL.  After settlement discussions proved unsuccessful, the

parties consented to proceed before the undersigned for trial and entry of judgment.

---

[1]At various points throughout both parties' submissions, Andreopolos is spelled
"Andriopoulos."  For the sake of consistency and clarity, the Court will refer to this defendant
based on the spelling defendant gave of his name at trial:  "Andreopolos."  (Tr. at 479).

[2]At various points throughout both parties' submissions, "Hellen Mustakas" is also
spelled as "Helen Mustakas."  The Court, in the interest of uniformity, refers to this defendant as
"Hellen Mustakas."

The case proceeded to a bench trial, which was held before this Court from May 2, 2016 to May 5, 2016. Plaintiffs' case-in-chief consisted primarily of the testimony of plaintiffs Bedasie, Diaz, and Rosario, along with various documentary evidence offered in support of plaintiffs' testimony. Defendants' case-in-chief consisted of the testimony of defendants Andreopolos and Mustakas, as well as the testimony of Frank Evangelista, Mohammad Ali, Marshal Alejandro Finardo,[3] and Marshal Gary Rose.

For the reasons set forth below, the Court finds that defendants Mr. Z Towing and Frank Andreopolos have violated certain provisions of the FLSA and the NYLL, and awards plaintiffs damages in the amount of $119,655.11.

FACTUAL BACKGROUND

Although many of the critical facts surrounding plaintiffs' employment are disputed, the parties appear to be in agreement about certain facts, and the Court outlines them briefly to provide a chronological context for the evidence presented at trial.

Defendant Mr. Z Towing is a towing service that, in relevant part, contracts with the New York City Marshal's Office (the "Marshal's Office") to locate and tow away vehicles with outstanding tickets. (Am. Compl.[4] ¶¶ 12, 27; JPTO[5] at 5). Defendant Andreopolos is a 50%

---

[3]Once again, although the parties' submissions sometimes spell this individual's surname as "Fernardo," the Court refers exclusively to this witness as "Finardo."

[4]Citations to "Am. Compl." refer to the Amended Complaint, filed by plaintiffs on November 20, 2013.

[5]Citations to "JPTO" refer to the Joint Pretrial Order, filed by the parties on October 28, 2015.

owner and vice president of Mr. Z, and defendant Mustakas is an employee of Mr. Z. (JPTO at 5). Plaintiffs Bedasie and Diaz worked as "taggers" or "scouts" for Mr. Z, in which capacity they were responsible for running the license plates of cars parked in a defined geographic area through a system designed to check for any outstanding tickets. (Id.; Tr.[6] at 20, 104). Plaintiff Rosario worked as a "stager" for Mr. Z, in which capacity he functioned as a security guard for the lot in which all towed cars were kept. (Tr. at 188).

Although there is some dispute as to whether plaintiff Bedasie took extended leave during certain periods over the course of his employment, the parties agree that Bedasie began working for Mr. Z at some point in January 2007 and ended his employment in June 2013. (JPTO at 5). Plaintiff Diaz worked for Mr. Z as a tagger from January 2009 to May 2013. (Id.) The parties also agree that plaintiff Rosario was employed by Mr. Z from "some time in 2008" to June 2013. (Id.) The parties further stipulated that "[p]laintiffs' regular schedules were Monday through Thursday, and every other Friday for the years 2012 and 2013." (Id.) Defendants conceded that they did not require the plaintiffs to clock in or out to keep track of shifts, and maintained no other records as to the hours worked by any of the plaintiffs. (Id. at 5-6). However, defendants contend that plaintiff Rosario was a minimum wage employee who received both minimum wages in the amount of $7.25 per hour and overtime wages in the amount of $10.88 per hour for the time he worked in excess of 40 hours, which, they allege, is reflected in his paychecks. (Id. at 3).

---

[6]Citations to "Tr." refer to the trial transcript of proceedings before this Court running from May 2 through May 5, 2016. Since these foundational elements of plaintiffs' testimony have not been challenged by the defendants, and the information about the job responsibilities of taggers or scouts was relied upon by the defendants in their testimony, the Court has treated them as uncontested facts.

a)  <u>Vijay Bedasie's Testimony</u>

At trial, plaintiff Bedasie testified that he worked for Mr. Z from 2007 until the summer of 2013.  (Tr. at 35).  He originally testified that other than vacations, he worked continuously for Mr. Z during this period.  (<u>Id.</u> at 35).  Bedasie testified that when he was hired, defendant Mustakas told him that he would be paid $15 per car, plus $50 per day.  (<u>Id.</u> at 19, 37-38).  On cross-examination, he indicated that if he worked four days per week, he was paid $200, plus $15 per car; if he worked five days that week, he would be paid $250, plus $15 per car.  (<u>Id.</u> at 38).  He also testified that although he was promised money for gas and he asked for it on several occasions, defendants never paid him for gas.  (<u>Id.</u> at 38).

Bedasie denied that he was ever paid on an hourly basis, denied that he was asked to check in or out, and testified that there was never a clock-in or clock-out machine.  (<u>Id.</u> at 19-20).  He did explain, however, that there was a basic schedule of when the scouts were to start and when they could leave, and that "every week is . . . basically the same schedule."  (<u>Id.</u> at 21).  According to Bedasie, when he worked four days a week, he worked approximately 50 hours per week and when he worked five days a week, he worked between 59 and 60 hours a week.  (<u>Id.</u> at 50).  Although he testified on cross-examination that he had no records, he reiterated that every week, the scouts would start and end at the same times depending on the day, and that the schedule was the same.  (<u>Id.</u>)

According to Bedasie, on Sunday nights at 11:30 p.m., he would go to the yard to pick up the disk for his computer and the sheet prepared by Mustakas that showed the locations where he was to go to that day.  (<u>Id.</u> at 22).  He testified that after picking up the envelope with the

computer disk, he would return to his car, upload the disk onto the computer, and proceed to his assigned area.  (Id.)  From then until 3:00 p.m., he would tag cars for a total of 15.5 hours.  (Id.)

On Tuesdays, his shift began at midnight and he would work until 3:00 p.m, for a total of 15 hours.  (Id. at 22).  Bedasie testified that on Wednesdays and Thursdays, he would arrive at 2:00 p.m. and work until midnight, for a total of 10 hours each day.  (Id.)  When he worked on Fridays, which was twice a month, he worked from 2:00 p.m. until 11:00 p.m.  (Id. at 22, 92-93).  However, he explained that even though the marshals would call the end of the shift on Fridays at 11:00 p.m., by the time the scouts got back to the yard, and reviewed the list of cars towed that week with the marshal's list, it would be closer to 12:00 or 12:30.  (Id. at 22-23, 93).  In addition, he testified that if he worked on a Thursday and not on a Friday, he would have to return to the yard to return the computer chip he used to determine the assigned area each week.  (Id. at 23).  On cross-examination, Bedasie testified that from 2007 to July of 2009, he worked on average approximately 50 hours per week, broken down as follows: 15.5 hours on Monday, 15 hours on Tuesday, 10 hours on Wednesday, and 10.5 hours on Thursday.  (Id. at 41).  Although he testified that his schedule remained the same for the entire time he worked for Mr. Z, he conceded that he did not start working Fridays until some time in 2009.  (Id. at 24).

When asked how he could have put in close to 50 hours per week working only four days per week, while the marshal only put in 42 hours, Bedasie explained that even though the marshals would start at 3:00 p.m. on Mondays and Tuesdays, the scouts were told to go out three hours earlier so that cars would be ready for towing when the marshals started.  (Id. at 25).  On the other days, the scouts would only start an hour earlier because it was "daytime. . .like a high traffic area," and if they tagged cars three hours earlier, the cars would be gone by the time the

marshal arrived.  (<u>Id.</u>)

Bedasie denied being given or taking meal breaks, testifying that he would have food in the car and would eat while scanning license plates.  (<u>Id.</u> at 25-26).  He did concede that there were days when he would be off due to a storm or blizzard, estimating that it was "[m]aybe three, four days" per year.  (<u>Id.</u> at 26).  He also testified that Mr. Z was closed for a week or a week and a half after Hurricane Sandy (<u>id.</u> at 27), and that there were days when the computers went down while the scouts were in the middle of checking plates.  (<u>Id.</u> at 27).  According to Bedasie, the scouts were told to keep working and they would be notified when the computers were back online.  (<u>Id.</u>)  On those occasions, the scouts would write down the plate numbers and then check the plate numbers when the computers were back online.  (<u>Id.</u> at 86).  There were, however, days when the computers would be down all day and then the scouts were told not to work.  (<u>Id.</u> at 55).  Bedasie also conceded that they did not work on federal holidays, such as Thanksgiving or Christmas; when the holiday fell on a Monday, he stated that they would work on Friday to make up for it.  (<u>Id.</u> at 28).  When asked how many vacation days he took every year, Bedasie testified that he took "a week or two" and he called in sick on average three days per year.  (<u>Id.</u> at 28-29).

Bedasie testified that there were times when the marshal would tell them to leave early but this happened "rarely."  (<u>Id.</u> at 29).  He denied that he ever left work on his own early because he got paid "basically on cars.  So if I left early, it would effect me at the end of the week."  (<u>Id.</u>)  On cross-examination, he was asked if he was involved in an accident and out for an extended period of time, but he claimed he could not recall.  (<u>Id.</u> at 55-56).  After being shown a document, he admitted that he was in an accident but he did not recall when it was.  (<u>Id.</u> at 57).  He admitted that he had been involved in a medical malpractice lawsuit, but he insisted that he

did not miss work during that period.  (Id. at 58).[7]

Bedasie testified that he got paid on a weekly basis, either on Thursday night or Friday.
(Id. at 30).  He and Mustakas would compare the list of cars he tagged each day during the week
with the list that the marshal prepared and she would then calculate the amount to be received
and she would write the checks.  (Id. at 31).  However, he testified that Mustakas would not sign
the checks; those were signed by defendant Andreopolos.  (Id. at 31, 51).  Although Bedasie
never received pay stubs or pay records, he did identify certain paychecks he received from Mr.
Z.  (Id. at 32).  Bedasie testified that the paychecks entered into evidence as Plaintiffs' Exhibit 1
correctly reflected the gross amount of pay earned during the period reflected on the check.  (Id.
at 33-34).  When shown Plaintiffs' Exhibit 2, Bedasie testified that they appeared to be pay stubs,
but he testified that the first time he had ever seen these documents was in his lawyer's office.
(Id. at 34).  Nevertheless, he testified that they appeared to be accurate.  (Id.)

On cross-examination, Bedasie was shown checks for the weeks of January 6, January 20
and January 27, 2012.  (Id. at 43).  The checks were each for $200.  (Id., Tr. Ex.[8] 1). When asked
to explain how he could have accepted a paycheck for only $200 if he was working 50 hours that

---

[7]Defendants' counsel attempted to show plaintiff Bedasie a document allegedly related to
his prior lawsuit that purported to show Bedasie's hours worked, which counsel claimed had
been offered in support of Bedasie's claim in that suit for lost wages.  (Id. at 62).  Counsel
admitted, however, that the document had not been previously disclosed to plaintiffs' counsel
during discovery.  (Id.)  The Court allowed the document to be used for impeachment purposes,
but declined to admit it into evidence based on defendants' failure to comply with discovery
requirements.  (Id.)

[8]Citations to "Tr. Ex." refer to exhibits that were admitted at trial.  Exhibits that are
designated by a number refer to plaintiffs' exhibits and exhibits that are designated by a letter
refer to defendants' exhibits.

week, Bedasie could not respond.  (Id. at 42).  As counsel noted, if Bedasie was supposed to be

paid $50 a day, as he testified, and he tagged even 10 cars, that would be an additional $150 that

he was owed for each of these weeks if he worked 4 days a week during that period.  (Id. at 44).

When shown a check for the week of September 21, 2012, Bedasie stated he could not explain

how he could have been paid $1,010 that week.  (Id.)  He also could not explain how his gross

pay of $1,005 for the week of March 11, 2011, as reflected on the Exhibit, was calculated.  (Id. at

45).  Defendants, however, provided no explanation either.

   b) Ruddy Diaz's Testimony

   Plaintiff Diaz testified that he began working for Mr. Z in 2008, and was originally hired

as a stager.  (Id. at 101-02).  According to Diaz, he was told by defendant Mustakas that he would

be paid $10.00 an hour.  (Id. at 102).  In the winter of 2009, Diaz was hired as a tagger or scout.

(Id. at 103).  Diaz testified that at that time, Mustakas told him that they needed more spotters for

cars because they were not getting enough cars.  (Id. at 103).  When Diaz became a scout, his job

was to identify cars that had unpaid tickets, run the plates, and identify the location of the car.  (Id.

at 104).  He also testified that when he became a scout, his rate of pay changed to $20 per car.  (Id.

at 104, 126).  He testified that he was supposed to be paid for gas, but never received gas money.

(Id. at 126).  He never had to punch in or out, or sign in or out; he was never asked to keep track

of his time.  (Id. at 104).  He never checked in when he started his schedule, but he would notify

the marshal by radio when he ended a work shift.  (Id. at 105).

   Diaz testified that, like Bedasie, he had a regular schedule.  (Id.)  He testified that on

Sundays, he would head to the yard at 11:30 p.m. to pick up the chip, upload the computer and

then travel to his assigned location.  (Id.)  He would then work until 3:00 p.m. Monday; on

Tuesday, he worked from midnight until 3:00 p.m.  (Id. at 106).  On Wednesdays, Thursdays, and

Fridays, he worked from 2:00 p.m. until 12:00 p.m.  (Id.)  On Fridays, after he finished his shift at

11:00 p.m., he would return to the yard and give back the computer.  (Id. at 107).  At the end of a

workweek, he would also count the cars that were towed and give the list to Mustakas.  (Id.)  He

explained that he worked two Fridays a month the entire time that he was working as a scout.

(Id.)  He confirmed Bedasie's testimony that the scouts began working at midnight, before the

marshal got there at 3:00 a.m., because they wanted to get cars ready for the marshal to tow.  (Id.

at 108).  He did not think there were any days when the marshal ended a shift more than a half

hour early, and he denied leaving work early on any occasion.  (Id.)

   Like Bedasie, Diaz testified that he took no meal breaks, ate lunch in the car, and did not

work due to bad weather approximately two times a year.  (Id. at 109).  He also testified that he

missed 7 to 10 days after Hurricane Sandy.  (Id. at 109-10).  According to Diaz, if the computer

system went down, Diaz would continue listing cars and running plates.  (Id. at 110).  He testified

that they were off for Thanksgiving and Christmas and that he took a week or two off for vacation

for only one year in 2011 when he suffered a family emergency.  (Id. at 113-14).  Diaz testified

that he did not take off for vacation for any year other than 2011.  (Id.)

   Diaz identified certain checks that showed his gross wages, and he verified that the

amounts were what had been paid to him.  (Id. at 116).  When asked to verify certain other

documents, he claimed he had not received copies of these documents which appeared to be pay

stubs.  (Id. at 117, Tr. Ex. 5).

9

According to Diaz, he stopped working at Mr. Z in the summer of 2013. (<u>Id.</u> at 118). He denied that he ever took an extended period of time off from work. (<u>Id.</u>) When asked if he cut his shift short to go to car auctions with his father, Mr. Diaz denied that he ever left work early. (<u>Id.</u> at 121). He denied that he was ever paid $50 a day. (<u>Id.</u> at 126-27). He testified that nothing was ever put in writing; everything was agreed to orally between him and Mustakas. (<u>Id.</u> at 127). He testified that he was always paid by car, never by the number of hours he worked. (<u>Id.</u> at 128). He testified that on one occasion, he tagged 50 or 60 cars but was only paid half of what he was owed. (<u>Id.</u> at 129). When he complained, he was promised that they would help him "next time." (<u>Id.</u>) He complained only once but testified that he was afraid of losing his job. (<u>Id.</u> at 129-30). He denied ever receiving $25 per hour in pay. (<u>Id.</u> at 142).

On cross-examination, Diaz admitted that there came a time in 2013 when Marshal Finardo suspended him because he was not in the proper section and he had not asked permission from the marshal to go to another section. (<u>Id.</u> at 163, 165). He explained that he was there because his "area was slow." (<u>Id.</u> at 164). He testified that he never got hired back after that. (<u>Id.</u>) Also on cross-examination, he testified that he did not work on Labor Day or Memorial Day. (<u>Id.</u> at 176). He also testified that if there was a federal holiday that fell on a Monday, he would still work that Friday to make up for the Monday off. (<u>Id.</u> at 174). He testified that he called in sick on average two to three days per year, and that he lost four days when his brother died in 2011. (<u>Id.</u> at 179).

c) <u>Jose Rosario's Testimony</u>

Jose Rosario testified that he began working as a stager for Mr. Z in January 2008 and

worked there until June 2013.  (Id. at 188).  His typical workday began at 3:00 a.m. when he would pick up the forms at Mr. Z's lot that he needed for the cars.  (Id. at 189).  On the form, he would enter the model of the car, color, year, and any information about what was inside the car.  (Id. at 190).  At the end of the day, one copy of the form would go to Mustakas or Andreopolos and the other copy would be taken to the precinct.  (Id. at 191).  On Mondays and Tuesdays, he would usually go to two precincts; on the other days, he would go to "a couple of precincts."  (Id.)  He testified that in the beginning, he was paid $10 an hour for about a year; in the middle of 2009, his pay increased to $11 per hour.  (Id. at 192, 208-09).  Rosario testified that his pay went up to $12 in 2012 (id. at 192), but also testified that he was told "in the beginning of 2013" that his pay would increase to $12.  (Id. at 193).

He testified that in 2008, he worked Mondays through Thursdays and then after 2009, he started working every other Friday.  (Id. at 194).  He also testified that throughout the period, his schedule stayed generally the same:  he would start on Mondays and Tuesdays at 3:00 a.m. and work until 6:00 p.m.  (Id. at 195).  On Wednesdays, he would start at 3:00 p.m. and work until 2:00 a.m. when he would go to the yard.  (Id. at 196).  He would then give the information forms to Mustakas or Andreopolos and then go to the precinct, maybe at the latest, 3:00 a.m.  (Id.)  He testified that his schedule on Thursdays was the same as Wednesdays, and on Fridays, he would start at 2:00 p.m. and end at 1:00 a.m.

Like the other plaintiffs, Rosario testified that he did not have to sign in or out at any time.  (Id. at 198).  He conceded that there were times when he left earlier or later than he estimated, but these estimated times were to the best of his recollection.  (Id.)  He also testified that there were one or two snow days per year when they did not work, and there were days when the computers

were down, but he still had to guard the cars during the period that the computers were down.  (Id. at 199).  He testified that he believed Mr. Z was closed for a week during Hurricane Sandy, but that he was required to work, to guard the cars in the back that were about to be flooded.  (Id.)  He claims that he did not get paid for that day that he worked during the hurricane.  (Id. at 247).  As for lunch breaks, he testified that he would get 15 to 20 minutes to go get food.  (Id. at 200).

He acknowledged receiving paychecks while working at Mr. Z (id. at 201-02, Tr. Ex. 7), but he also identified pay stubs that he claimed he had never seen while actually working for Mr. Z.  (Id. at 202).  When asked on cross examination to explain why he accepted one paycheck indicating that his gross pay was $571 even though he was supposed to be paid at the rate of $12 per hour, and he claimed he was working a minimum of 60 hours, Rosario testified, "I just accepted it."  (Id. at 221).  Counsel for defendants showed Rosario several checks where he was not paid the full amount he claimed he was owed even if the rate had been $10 per hour.  (Id. at 222).  Rosario indicated that he "just trusted" Mustakas and Andreopolos.  (Id.)  He also testified that even though he was paid on an hourly basis, he never gave Mustakas or Andreopolos input on how many hours he worked.  (Id. at 250).

He testified that he worked when there was rain and sleet, but not if it snowed and the snow made it difficult to see the license plates.  (Id. at 232).  He also testified that he continued to work when the computer went down because he had cars to watch and he could not leave them alone.  (Id. at 233).  He testified that the amount of time it took for the marshal to arrange to have the truck drivers pick up the tagged cars varied depending on the number of cars.  (Id.)  He admitted that there were times when he left early – "twice" a year – and he testified that he had surgery one year that resulted in his being out for 4 days.  (Id. at 234).  He also claimed that he

never took vacation in the six years he was working for Mr. Z.  (Id.)

d)  Frank Andreopolos' Testimony

In their defense, defendants presented the testimony of the company's part owner, defendant Frank Andreopolos, as well as the testimony of defendant Hellen Mustakas, Frank Evangelista, and Marshal Alejandro Finardo.

Defendant Andreopolos testified that he was a 50% owner of Mr. Z.  (Id. at 479).  He testified that he is the vice-president of the company, with the job functions "to run the business, hire and fire people, drive with the marshal, do paperwork . . . . I would do office work, communicate with the marshals, with the scouts, with the drivers, marshal's office, the DM Vehicles." (Id. at 480).  For each car towed, Andreopolos testified that Mr. Z would receive $185 plus tax from the City.  (Id.)  He explained that "scouts" were hired to locate the vehicles, give the information to the marshal, who would verify the car and plate, and then tow trucks would pick up the tagged cars.  (Id.)  The cars were then towed to a staging area where Rosario would count the cars that came in.  (Id.)

According to Andreopolos, he employed between 7 and 14 scouts at any one time.  (Id. at 481).  He testified that "[t]hey all, like, part-time workers and they work on their own and if they show up, they show up."  (Id. at 481).  He described Mustakas' job as "all-around, lady all-around."  (Id.)  According to Andreopolos, Mustakas was a manager of Mr. Z from 2000 until 2003, when she suffered some personal problems so Andreopolos had to hire other people, such as Ali, whose role was to manage the scouts, the drivers, the office work, do the paperwork and

work with the marshal – all things Mustakas had done before 2003.  (Id. at 481-82).[9]

Andreopolos testified that Mustakas played no role in hiring or firing employees.  (Id. at 482).  He

admitted that she was present in the trailer when employees were being interviewed, and she

might have given a second opinion, but the "bottom line it was me [Andreopolos] that decided if

they were going to get the job or not."  (Id. at 483).

On cross-examination, Mr. Andreopolos admitted that he did not keep track of the scouts'

Andreopolos testified that when he hired Bedasie, Bedasie was paid $15 per car.  (Id. at

485).  Andreopolos testified that "[w]henever he [Bedasie] decide to come to work, he was

making money.  Mr. Bedasie want to work little hours.  He had his own things going on.

Whenever he was free, he would come in."  (Id. at 491).  Andreopolos claimed that Bedasie was

"[r]eprimanded constantly" by the marshals for disappearing, not showing up, giving wrong

locations and disappearing.  (Id. at 492).  When the marshal would notify Andreopolos of these

issues, Andreopolos would try to contact Bedasie and then if Bedasie did not respond,

Andreopolos would have to find a replacement.  (Id. at 492).

On cross-examination, Mr. Andreopolos admitted that he did not keep track of the scouts'

---

[9]Andreopolos' recollection as to specific dates was unreliable.  When asked on cross-examination when Mustakas was arrested, Andreopolos testified that I don't want to give wrong dates.  I don't remember."  (Id. at 498).  A few minutes later, he stated:  "I can't come up with dates, you know."  (Id. at 501).  He could not tell how long she was out of work then, stating:  "I can't – I don't know.  I can't figure out for you. . . .I don't want to give dates when I'm not sure."  (Id. at 502).  He also was confused about when she was out of work, first stating that it occurred while she was working with Marshal Rose, who only worked in 2007.  (Id. at 499).  Then later, Andreopolos testified that the arrest occurred in 2008 (id. at 500), and then he said, Christmastime 2007 (id. at 501), and then, in response to a leading question from his counsel, he testified that she was arrested in 2010.  (Id. at 502).  Andreopolos was also confused as to when Mustakas was out due to an accident and who was hired as manager.  Finally, after once again being unable to give a date, Andreopolos responded to counsel's leading question, "in 2012 when she had the accident, who took over?" by agreeing to the date.  (Id. at 503).

14

time at all. (Id. at 522-23). According to Andreopolos, each week, the scouts would verify the number of cars tagged by comparing the license plates of the cars they tagged to the marshal's logs. (Id. at 505). Andreopolos testified that although Mr. Z kept copies of the logs, which showed the days worked, the trailer was flooded during Hurricane Sandy and all of the records got wet. (Id. at 506).[10] Unfortunately, it was not until the middle of trial that defendants subpoenaed copies of the marshals' logs, but because the logs were not produced during discovery and not listed on the pretrial order, the logs were not admitted into evidence. (Id. at 505).

When asked if he had changed his record-keeping practices after a former employee, Raphael Rivera, brought a wage and hour lawsuit in August 2012, before Hurricane Sandy, Andreopolos explained that the scouts were getting paid by the piece and he did not track their hours even after the Rivera lawsuit. (Id. at 540). He conceded that he never paid Bedasie or Diaz overtime. (Id. at 543). According to Andreopolos, he would tell the accountant how many cars each scout had and the accountant would then calculate the taxes and give Andreopolos the net amount owed. (Id. at 546-47). The accountant would then indicate how much to write the checks for. (Id. at 547). He testified that the pay stubs admitted into evidence were prepared by the accountant based on information provided by Andreopolos. (Id. at 550). He claimed that in the beginning, he started giving the scouts "pay stubs and stuff" but "[t]hey threw them out." (Id.)

When asked if there was a period of time that Mr. Bedasie was out due to an accident,

_____

[10]The Court notes that Hurricane Sandy hit New York in late October, early November of 2012. While flooding from the hurricane may explain the absence of records created prior to that date, it does not explain why defendants failed to maintain the proper employment records thereafter.

Andreopolos testified that he did not remember, but when shown some notes,[11] he claimed that Bedasie was out from July 2008 until January 2010. (Id. at 494-95). Andreopolos testified that he was "not sure" how Bedasie came back; "I believe he rehired, yeah. I'm not sure." (Id. at 495). Andreopolos never explained what the basis for the notes were upon which he testified that Bedasie was not working for a year and a half. He did state that Bedasie had multiple lawsuits and he "was constantly in and out, and that's why one of the reasons that they work on commission is that to have the option to leave and come whenever they want." (Id. at 495). He also claimed that every Thursday night, both Bedasie and Diaz would come in at 10:00 p.m. and figure out their daily hits. (Id. at 496). According to Andreopolos, they wanted to leave early and not go out to get additional cars, and he testified that they did not want to work on Fridays because "it's dry," meaning there were very few cars to tag. (Id.) Again, however, he had no records to corroborate these statements.

Despite his problems remembering dates and times when it came to his wife's accident and arrest, Andreopolos was adamant that neither Bedasie or Diaz had "ever work[ed] more than 40 hours a week." (Id.) He also testified that from 2007 to 2013, Mr. Z was closed for snow days "offhand I can say in a year about four, five, six, maybe more" days. (Id. at 516). Also, he testified that when there was a computer failure, Mr. Z would shut down. (Id. at 517). Although he testified that "I don't know" when asked how many days would be lost to computer failure, he later stated that it would be "way more than five" a year. (Id.) He then testified "at least 10, 20

_____

[11]It was unclear who created these notes, when they were created, or what the basis for the dates written on the notes were since Andreopolos conceded that he had no specific recollection, nor did he have any records created at the time that were ever offered into evidence. The Court finds this testimony has little, if any, credibility.

times" for every year except 2013 when they got new computers.  (Id.)  He also claimed that Mr. Z would close for two weeks during Christmas, and also for Thanksgiving, July 4th, Martin Luther King Day and Election Day.  (Id. at 518-19).  He denied that if a federal holiday fell on a Monday, they would then work the Friday before.  (Id. at 519).  He also testified that usually when there was a holiday, they would not work the day before because there was no way to redeem the vehicles the next day.  (Id.)

When asked about vacations, Andreopolos testified that Bedasie was gone about a week to ten days per year; "same thing" for Diaz and Rosario.  (Id. at 520).  According to Andreopolos, Mr. Z was closed for two to three weeks after Hurricane Sandy.  (Id.)  He explained that the scouts were not paid for that period because they were not towing cars.  (Id. at 521).

When asked about Diaz, Andreopolos testified that he hired Diaz because he knew Diaz's father for over 30 years.  (Id. at 483).  According to Andreopolos, when he interviewed Diaz, he had no skills and no prior experience in the towing industry.  (Id.)  He could not recall if he hired Diaz originally to work in the staging area; "[o]ver the years I have hired hundreds of people." (Id. at 484).  He did know that when Diaz was hired as a scout, he was paid a straight commission of $25 per car towed.  (Id. at 484).  According to Andreopolos, every company in New York City that was involved in the scofflaw program paid by the car.  (Id.)  "Why? Because it's people they were making their own time.  They would come in whenever they want, as they please . . . . they wanted to put hours and get more hours and that's actually what's happening." (Id.)  He explained that he paid Diaz $25 a car because "the kid was just starting out.  He couldn't make money and I gave him the incentive to go and get more cars and plus I knew his father. . . ." (Id. at 486).  According to Andreopolos, there were problems with Diaz's job performance; "every day, every

marshal . . . everybody fired him." (Id.)  When asked why he rehired Diaz, Andreopolos testified that it "[d]idn't cost me nothing" because they made their own time and every additional car was more for him.  (Id. at 486-87).

Mr. Andreopolos testified that "[f]rom the day he started to the day that he finish, about two times a week, I'm not sure if it was Tuesday or Friday, but every day he was – every day they had auction, he [Diaz] would take off and go with his father to auctions." (Id. at 490).  According to Andreopolos, when this happened, Andreopolos "had to replace him;" whoever was available would fill in.  (Id.)[12]

e) <u>Frank Evangelista's Testimony</u>

Frank Evangelista testified that he has worked for Mr. Z since 2008 as a tow truck driver and manager.  (Id. at 262-63, 282).  On cross-examination, he first testified that he worked daily "Monday through Thursday," from 3:00 a.m. until the last car was brought in, roughly "two, three o'clock in the afternoon." (Id. at 283).  He later testified that he only worked that schedule on Monday and Tuesday, and that on Wednesdays and Thursdays, he would start work at 3:00 p.m. and work until midnight.  (Id.)  On Fridays, he worked from 5:00 or 6:00 a.m. until 12:00 in the afternoon.  (Id.)  He testified that the scouts had no schedule; "they came and went as they pleased." (Id. at 285).

He testified that he knew both Diaz and Bedasie and that there were times when he would call them on the radio during the day and they were not working or they would disappear.  (Id. at 265).  He claimed that "maybe like once, twice a week Diaz wouldn't show up.  He'd go to

---

[12]Defendants had no records to corroborate this testimony.

auctions with his father or he'd go sell cars that he bought at the auction." (Id.) Evangelista stated that it "could have been any day. It was usually twice a week. . . . no specific days or anything." (Id. at 266). He testified that there were days when Diaz did not come in at all or would "just disappear." (Id.) However, he provided no corroboration for this testimony and could not be more specific as to when during a shift, Diaz would disappear, or how often Diaz did not come in at all. Evangelista also testified that there were times when Diaz was caught sleeping on the job; it happened on more than one occasion. (Id. at 268-69). According to Evangelista, Diaz was terminated from the company because he was not producing. (Id. at 270-71).

Evangelista also testified that there were times when Bedasie failed to show up for work as well. (Id. at 267). He testified that Bedasie "was involved in lawsuits, so he wouldn't show up for work due to accidents." (Id.) According to Evangelista, Bedasie was out of work for a year and a half, from July of 2008 to January 2010. (Id. at 267-68). He also testified that on Mondays, Bedasie and Diaz would come in early at 11:00 a.m. and leave early even though the shift ended at 3:00 p.m. (Id. at 272).

On cross-examination, Evangelista explained that the marshals wanted certain scouters terminated because when they came in, tagged five cars and then left at 9:00 p.m., the marshal would have nothing to do. (Id. at 286). He testified that his job was to pick up the cars when the marshal came in. (Id. at 288). The marshal would tell him where to go and he would get in his tow truck, pick up the car, bring it back to the staging area and drop the car off there. (Id. at 288-89).

Evangelista also conceded that on one occasion, Marshal Finardo planted money in a car

and accused Evangelista of stealing it. (Id. at 291). Evangelista claimed that although Finardo reported it to Andreopolos, Evangelista was never disciplined for stealing the money, and he denied having taken it. (Id. at 292, 293).

With respect to the periods when the computers shut down, Evangelista testified that scouters could not check the cars so they "waited it out until they came up, if they ever came up." (Id. at 274). Evangelista testified that Mr. Z was shut down "for about three weeks" after Hurricane Sandy. (Id. at 279). He also testified that "none of the scouters worked 40 hours a week." (Id.) On average, he testified that they worked "maybe eight hours a day," and on Fridays, neither Mr. Diaz or Mr. Bedasie worked. (Id. at 280).

f) Mohammad Ali's Testimony[13]

Defendants also called Mohammad Ali, who worked as an administrative manager for Mr. Z beginning in 2003 until mid-2012. (Id. at 301). Ali testified that one of his main responsibilities was to speak to the scouts over a Nextel Direct Connect cell phone. (Id. at 302). According to Ali, he was the manager during the time that Evangelista had also testified that he was the manager.[14] (Id. at 301). According to Ali's testimony, from 2008 until 2013, Evangelista

---

[13]Mr. Ali was only identified in the Pretrial Order as having information regarding the days that Mr. Z was closed – federal holidays, days the computer was down, snow days, and Fridays – the fact that employees were paid on a commission basis, and discussions with the plaintiffs about their salaries. Thus, the Court limited Mr. Ali's testimony and would not allow him to address the hours worked by plaintiffs because that was not disclosed as part of his testimony during discovery or in the Pretrial Order. (Tr. at 306-07).

[14]Ali testified that his duties as the manager included administrative tasks such as maintaining paperwork for each vehicle that would be picked up, preparing inventory or damage reports, and keeping daily logs of the vehicles. (Tr. at 301). He also testified that as the "main tow run manager," Evangelista would perform Ali's duties any time Ali wasn't around. (Id. at

was "the main tow run manager." (Id. at 303).

When asked if Bedasie or Diaz worked Fridays, Ali testified that "[u]sually they didn't." (Id. at 308). He explained that he knew this because "it was just recollection; that if we're working on Fridays, don't expect to see them there." (Id. at 309). He testified that the company would close on snow days. (Id. at 311). From 2007 through 2012, he stated that they would close between 10 and 15 days in January, February, and December. (Id. at 311-12). When asked if this was every year, he admitted: "It's difficult to answer that. Some years there were less." (Id. at 312). When asked what happened when the computer system went down, Ali testified that "it was pretty much extra free time so they could do whatever they want. They would go home, they would disappear." (Id. at 314). He stated that the system would go down "a couple of times a month." (Id.) As for federal holidays, he testified that Mr. Z was closed on the Fourth of July, Memorial Day, Veterans Day, Thanksgiving, Christmas, and the Jewish holidays. (Id. at 314-15). He also denied that when a federal holiday fell on a Monday, that they would work on Friday to make up for it. (Id. at 314).

Ali also testified that there were times when the marshals left early. (Id. at 316). He recalled this because "I would get happy that, all right, I get to go home early too, during the evening hours." (Id.) He could not be more specific as to when or how often this occurred.

---

303). However, Andreopolos testified that Ali's duties were much broader, testifying that "[Ali's] role was to manage the scouts, the drivers, whatever he could, the office work, work with the marshal." (Id. at 482). Although Evangelista testified that he did not do the paperwork and that the paperwork was usually done by "Hellen or Mohammed or Frank Andreopoulos" (id. at 263), he also testified that his job as manager entailed making sure "everybody's in, the trucks are all ready to go, everything's in order to start the day," which overlaps with some of the duties Andreopolos attributed to Ali as manager. (Id. at 263).

Ali testified that the scouts were paid on a commission basis for each car towed in.  (Id. at 317).  If no cars were towed, the scouts would not get paid.  (Id.)  Ali testified that at the end of every week, Bedasie and Diaz would come in with "their own little notebooks" and write down the cars that they had tagged; "they kept their own log, basically."  (Id. at 318).  Ali would take their books and compare them to the daily tow log, and then Ali would give the number of towed cars to Andreopolos, and he would cut the check.  (Id. at 319).  According to Ali, Bedasie was paid $15 per car and Diaz was paid $25 per car.  (Id. at 320).

Ali testified that there were times when cars were called in by Diaz or Bedasie but the car would be gone once the marshal appeared to tow it, and it was later determined that the scout had called the same car in the day before.  (Id. at 322-24).  He also claimed that Diaz "would get fired at least, like once every couple of months."  (Id. at 324).[15]  On cross-examination, Ali conceded that during the period of 2007 to 2008, he was taking classes three days a week, Tuesday, Wednesday and Thursday, five hours a day, and only working part time.  (Id. at 333-34).  He could not answer counsel's question as to when Diaz began working at Mr. Z or exactly what position Diaz was initially hired for, testifying that Diaz was "initially hired as either the stage person or working in the yard at the gate or something."  (Id. at 336).  When asked if there were any records, Ali testified that the "only records that I would know of would be the pay stubs."  (Id. at 337).  Ali indicated that "[n]obody knew how many hours they worked, they would come and

---

[15]Like much of defendants' testimony, the witnesses could not be more specific as to when these events occurred and there were no records presented to clarify dates and times. While defendants presented a number of witnesses who complained about the plaintiffs' performance issues, it is impossible to quantify this testimony in a way that would allow for incorporation into the damages analysis.

go as they please." (Id. at 338).

   g) Hellen Mustakas' Testimony

Hellen Mustakas testified for defendants. She explained that she used to be the office manager for Mr. Z beginning in 2000, continuing off and on until 2007 when she had a couple of miscarriages, and was falsely arrested and out for six months. (Id. at 346). She also suffered a "very bad accident" in July 2012 and was out for eight or nine months. (Id. at 346-47). She testified that although she was in the office when Diaz was hired, her husband[16] was the one who hired him, issued the paychecks, and determined the salaries.[17] (Id. at 349-50).

She testified that Bedasie was paid $15 per car and Diaz was paid $25 per car; Rosario was paid minimum wage of $7.25 plus overtime. (Id. at 352). Mustakas testified that when Diaz and Bedasie were offered their positions, they were given the option of being paid by the number of cars tagged or $7.25 an hour plus overtime. (Id. at 377, 463). She testified that they chose to be paid by commission because they would make more money. (Id.) She also denied that Bedasie or Diaz ever worked more than 40 hours a week, because the marshals would complain that they could not be found. (Id. at 352-53).[18]

---

[16]According to Mustakas, she married Frank Andreopolos in 2005. (Id. at 350; see also id. at 459).

[17]When confronted with earlier deposition testimony in which she had stated that she was involved in hiring Bedasie, Mustakas stated that she "must have misunderstood the question, meaning that did I interview him." (Id. at 462). However, she was asked specifically in her deposition as to whether she interviewed him, to which she answered "[n]ot that I recall." (Id.)

[18]Defendants attempted to introduce a chart that had been prepared from records subpoenaed shortly before trial. (See discussion at Tr. 354-61). Since the records had not been disclosed to plaintiffs prior to the trial, the Court disallowed the testimony of Mustakas based on the chart she had prepared from the records. (Id.)

Mustakas testified that there were times when the office was closed due to snow days and computer failure. (Id. at 362). She estimated that in 2011, Mr. Z was shut down for nine or ten days because of bad weather and that they were closed for three weeks due to Hurricane Sandy and the flooding that occurred in the office. (Id. at 362). She also testified that Marshal Rivera showed her pictures of Diaz sleeping and disappearing when he was supposed to be working. (Id. at 371). As a result, Diaz was terminated in 2009, but came back to work "a few days afterwards." (Id. at 372). She testified that although Bedasie was reprimanded, he was not terminated. (Id. at 373).

According to Mustakas, Diaz would go on Tuesdays and Fridays with his father to auction and she knew this because "a couple times when we call him to see where he was at, he said 'I'm at the auctions with my dad.'" (Id. at 373). She also testified that "between nine, ten or eleven in the morning on Mondays and Tuesdays," they could not reach Diaz or Bedasie. (Id. at 375). Although she agreed with counsel's question that this "was pretty much a set thing," she could not be more specific as to when either of these things occurred nor did she specify how often they occurred.

With respect to vacations, Mustakas testified that Bedasie would take two weeks every year. (Id. at 382). She testified that he had an accident and was out of work from July 2008 until January 2010. (Id. at 386). She also claimed that he took off days from work in 2010 to deal with a malpractice case that he was pursuing; he was not paid during these time periods. (Id. at 386). She estimated it was two or three days for a few weeks. (Id. at 387). As for Diaz, she stated that he took two vacations in total during the years 2011 and 2012. (Id. at 385). She also testified that

24

Mr. Z was closed for two weeks during Christmas. (Id. at 382). According to Mustakas, Mr. Z was also closed on Columbus Day, Presidents Day, Labor Day, Memorial Day, Election Day, New Year's Day, and Thanksgiving. (Id. at 383). She also claimed that they would not work the prior Friday before a Monday holiday. (Id. at 384).

On cross-examination, she conceded that she did not keep track of the days that the scouts worked or when they were hired, fired or stopped working. (Id. at 464). She testified that she would write down the schedules based on what the marshal told her, but that she did not prepare the schedule for Rosario. (Id.) This contradicted defendants' Responses to Interrogatories, Exhibits 11 and 19, where defendants had identified Mustakas as one of the people responsible for determining Rosario's schedule. (Id. at 466; Exs. 11, 19, Question 15). She testified that Rosario would begin working when the marshal started and he would end work when the last car was picked up. (Tr. at 467). She conceded that at times, he would deliver forms to the precinct. (Id.) She indicated that when he reported his finishing time, it could be to the minute – "12:40, 12:41." (Id. at 468). She conceded that he might have worked 50 hours a week on occasion, but stated "I don't think so" when asked if he ever worked 60 hours or 70 hours in a week. (Id. at 468-69).

Contrary to earlier testimony from Andreopolos, Mustakas initially responded "yes" when asked if the company began tracking the times of its employees after Raphael Rivera brought a lawsuit against Mr. Z in August 2012. (Id. at 469). Then, after looking at her husband across the courtroom, she responded, "No" to the repeated question. (Id. at 469-70). She then admitted that even though there was a lawsuit pending, the company would still discard all of its records at the end of the week. (Id. at 472).

h) Marshal Alejandro Finardo's Testimony

Defendants' final witness was Marshal Finardo, who testified that from 2009 to the present, he has worked as a marshal for New York City. (Id. at 396). In the beginning of his employment, he worked with Mr. Z two days a week until gradually, in late 2009, 2010, it became four or five days a week. (Id. at 396-97). On Mondays and Tuesdays, he worked the early morning shift, from 3:00 a.m. until 3:00 p.m.; on Wednesdays and Thursdays, he worked late afternoon, starting at 3:00 p.m. until around midnight. (Id. at 397). He also stated that they would work Fridays, "sporadically," depending on several factors. (Id. at 398). He testified that if there was a holiday on a Monday, he may work Friday, depending on how busy they were. (Id.) Also, if there was bad weather, they may work Fridays to make up for it. (Id.)

He testified that they would close down for snow days based upon the decision of the City. (Id. at 398-99). He could not estimate how many days per year, testifying that "[e]very year was different." (Id. at 399). When the computer went down, they would stop all operations and resume when it came back on. (Id.) He explained that if the computer broke down near the end of the day, they "would probably call the day at that time." (Id. at 400). He also stated that the schedule for the entire week was predetermined by the program marshals and the hours were essentially the same. (Id. at 401). When asked if a vehicle was reported and then "GOA," meaning "gone on arrival" or no longer there by the time the marshal arrived, the marshal would "give the scouts the benefit of the doubt," concluding that the vehicle's owner had left the scene before the car could be towed. (Id. at 405). Marshal Finardo did not completely agree with counsel's contention that if a car was GOA, and efforts were unsuccessful to contact the scouts,

that it meant the scouts were not working.  (Id. at 406).  Instead, he indicated that there may be several possible reasons why the scouts did not respond, including that the phone was off, they were away from the phone, using the bathroom, but if they never called back, "one can easily derive they're no longer working."  (Id. at 407).

When asked if he had reprimanded Bedasie about leaving early, he testified that there may have been "one time" when they had a disagreement about the hours or leaving early, "maybe once."  (Id. at 408).  As for Diaz, Finardo testified that there were a "couple of occasions" when he discussed not working in the proper area, leaving early, or not being out when he was supposed to be, but the marshal stated that between the two plaintiffs, "it was less than one handful in the years that I worked."  (Id.)  He also denied ever suspending Diaz; "I didn't have the authority to suspend anybody."  (Id.)  He also stated that while he sent Diaz home on occasion, it was no "more than a handful of occasions."  (Id.)

Marshal Finardo testified that he did not know the exact hours that any of the plaintiffs worked and he denied having any records because they were not his employees.  (Id. at 410-11).  When shown his affidavit which stated that Bedasie and Diaz worked "approximately the same hours as me," Finardo confirmed that the information provided in response was accurate because it was approximate.  (Id. at 413-14).  He clarified that he did not know "exactly what time . . . they [came] in," but he had an idea based on their hits.  (Id. at 414).  He conceded that he had no records and could not testify as to what shifts they had worked on any given day in earlier years.  (Id. at 415).

When asked by defense counsel about an affidavit prepared by defense counsel that he

refused to sign, Finardo explained that "it was full of things I was not aware of.  And I amended it to this form, this affidavit, that I prepared or assisted in and I signed this and I submitted it to you."  (Id. at 420).

When asked if Diaz took off on Tuesdays or Fridays to go to auctions with his father, or left work early, Finardo said that he "wouldn't know for sure, no."  (Id. at 425).  He assumed the scouts were paid by commission, but did not know for sure; he did not know if they were entitled to overtime.  (Id. at 427).  He also assumed they took time off for lunch, but conceded that he had no way of knowing whether or not they did.  (Id. at 428).

On cross-examination, Finardo declined to estimate the number of Fridays that they would work in a month, declaring that "[i]t would be pure speculation . . . ."  (Id. at 433).  He did testify that because there were already hits logged when he started working, he surmised that the scouts had been out before him.  (Id. at 434).  Finardo also testified that "I don't recall any extended period of time in which [Bedasie] did not work when I was working with Mr. Bedasie that may have been longer than a month.  I do not recall."  (Id. at 437).

When asked if he ever had to reprimand Evangelista, whom he described as a tow truck driver, Finardo testified that there had been complaints about things missing from vehicles and he began an investigation.  (Id. at 438).  Finardo consulted with Andreopolos and conducted an "integrity test."  (Id.)  Finardo explained how he had planted money under the seat of the front passenger vehicle, told Evangelista that he had left his flashlight inside, and then later, after Evangelista had looked in the car, Finardo checked the vehicle only to see that the money was missing.  (Id. at 439).  According to Finardo, Mr. Z fired Evangelista after this, although he was

hired back at some time.  (Id. at 442).

    i)  <u>Gary Rose's Testimony</u>

Marshal Rose was called by defendants.  He testified that he had been a City marshal since 2005, responsible for seizing vehicles with outstanding tickets.  (Id. at 447).  He worked with Mr. Z from April 2006 through December 2007 and only on Mondays.  (Id. at 448).  He stated that he would normally get in at 3:00 a.m. and end work around 3:00 p.m.  (Id. at 449).  Prior to 2009, there was no towing on Fridays.  (Id. at 448).  He denied knowing Bedasie and Diaz by these names.  (Id. at 451).  He testified that he "wasn't really aware of when scouts showed up or didn't show up."  (Id. at 452).  He explained that he did not check up on the scouts, did not have contact with the scouts, and did not know what their specific arrangements were with respect to pay.  (Id. at 453).

When asked if he ever left early between October 2007 and December 2008, Marshal Rose testified that he could not say, but that "70 to 75 percent of the time I would end up leaving before three o'clock."  (Id. at 457).


<u>PROCEDURAL BACKGROUND</u>

Plaintiffs Bedasie and Diaz commenced this action on October 2, 2013, alleging various violations of the FLSA and the NYLL.  On November 20, 2013, plaintiffs filed an Amended Complaint that included the claims of Rosario.  The parties engaged in pretrial discovery and settlement negotiations were held before the Honorable Marilyn D. Go.  On August 14, 2015, the Honorable Carol B. Amon granted partial summary judgment to plaintiffs as to their claims under

Section 195(3) of the NYLL for wage statement violations, leaving only the following disputed claims:  (1) claims for unpaid minimum wages on behalf of plaintiffs Bedasie and Diaz; (2) claims for unpaid overtime wages for all three plaintiffs; (3) claims for unpaid spread-of-hours wages for plaintiffs Bedasie and Diaz; (4) liquidated damages for all unpaid wages; (5) prejudgment interest; and (6) attorneys' fees.[19]

On January 19, 2016, after numerous attempts to settle the remaining claims proved fruitless, the parties consented to proceed before the undersigned for a bench trial, which was held from May 2, 2016 to May 5, 2016.  Following the conclusion of the trial, the parties submitted post-trial memoranda summarizing their respective positions on the evidence.

In their Post-Trial Memorandum of Law, dated June 27, 2016, plaintiffs argued that:  1) all three plaintiffs were "employees" for purposes of the FLSA and NYLL (Pls.' Post Mem.[20] at 15, 17-18); 2) defendants Mr. Z, Andreopolos, and Mustakas were "employers" as defined by the FLSA and NYLL (id. at 14, 17); 3) defendants failed to keep records of plaintiffs' hours worked and minimum and overtime wages paid (id. at 18, 19); 4) defendants' violations of the FLSA were willful (id. at 15, 18); 5) plaintiffs Bedasie and Diaz were not paid proper amounts in minimum, overtime and spread-of-hours wages (Pls.' Post Stmt. Dam.[21] at 1-9, 9-16); and 6) plaintiff Rosario was not paid the proper amounts of overtime wages.  (Id. at 17-22).  Plaintiffs argue that

---

[19]Since plaintiffs have not requested attorneys' fees nor filed supporting documentation pending this Court's determination of the issues presented at trial, the Court has not addressed attorneys' fees at this time.

[20]Citations to "Pls.' Post Mem." refer to Plaintiffs' Post-Trial Memorandum of Law, dated June 27, 2016.

[21]Citations to "Pls.' Post Stmt. Dam." refer to Plaintiffs' Post-Trial Statement of Damages, filed on June 27, 2016, attached as Exhibit A to Pls.' Post Mem.

defendants should be held liable for $128,073.42 in damages as follows:

1) For Plaintiff Bedasie:

| 2007-2013: | Minimum Wages | $ 4,496.30 |
| | Overtime Wages | $19,325.11 |
| | Spread-of-Hours | $ 1,195.46 |
| | Subtotal: | $25,016.87 |

| Plus: | NYLL Liquidated Damages | $13,847.68 |
| | FLSA Liquidated Damages | $13,096.69 |
| | Interest | $ 7,770.42 |
| | Total Damages: | $59,731.67[22] |

2) For Plaintiff Diaz:

| 2009-2013: | Minimum Wages | $ 2,096.16 |
| | Overtime Wages | $11,981.39 |
| | Spread-of-Hours | $ 655.07 |
| | Subtotal: | $14,732.62 |

| Plus: | NYLL Liquidated Damages | $ 9,542.27 |
| | FLSA Liquidated Damages | $10,543.35 |
| | Interest | $2,486.94 |
| | Total Damages: | $37,305.17[23] |

3) For Plaintiff Rosario:

| 2008-2013: | Overtime Wages | $13,084.50 |

| Plus: | NYLL Liquidated Damages | $ 7,013.25 |
| | FLSA Liquidated Damages | $ 7,120.50 |
| | Interest | $ 3,818.33 |
| | Total Damages: | $31,036.58[24] |

---

[22]Pls.' Post Mem., Ex. 1.

[23]Pls.' Post Mem., Ex. 2.

[24]Pls.' Post Mem., Ex. 3.

Defendants' post-trial submission did not address plaintiffs' proposed damages calculations, arguing instead that because plaintiffs lacked credibility, their evidence on damages should be disregarded in its entirety. Defendants contend that all three defendants "lied about [Mustakas] being the boss." (Defs.' Post Mem.[25] at 5, 6-11). In arguing that Rosario is not entitled to any relief, defendants detail a number of lies that they contend are sufficient grounds to disregard his testimony in its entirety: 1) "Lie I:" "when testifying about his salary at trial he clearly perjured himself" because his testimony about when he received certain raises differed from the dates set forth in the amended complaint (id. at 12-13); 2) "Lie II:" the evidence of the amount of pay received does not reflect his testimony regarding salary and raises; "[i]t is clear after a quick examination of . . .checks and pay stubs that Mr. Rosario is blatantly lying" (id. at13-16); 3) "Lie III:" Rosario is lying when he testifies. . .that he never gave [his employers] any information to assist in the calculation of his paycheck" (id. at 16-17); 4) "Lie IV:" "the lies keep rolling in and they get stupider and stupider" in that Rosario lied about speaking to his friends about suing (id. at 17-18); 5) "Lie V:" that Andreopolos did not participate in hiring Rosario; 6) "Lie VI:" that Rosario was only out of work for a week due to Hurricane Sandy (id. at 19-20); and 7) "Lie VII:" Rosario lied about Mustakas being the boss. (Id. at 20).

Similarly, defendants argue that Bedasie also lied about so many significant issues that his testimony should be disregarded in its entirety and that he is not entitled to any relief. Specifically, defendants claim that Bedasie lied about the following: 1) "Lie I:" he "fraudulently misrepresented that he doesn't remember the details of his accident. . ." (id. at 21-23); 2) "Lie II:"

---

[25]Citations to "Defs.' Post Mem." refer to Defendants' post-trial memorandum of law, filed on June 27, 2016.

he lied about Andreopolos having no role in hiring Bedasie (id. at 23-24); 3) "Lie III:" he lied about his salary including $50 per day plus gas (id. at 24-26); 4) "Lie IV:" he lied when he claimed he worked every other Friday from 2009 to 2013 (id. at 26-27); 5) "Lie V:" he lied about working more than 40 hours a week and not being compensated properly (id. at 27-34); 6) "Lie VI:" he lied about the Rivera lawsuit (id. at 34-35); 7) "Lie VII:" he lied about how he decided to sue (id. at 35-36); 8) "Lie VIII:" he lied about Mustakas being the boss (id. at 36); and 9) "Lie IX:" he lied about not knowing that Diaz was suspended. (Id. at 36-37).

Defendants argue that Diaz also lied:  1) about how he got the job (id. at 38-39); 2) about his memory being better now than it was at his deposition (id. at 39-40); 3) about his lunch breaks (id. at 40-41); 4) about the Rivera lawsuit (id. at 41-41); 5) about not colluding to hire plaintiffs' attorneys (id. at 42-43); 6) about working more than 40 hours per week and not being compensated properly (id. at 43-49); 7) about friends telling him to sue (id. at 49-50); 8) about time off during Hurricane Sandy (id. at 51-52); 9) about his car being tagged by Marshal Rivera (id. at 52); and 10) about his salary being $20 per car whereas defendants claim he was paid $25 per car tagged.  (Id. at 53-54).

Defendants argue that defendants' witnesses were more credible than plaintiffs; that as a result, plaintiffs should not be awarded any damages; and that Mustakas was not a manager for purposes of imposing liability upon her as a defendant.  (Id. at 64)

DISCUSSION

As noted above, prior to trial before the undersigned, Judge Amon granted partial summary judgment to plaintiffs and made certain findings. Accordingly, the Court first identifies the findings made by Judge Amon that continue to govern as the law of the case.

I. Law of the Case

The "law of the case" doctrine stands for the proposition that "a decision regarding an issue of law made at one stage of a litigation becomes binding precedent, to be followed in subsequent stages of the same litigation." Firestone v. Berrios, 42 F. Supp. 3d 403, 411 (E.D.N.Y. 2013) (quoting Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC., 152 F.R.D. 18, 24 (S.D.N.Y. 1993)). Thus, absent "cogent" or "compelling" reasons, a court should continue to adhere to decisions made previously in the same case. United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991). Such "cogent" or "compelling" reasons include "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." DiLaura v. Power Auth. of N.Y., 982 F.2d 73, 76 (2d Cir. 1992) (quoting Virgin Atl. Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245, 1255 (2d Cir.), cert. denied, 506 U.S. 820 (1992)).

In her Memorandum and Order granting plaintiffs partial summary judgment, Judge Amon expressly held that Mr. Z was an "enterprise engaged in commerce" and thus, was subject to the

minimum wage and overtime provisions of the FLSA.  (See 8/14/15 Order[26] at 2 n.2).  Judge

Amon also found that plaintiffs Bedasie and Diaz were paid at least in part based on the number

of cars they tagged each week.  (Id. at 3).  Plaintiff  Rosario, on the other hand, was paid by the

hour.  (Id. at 4).  Finally, Judge Amon found defendants liable for wage statement violations and

accordingly awarded each plaintiff $2,500 in damages.  (Id. at 8).

Upon review of the record, the Court finds that no new evidence has been introduced, nor

has there been any intervening change in the law, that would warrant revisiting any of these

findings.  Accordingly, the Court treats Judge Amon's findings as the law of the case for all

purposes.


II.  Liability under the FLSA and NYLL

A.  Legal Standard

Plaintiffs who bring claims under the FLSA must prove that:  1) defendants are employers

subject to the FLSA; 2) plaintiffs are employees within the meaning of the FLSA; and 3) the

employment relationship is not subject to any of the exemptions under the FLSA.  Drozd v.

Vlaval Constr., Inc., No. 09 CV 5122, 2011 U.S. Dist. LEXIS 156415, at *12 (E.D.N.Y. Oct. 18,

2011).  Plaintiffs who bring claims under the NYLL must prove that:  1) plaintiffs were

employees and 2) defendants were employers.  Garcia v. Chirping Chicken NYC. Inc., No. 15 CV

2335, 2016 U.S. Dist. LEXIS 32750 *17-18 (E.D.N.Y. Mar. 31, 2016).

---

[26]Citations to "8/14/15 Order" refer to the Memorandum and Order issued by Judge
Amon on August 14, 2015, filed as document 43 on the public docket.

B. <u>Status as "Employer"</u>

In this case, Judge Amon found that Mr. Z was an "enterprise engaged in commerce," and therefore an employer who was subject to the minimum wage and overtime provisions of the FLSA. (<u>See</u> 8/14/15 Order at 2 n.2). She made no findings as to the employer status of the individual defendants.

In order for the individually named defendants, Andreopolos and Mustakas, to be held liable for violations under the FLSA and NYLL, they must be considered employers within the meaning of those statutes. In <u>Herman v. RSR Securities Services, Ltd.</u>, the court held that "the overarching concern" for determining whether an individual was an "employer" under the FLSA was whether "the alleged employer possessed the power to control the worker in question. . . ." 172 F.3d 132, 139 (2d Cir. 1999). Under this economic reality test, courts consider whether the person had the power to: 1) hire and fire employees; 2) supervise and control work schedules and conditions of employment; 3) determine the rate and method of pay; and 4) maintain employment records. <u>See</u> <u>id.</u> Moreover, courts must examine the totality of circumstances and no single factor is exclusive or dispositive. <u>Id.</u>

Although the Second Circuit and the New York Court of Appeals have not decided whether the tests for "employer" status are the same under the FLSA and the NYLL, district courts in this circuit have adopted a similar standard for both statutes. <u>See</u> <u>Vasto v. Credico (USA) LLC</u>, No. 15 CV 9298, 2016 WL 4147241, at *5 (S.D.N.Y. Aug. 3, 2016) (holding that "[t]he standard for employer status under the NYLL appears nearly if not wholly identical to that of the FLSA . . . . [D]istrict courts in this Circuit have consistently interpreted the definition of

'employer' under the New York Labor Law coextensively with the definition used by the FLSA).

The Court finds defendant Andreopolos to be an employer within the meaning of the FLSA and NYLL. In their Joint Pretrial Order, the parties stipulated that Andreopolos was the vice-president and owned 50% of Mr. Z. (JPTO at 5). The parties also stipulated to the fact that "Andreopolos supervised plaintiffs, set their wages, and had the authority to hire and fire them." (Id.) Andreopolos himself testified at trial that: "My job function was to run the business, hire and fire people, drive with the marshal, do paperwork." (Tr. at 480). The evidence clearly indicates that Andreopolos had the power to hire and fire employees, supervise and control work schedules, determine rates of pay, and maintain employment records, making him an employer under the FLSA and NYLL.

As for the other named defendant, Hellen Mustakas, plaintiffs allege that Mustakas was an "employer" within the meaning of the FLSA and the NYLL, while defendants argue that Mustakas was merely an employee. Specifically, defendants claim that she was just "a girl Friday, an assistant, and that she came in many times just to fill in if help was needed." (Defs.' Post Mem. at 8). Defendants argue that Mustakas did not have any involvement in the day-to-day activities of the company, and was only an assistant who came in from time to time. (Id. at 8). They contend that because Mustakas did not receive regular reports on sales or payroll, did not sign corporate checks, did not hire employees, and did not supervise employees or determine rates of pay, she does not qualify as a statutory employer. (Id. at 9). Defendants also refer to the testimony of Mohammad Ali, Mr. Z's administrative manager from 2003 to 2007, who testified that Hellen Mustakas did not have the authority to interview or hire anyone: "She wasn't the owner, manager, assistant manager. She was never put in charge of hiring or firing." (Tr. at 341).

Plaintiffs argue that Mustakas was an employer subject to the requirements of the FLSA and the NYLL based on the testimony provided by several witnesses at trial. (Pls.' Post Mem. at 14). First, plaintiffs point to the testimony of Bedasie who stated that Mustakas conducted his interview, described the job duties to him, and told him what his pay rate would be. (Tr. at 18-19). Plaintiff Diaz also testified that Mustakas was the one who hired him to be a stager and informed him of his rate of pay. (Id. at 102). Plaintiff Rosario testified that he met with Mustakas when he was hired to work for the company and that while her husband was present, he did not conduct the interview. (Id. at 191). Plaintiffs argue that defendant Andreopolos himself testified that Mustakas was a manager at Mr. Z. (Pls.' Post Mem. at 14 (citing Tr. at 481)). Finally, plaintiffs refer to the testimony of Marshal Rose, who testified that, as part of Mustakas' duties, she would "move staff around depending on what the needs were on a given day." (Tr. at 455).

Examining the totality of the testimony and evidence before the Court, the Court finds that even if Mustakas was present during the plaintiffs' interviews and may have even conducted the interviews and described the job responsibilities and pay, the evidence presented does not support a finding that she had the power to make the hiring and firing decisions or set the rates of pay without the input of her husband. Gary Rose, a City marshal who worked in conjunction with Mr. Z, and who was a disinterested witness in the case, described the variety of functions that he had observed Mustakas perform, including setting up the computers in the morning, making sure everything was running, and filling in if someone failed to come in to work. (Tr. at 455). He explained: "like [if] someone that did the paperwork didn't show up[,] she would come in and she'd move staff around depending on what the needs were on a given day." (Id. at 455).

His testimony was corroborated by the testimony of Mohammad Ali, the manager of Mr. Z

from 2003 to 2007, who testified that part of Mustakas' tasks included helping out with paperwork, helping out others in the office with errands, and answering the phones. (Id. at 340). Ali claimed that Mustakas "couldn't" interview anyone for employment purposes and he testified that "she was never put in charge of hiring of firing," explaining that defendant Andreopolos was in charge of hiring or firing. (Id. at 341). Defendant Andreopolos explained that while Mustakas may have been present during the job interviews, "[i]t's a small trailer. Everybody's next to me. There's not only Hellen, there's other–Latisha was there, Wendy was there, Felix Rodriguez was every time there. They [*sic*] doesn't mean they have any right to hire and fire." (Id. at 482-483).

In addition, the testimony of Frank Evangelista, the manager of Mr. Z from 2008 onwards, further corroborates defendants' claim that Mustakas did not wield actual authority over hiring and firing. (Id. at 276-78). Evangelista testified that during the period he was the manager of Mr. Z, Mustakas had participated in the act of hiring of firing certain people and that he had heard her say, "You're hired" or "You're fired." (Id. at 276). However, he also testified that, "Me, Fotios and Hellen were in the office and . . . Fotios[27] would talk to them, but Hellen had no decision on hiring and firing." (Id. at 277). The Court interprets Evangelista's testimony to mean that while Mustakas may have spoken to certain employees regarding their employment status, she did not wield the actual authority to determine or alter an employment status. Evangelista also testified that Mustakas did not sign the employee's paychecks, stating that: "Hellen has nothing to do with the checks, the payroll, or anything." (Id. at 278).

As for the evidence suggesting that Mustakas acted as a "manager," defendant

---

[27]The parties do not describe who "Fotios" is or what his position is within the company, but the Court assumes from the context of the testimony that Fotios refers to Frank Andreopolos.

Andreopolos specified in his testimony that Mustakas only served as the manager from 2000 to 2003, well before any of the plaintiffs were employed at Mr. Z. (Id. at 482). Indeed, Ms. Mustakas testified that in the years 2003, 2007, and 2012, she suffered from some personal issues that required her to stop working at Mr. Z for some period of time during those years. (Id. at 346). Thereafter, Ali was hired as the manager in 2003 until 2007, to be followed by Evangelista, who served as manager during the latter part of plaintiffs' employment. Thus, even if Ms. Mustakas had performed as a manager at some point, the testimony was that she was not serving in that capacity after plaintiffs were hired by Mr. Z , at a time when others were acting as managers. Thus, plaintiffs could not have been under her managerial authority. (Id. at 481).

Based on the totality of the evidence, the Court finds that defendant Mustakas was not vested with the power to determine whether employees could be hired or terminated, nor did she exercise the authority to make other significant employment decisions, such as controlling employee pay records, or setting rates of pay. In summary, the combined testimony of both interested and disinterested witnesses demonstrates to the Court that while Mustakas may have wielded some apparent authority over employment decisions, she did not exercise the degree of operational control over the employees, their employment records, their pay rates, or their daily activities that would make her an "employer" for purposes of imposing liability under the FLSA. See Kaur v. Royal Arcadia Palace, Inc., 643 F. Supp. 2d 276, 293 (E.D.N.Y. 2007) (citing Herman v. RSR Sec. Serv., Ltd., 172 F.3d at 139-140) (holding that "the court must evaluate the 'totality of the circumstances' to determine whether a defendant had 'operational control'").

Accordingly, the Court finds that Mustakas does not qualify as an "employer" under either the FLSA or the NYLL, and cannot be held liable for any wage and hour violations. However,

since there appears to be no dispute that Andrepolos was an "employer," under the FLSA and

NYLL, the Court finds that defendants Mr. Z and Andreopolos are "employers" for purposes of

both statutes and are jointly and severally liable for any violations of the wage and hour laws.


C.  Status as Employees - Exemption under Section 1(a)(1) of the FLSA

The third element that plaintiffs must establish before liability can be imposed under the

FLSA is demonstrating that the plaintiffs do not fall within an established exemption.  Since

exemptions are considered affirmative defenses, it is the employer's burden to prove that an

employee is exempt under the FLSA.  See, e.g., Bilayou v. Dutchess Beer Dist., Inc., 300 F.3d

217, 222 (2d Cir. 2002).  Moreover, the case law is clear that the exemptions under the FLSA are

narrowly construed against the employer.  See Karropoulos v. Soup du Jour, Ltd., 128 F. Supp. 3d

518, 527 (E.D.N.Y.  2015).

In their post-trial memorandum, defendants appear to re-raise an argument that plaintiffs

Bedasie and Diaz were "outside sales/commission employees," who do not qualify for relief under

the FLSA.  (Defs.' Post Mem. at 62).  This argument was first raised by defendants after Judge

Amon issued her decision granting plaintiffs' motion for summary judgment with respect to the

NYLL wage statement claims, finding that there was no issue of disputed fact in that defendants

had failed to "furnish each employee[28] with a statement with every payment of wages. . .," as

required by Section 195(3) of the NYLL.  (Order at 5, 8).  Following that decision, and during the

---

[28]Judge Amon's finding as to the NYLL wage notice violation determined the issue of
whether plaintiffs were "employees" for purposes of the NYLL.

preparation of the Pretrial Order, defendants moved to amend their Answer to add, inter alia, a defense that plaintiffs were exempt from the protections of the FLSA because they were employed as "outside sales employees." (Defs.' 8/2/15 Letter[29] at 1). In an Order dated August 26, 2015, Judge Go denied defendants' motion to amend to add this defense, finding that it did not apply. (8/26/15 Order[30] at 2). In a pretrial Order dated April 29, 2016, this Court clearly held that defendants were precluded from asserting any counterclaims or additional defenses not previously raised in the pleadings. Bedasie v. Mr. Z Towing, Inc., No. 13 CV 5453, 2016 U.S. Dist. LEXIS 57431, at *11 (E.D.N.Y. Apr. 29, 2016). Given that the Court denied the motion to amend, and the exemption was not raised as an affirmative defense in the initial pleadings, defendants are now precluded from raising such a defense because affirmative defenses are required to be asserted in the pleadings or they are deemed waived. Id.; Satchell v. Dilworth, 745 F.2d 781, 784 (2d Cir. 1984); Columbia Artists Mgmt, LLC v. Alvarez, No. 08 CV 11254, 2010 WL 5396097, at *5 (S.D.N.Y. Dec. 23, 2010).

Even if the issue had not been previously considered by Judge Go, this Court, having considered all of the evidence presented at trial, concludes that all three plaintiffs were "employees" under the FLSA and NYLL. None of them were "sales" employees; there is no dispute that they were not engaged in selling anything, but rather were taggers, whose job was simply to identify vehicles for towing. Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2162 (2012) (citing 29 C.F.R. §§ 541.500-503) (holding that, based on regulations issued by

---

[29]Citations to "Defs.' 8/2/15 Letter" refer to the letter motion submitted by defendants' counsel, dated August 2, 2015, seeking to add certain affirmative defenses to their answer.

[30]Citations to "8/26/15 Order" refers to Judge Go's Minute Order filed on August 26, 2015.

the Department of Labor, "an outside salesman is any employee whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition"). Moreover, plaintiffs were issued and paid as W-2 employees and defendants withheld employment taxes from their wages. (Tr. at 546, 550).

Accordingly, the Court rejects defendants' argument that plaintiffs were exempt sales employees under the FLSA.


D.  The Commission Exemption under the FLSA

Throughout this litigation, defendants have argued that plaintiffs Bedasie and Diaz were exempt from the hourly wage and overtime wage requirements of the FLSA because they were commissioned employees. (Defs.' Post Mem. at 2). Plaintiffs contend that regardless of whether they were paid by commission or by piece – i.e. by every car that they tagged – the protections of the FLSA extend beyond employees who are paid on an hourly basis. (Pls.' Post Mem. at 5).

It is up to the courts to determine whether non-hourly wage practices comply with minimum wage and overtime regulations by determining the hourly equivalents of commissions. Cruz v. AAA Carting & Rubbish Removal, Inc., 116 F. Supp. 3d 232, 242–43 (S.D.N.Y. 2015) (citing Chuchuca v. Creative Customs Cabinets Inc., No. 13 CV 2506, 2014 WL 6674583, at *9 n. 10 (E.D.N.Y. Nov. 25, 2014) (holding that "For minimum-wage recovery under the FLSA, the pertinent question is whether 'the amount of compensation received by an employee results in a straight-time hourly rate that is less than the applicable federal minimum wage"); Karic v. Major Auto. Cos., 992 F. Supp. 2d 196 (E.D.N.Y. 2014) (holding that the "NYLL indisputably requires

that employers pay employees minimum wage and overtime on a weekly basis, regardless of whether those employees earned commission in subsequent weeks").

Although the FLSA "does not require employers to compensate employees on an hourly rate basis, their earnings may be determined on a piece-rate, salary, commission, or other basis, but in such case the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom and, therefore, it is necessary to compute the regular hourly rate of such employees during each workweek."  29 C.F.R. § 778.109.  Section 207(a)(1) of the FLSA requires an employer to pay an employee overtime pay in the amount of one and one-half times their regular rate for hours worked in excess of forty hours.  29 U.S.C. § 207(a)(1).  Under Section 207(i), "No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title,[31] and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services."  29 U.S.C. § 207(i).  For commissions paid on a weekly basis, federal regulations provide that:  "[w]hen the commission is paid on a weekly basis, it is added to the employee's other earnings for that workweek (except overtime premiums and other payments

_____

[31]Federal regulations also make clear that "[i]f the employee's regular rate of pay is higher than the statutory minimum, his overtime compensation must be computed at a rate not less than one and one-half times such higher rate."  29 C.F.R. § 778.107.  New York law also requires that employees be compensated for overtime at "one and one-half times the employer's regular rate of pay" and provides that the regular rate should be calculated "in the manner and methods provided in" the FLSA.  12 N.Y.C.R.R. § 142-2.2.

excluded as provided in section 7(e) of the Act),[32] and the total is divided by the total number of

hours worked in the workweek to obtain the employee's regular hourly rate for the particular

workweek. The employee must then be paid extra compensation at one-half of that rate for each

hour worked in excess of the applicable maximum hours standard." 29 C.F.R. § 778.118.

Defendant Andreopolos testified at trial that both Bedasie and Diaz were paid entirely on

commission. (Tr. at 484). Defendants contend that the commissions paid to those plaintiffs

exceeded the amount they would have received had they been paid a minimum wage of $7.25 and

corresponding overtime rate of $10.88. (Defs.' Post Mem. at 2). Defendants argue that plaintiffs

Bedasie and Diaz chose to be paid on a commissioned rather than on a salaried basis, because a

commissioned-based scheme provided them with incentives to earn a higher amount than they

would have earned on minimum wage. (Id. at 25). In ruling on the defendants' motion for partial

summary judgment, Judge Amon found that plaintiffs Bedasie and Diaz were paid at least in part

based on the number of cars they tagged each week and that plaintiff Rosario was paid by the

hour. (8/14/15 Order at 3).

Plaintiffs contend, and the Court agrees, that in order to determine whether defendants'

commission-based pay scheme complied with the minimum wage, overtime, and spread-of-hours

---

[32]Payments may be considered "overtime premiums" and excluded from the calculation of the regular rate of pay only if such payments are provided for in employment contracts and specifically allocated as payment for hours worked in excess of 40 hours in a particular workweek. Federal regulations provide that: "[i]f the payment of such contract overtime compensation is in fact contingent upon the employee's having worked in excess of 8 hours in a day or in excess of the number of hours in the workweek specified in section 7(a) of the Act as the weekly maximum, the extra premium compensation paid for the excess hours is excludable from the regular rate under section 7(e)(5) and may be credited toward statutory overtime payments pursuant to section 7(h) of the Act." 29 C.F.R. § 778.202. Here, there has been no evidence presented to suggest that plaintiffs were subject to employment contracts or that these contracts specified that plaintiffs would receive "overtime premiums."

requirements of the FLSA and NYLL, the Court must determine the plaintiffs' regular hourly rate of pay based on their commissioned work. If that regular hourly rate is higher than the minimum wage and if plaintiffs were properly paid overtime based on time and a half for hours over 40 worked in a week, then defendants would not be liable for wage and hour violations.

In order to conduct this comparison, the Court must first determine the regular hourly rate of plaintiffs' activities based on the evidence before the Court.


   E.  Burden of Proof

Both the FLSA and the NYLL provide a burden-shifting framework for proving wage violations. Under the FLSA, an employee may meet his or her burden of proof by producing "sufficient evidence from which violations of [the FLSA] and the amount of an award may be reasonably inferred." Reich v. Southern New Eng. Telecomms. Corp., 121 F.3d 58, 66 (2d Cir. 1997). If an employee offers such evidence, an employer must then "come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." Yu Y. Ho v. Sim Enterps., Inc., No. 11 CV 2855, 2014 WL 1998237, at *14 (S.D.N.Y. May 14, 2014) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 688-89 (1946)). If an employer fails to present such evidence, the court may enter judgment in the employee's favor, using the employee's recollection to determine damages, "even though the result be only approximate." Reich v. South New Eng. Telecomms. Corp., 121 F.3d at 67.

Moreover, it is the responsibility of the employer, not the employee, to maintain employment records under Section 11(c) of the FLSA. See Santillan v. Henao, 822 F. Supp. 2d 284, 294 (E.D.N.Y. 2011) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. at 687) (holding that "the easiest way for an FLSA plaintiff to discharge his or her burden of proof is, generally, to 'secur[e] the production of such records' from the employer, who has the duty for their maintenance under section 11(c) of the FLSA"). Where the defendant has failed to maintain proper records, the burden of proving that plaintiff was properly paid shifts to the defendant. See Marin v. JMP Restoration Corp., No. 09 CV 1384, 2012 WL 439748, *6 (E.D.N.Y. Aug. 24, 2012); Kuebel v. Black & Decker Inc., 643 F.3d 352, 363 (2d Cir. 2011) (holding that "it is important to recognize that an employer's duty under the FLSA to maintain accurate records of its employees' hours is non-delegable").

New York law similarly provides that where an employer fails "to keep adequate records . . . the employer in violation shall bear the burden of proving that the complaining worker was paid wages, benefits and wage supplements." N.Y. Lab. L. §§ 196–a, 195(4) (requiring employers to "establish, maintain, and preserve for not less than three years payroll records showing the hours worked, gross wages, deductions and net wages for each employee"); Jiao v. Shi Ya Chen, No. 03 CV 0165, 2007 WL 4944767, at *3 (S.D.N.Y. Mar. 30, 2007) (holding that "[l]ike the FLSA, 'in the absence of adequate records,' New York law also 'places the burden on the employer to show the employee was properly compensated.' As the burden shift under New York law places on the employer the 'burden of showing by a preponderance of the evidence that [the] plaintiff was properly paid for the hours he worked,' if the employer is unable to meet its burden under the FLSA 'to 'negative the reasonableness of the inference' arising from the employee's

47

evidence of his hours and wages, then a fortiori [the employer] could not satisfy the more

demanding burden' under New York law") (citing <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328

U.S. at 687 (1946)).

Here, in support of certain Proposed Findings of Fact filed in advance of trial, defendants

submitted spreadsheets allegedly showing the gross pay of each plaintiff from 2011 to 2013, the

number of "hits," or cars tagged, and the amount paid for each hit – $15 per hit for plaintiff

Bedasie, $25 per hit for plaintiff Diaz – along with the overtime hours allegedly worked by each

plaintiff.  (Proposed Findings of Fact, Exs. 21-23).  Plaintiffs dispute the accuracy of the

defendants' spreadsheets, disagreeing as to the amounts plaintiffs were paid in commissions, the

number of hours plaintiffs worked, and the periods of time over which plaintiffs Bedasie and Diaz

worked.  Plaintiffs also argue that defendants did not maintain time records for plaintiff Rosario

and dispute the hourly rate at which Rosario was paid, as well as whether he was paid sufficient

overtime wages.

Apart from the fact that these exhibits were expressly not admitted into evidence at trial

(<u>see</u> Tr. at 505), and cannot therefore be considered by the Court, the exhibits do not detail the

number of hours plaintiffs worked each week.  (Proposed Findings of Fact, Exs. 14-20).

Similarly, defendants have also included in their Proposed Findings of Fact certain calendars

allegedly showing when the plaintiffs were scheduled to work.  These calendars were also not

admitted into evidence at trial because like the spreadsheets, they were never disclosed to

plaintiffs prior to trial; there was no testimony as to how they were created; and the defendants

have not provided the underlying records used to create these spreadsheets or calendars.

Moreover, the calendars do not show the number of hours or even the days that were actually

worked by plaintiffs in any particular week.  (Id., Exs. 14-20).  In addition, while defendants'

spreadsheets contain some information, they are limited to the years 2011 to 2013; there are no

records available for the earlier years from 2007 to 2011, when all three plaintiffs claim they were

working for defendants for some period of time.  (Id., Exs. 21-23).  Accordingly, the Court has not

considered either the spreadsheets or the calendars in determining defendants' liability or in

calculating damages.

     In light of defendants' failure to maintain proper records and disclose these records in a

timely fashion to plaintiffs, the Court finds that defendants have failed to meet their burden of

providing admissible evidence that plaintiffs were properly paid for the shifts they worked at Mr.

Z.[33]


     F.  Regular Rate of Pay

         1) Legal Standard

     When an employee is paid on a commission or piece-by-piece basis, courts must

determine the employee's regular rate of pay since, "[t]he regular rate of pay at which the

employee is employed may in no event be less than the statutory minimum."  29 C.F.R.

§ 778.107.  Under the FLSA, if an employee is not paid on an hourly basis, then "[t]he regular

hourly rate of pay of an employee is determined by dividing his total remuneration for

---

     [33]To the extent that defendants have argued that plaintiffs never complained about not
receiving proper pay, the law is clear that an employee may not waive the right to overtime under
the FLSA; such a concept would "nullify the purposes of the [FLSA] and thwart the legislative
policies it was designed to effectuate."  Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S.
728, 740 (1981); see also Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 534 (2d Cir.
2015).

employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." 29 C.F.R. § 778.109. "Commissions (whether based on a percentage of total sales or of sales in excess of a specified amount, or on some other formula) are payments for hours worked and must be included in the regular rate. This is true regardless of whether the commission is the sole source of the employee's compensation or is paid in addition to a guaranteed salary or hourly rate, or on some other basis, and regardless of the method, frequency, or regularity of computing, allocating and paying the commission." 29 C.F.R. § 778.117. Under New York law, "[t]he term regular rate shall mean the amount that the employee is regularly paid for each hour of work. When an employee is paid on a piece work basis, salary, or any basis other than hourly rate, the regular hourly wage rate shall be determined by dividing the total hours worked during the week into the employees' total earnings." N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.16.

Once the court has determined an employee's regular rate of pay, the court then compares this rate with the minimum wage under federal and state law for the respective time periods. See Heng Guo Jin v. Han Sung Sikpoom Trading Corp., No. 13 CV 6789, 2015 WL 5567073, at *8 (E.D.N.Y. Sept. 21, 2015) (explaining that "[t]o calculate the effective wage paid for minimum wage purposes, courts in this Circuit divide weekly pay by the total number of hours worked in a given workweek"); Caci v. Wiz of Lake Grove, Inc., 267 F. Supp. 2d 297, 300 (E.D.N.Y. 2003) (holding that there was no violation of the FLSA where plaintiff's weekly pay divided by the total number of hours he worked yielded an hourly rate that exceeded the required minimum wage for that period).

2) <u>Factual Disputes</u>

While defendants have provided records to show that plaintiff Rosario was paid at an

hourly rate for the entire period of his employment, they have not provided any admissible records

that demonstrate the number of hours worked by any of the plaintiffs, nor have they presented any

admissible records from which the hourly rates at which they were paid could be determined with

any certainty. Since defendants do not dispute the dates that plaintiffs claim to have begun their

employment at Mr. Z[34] (although they do dispute whether certain plaintiffs were out of work for

intermediate periods of time), it is clear that records are missing or nonexistent for significant

periods of time when plaintiffs were employed by Mr. Z.

Apart from the problem presented by defendants' lack of records, plaintiffs dispute the

number of hours worked and the amounts they were allegedly paid per vehicle or in hourly wages.

In contrast to defendants' claim that Bedasie was paid $15 per vehicle he tagged (Tr. at 485),

Bedasie testified that he was paid a flat rate of $50 for each day he worked, plus $15 for each car

he tagged. (<u>Id.</u> at 31). Diaz conceded that he was paid exclusively on commission, but Diaz

claims to have made only $20 for each car he tagged, while defendants claim that they paid Diaz

$25 for each car. (<u>Id.</u> at 486). For plaintiff Rosario, defendants argue that although he was a

---

[34]In their Amended Answer to the Complaint, defendants responded to the allegation that
Bedasie worked from 2007 to 2013, by admitting that: "At all relevant times, Bedasie was
Defendants' 'employee' and Defendants were his employers." (Am. Ans. ¶ 2). Similarly,
defendants admit the allegation in the Amended Complaint that Rosario was employed from
2008 to 2013, by stating: "At all relevant times, Rosario was Defendants' 'employee' and
defendants were his employers." (Am. Compl. ¶¶ 59, 81; Am. Ans. ¶ 2). As to plaintiff Diaz,
defendants denied knowledge or information as to the truth or falsity of the statement that "At all
relevant times, Diaz was Defendants' 'employee' and defendants were his employers." (Am.
Ans. ¶ 1).

salaried and not a commissioned employee, he was paid properly for any overtime work he performed.  (Defs.' Post Mem. at 14).

Accordingly, the Court has reviewed the testimony provided by all the parties and concludes as follows.

### i. Hours Worked

When accurate records are not available to determine the exact number of hours a plaintiff has worked, courts have inferred how many hours plaintiff worked, on average, in a particular week based on records that are available.  See Hart v. Rick's Cabaret Int'l, Inc., 60 F. Supp. 3d 447, 464 (S.D.N.Y. 2014) (holding that, where plaintiffs substituted "average log-out times" for particular days in which data was missing to calculate the number of hours worked by plaintiff, "it is well-settled that, in wage-and-hour cases, employees are permitted to prove their hours worked as a matter of 'just and reasonable inference' in the absence of employer-maintained time records").  In Chuchuca v. Creative Customs Cabinets Inc., the court had certain records showing the hours worked by plaintiff during the later period of his employment, but there were no records for the earlier period.  No. 13 CV 2506, 2014 WL 6674583, at *13 (E.D.N.Y. Nov. 25, 2014). The court held that, for the period in which records were not available, "it is reasonable to assume that, for the prior period at Creative (that is, from April 25, 2007 through December 31, 2009), plaintiff worked similar hours. Therefore, the Court's calculations for the prior period will use the weekly average of 49 hours, extrapolated from the entries in the Hours Spreadsheet through March 2012, when plaintiff ceased working at Creative."  Id.

Plaintiffs Bedasie and Diaz testified that they were given a set schedule for each day of the week, such that generally, they each worked a total of 51 hours per week until the second half of

2009, and either a total of 51 hours or 61 hours per week beginning in the second half of 2009 and continuing until 2013, depending on whether they were working on Fridays. (Pls.' Post Stmt. Dam. at 6-7, 35, 36). Defendants not only dispute the total number of hours worked per week, but they claim that plaintiff Bedasie took leave for an extended period of time due to an accident (Tr. at 495), and that there were repeated issues with both plaintiffs' attendance, with Diaz often skipping out of work early. (Id. at 490). Both Andreopolos and Evangelista denied that plaintiffs ever worked more than 40 hours a week. (Tr. at 413-14).

While defendants had no records to support their contentions as to the hours worked, both plaintiffs Bedasie and Diaz provided a detailed account of their daily schedule and their best recollection of the estimated number of hours they worked on average during the time they worked at Mr. Z. Their testimony as to their daily schedule was corroborated in significant respects by the testimony of Marshal Finardo. (Id. at 396-98). Based on plaintiff Bedasie's testimony, Bedasie worked a total of 51 hours per week in the years 2007, 2008, and the first half of 2009 – January 1, 2009 to June 27, 2009 – and an average of 56 hours per week from June 28, 2009[35] to until the end of his employment in 2013. (Pls.' Post Stmt. Dam. ¶¶ 6-7). As for plaintiff Diaz, based on Diaz's testimony, he worked a total of 51 hours per week from when he started in 2008 until June 27, 2009 and a total of either 51 or 61 hours per week from the June 28, 2009 to the end of his employment in 2013, depending on whether he was working Fridays, for an average of 56 hours during the later period. (Id. ¶¶ 35, 36). Since the defendants failed to present any records showing days or hours worked or even the number of cars tagged that would allow the

---

[35]The Court found that plaintiffs began working alternate Fridays from June 28, 2009, since this marked the beginning of the week for the second half of 2009.

Court to calculate damages with any degree of specificity and since the admitted exhibits do not contradict plaintiffs' testimony as to the average hours worked per week, the Court credits the plaintiffs' testimony regarding their hours worked.

Accordingly, based on their testimony and other evidence of their daily work schedules, the Court has calculated that plaintiffs Bedasie and Diaz worked, on average, 51 hours per week from the date that they started as scouts until June 27, 2009.  From June 28, 2009, when plaintiffs began working alternating Fridays, until the termination of their employment sometime after they received their last paychecks during the week of June 21, 2013 for Bedasie and May 17, 2013 for Diaz, the Court finds that the plaintiffs worked alternating workweeks of 51 hours and 61 hours. Thus, for this latter period, the Court calculated that plaintiffs worked an average of 56 hours per week.

The average number of hours per week plaintiffs Bedasie and Diaz worked are shown in the charts below:[36]

**Chart 1: Bedasie's and Diaz's Weekly Hours (On and Before June 27, 2009**)

| Day of the Week | Number of Hours |
|---|---|
| Monday | 15.5 hours |
| Tuesday | 15 hours |
| Wednesday | 10 hours |
| Thursday | 10.5 hours |
| **Average Number of Hours per Week** | 51 hours |

---

[36]These charts relate only to plaintiffs Bedasie and Diaz.  Plaintiff Rosario's claims are addressed separately, <u>infra</u> in Section IV.

**Chart 2: Bedasie's and Diaz's Weekly Hours (June 28, 2009 through 2013)[37]**

| Day of the Week | Number of Hours Week 1 | Number of Hours Week 2 |
|---|---|---|
| Monday | 15.5 hours | 15.5 hours |
| Tuesday | 15 hours | 15 hours |
| Wednesday | 10 hours | 10 hours |
| Thursday | 10.5 hours | 10 hours |
| Friday (2x a month) | -- | 10.5 hours |
| **Average Number of Hours per Week** | 56 hours | |

ii.  Time Worked

The parties also disagree as to the periods of time when plaintiffs worked at Mr. Z.  As noted, defendants appear to concede that Bedasie began working at Mr. Z in 2007 and stopped working in 2013.  (Am. Ans. ¶ 2).  Similarly, there does not seem to be much dispute that Diaz began working as a scout in 2009 and stopped working at Mr. Z in 2013.  However, Andreopolos' testimony regarding Diaz demonstrates the problem presented by the lack of records. Andreopolos could not recall exactly when Diaz was hired or when he was transferred from his initial job as a stager to become a scout.  (Tr. at 484).  Although Diaz testified that he started working as a stager for Mr. Z in 2008 (id. at 101-02), the Amended Complaint alleges that he worked for Mr. Z "[f]rom or on January 1, 2009," and Diaz only seeks damages from 2009

---

[37]Since plaintiffs only worked two Fridays a week from 2009 to 2013 and because their weekly schedule changed based on whether they worked on Friday for that week, the Court has shown the hourly distributions for weeks in which plaintiffs worked on Fridays or did not work on Fridays, and calculated the average hours worked based on this distribution.  (Pls.' Post Stmt. Dam. ¶ 7).

55

onwards in plaintiffs' Post Trial Statement of Damages. (Am. Compl. ¶ 26; Pls.' Post Mem. Ex. 2; Pls.' Post Stmt. Dam. ¶¶ 35-36). Accordingly, the Court finds that Diaz's relevant period of employment for purposes of the claims at issue is January 1, 2009 to May 17, 2013.

The parties also dispute whether Bedasie worked at Mr. Z's continuously from 2008 to 2010. Andreopolos testified that Bedasie was "out" and not working at Mr. Z's due to an accident and related lawsuits, but Andreopolos was unsure of the dates when Bedaise was allegedly not working due to the accident. (Id. at 494-95). Evangelista and Mustakas[38] testified that Bedasie was out from July 2008 until January 2010, but defendants provided no documentary evidence of Bedasie's alleged extended absence from Mr. Z. (Tr. at 495). Bedasie disputes this and claims that he worked for Mr. Z's for an uninterrupted period from 2007 to June 21, 2013. (Id. at 18). Marshal Finardo had no recollection of Bedasie being out for any extended period of time. (Id. at 437). In the absence of records and given the Court's evaluation of the credibility of the witnesses, the Court credits Bedasie's testimony that he worked for an uninterrupted period from 2007 to 2013.

In addition to raising questions about the time periods worked by Bedasie, defendants also offered some testimony regarding the work habits of both Bedasie and Diaz. Andreopolos testified that two times a week, every "Tuesday or Friday" – he was not sure – Diaz would go to car auctions with his father. (Id. at 490). Evangelista testified that once or twice a week, Diaz would not show up because he was at the auction with his father, but according to Evangelista,

---

[38]Although defendants argued that Mustakas was not an "employer" and was out of work for significant periods of time during the plaintiffs' employment, she had a much better recollection of the dates, hours and practices than Andreopolos, even during periods when she was allegedly coming in to work only sporadically.

there were no set days during the week when this would occur.  (Id. at 266).  Mustakas, on the other hand, testified that Diaz was out every Tuesday and Friday.  (Id. at 373).

Andreopolos also testified that every Thursday, both Bedasie and Diaz would leave work early at 10:00 p.m.  (Id. at 496).  Of course, Andreopolos conceded that he was bad on dates; he was even confused as to when his own wife was out of work.  (Id. at 522-23).  Evangelista testified that on Mondays, Bedasie and Diaz would come in at 11:00 and leave early.  (Id. at 272).  Mustakas testified that on Mondays and Tuesdays, they could never reach Bedasie or Diaz between the hours of nine, ten, and eleven.  (Id.)  Andreopolos testified that neither Bedasie or Diaz ever worked on Fridays.  (Id. at 496).  He claimed that they did not want to work many hours.  (Id. at 540).  Evangelista and Ali also testified that Bedasie and Diaz "never" worked on Fridays.  (Id. at 280, 309).  There was also some vague testimony offered about days when the Marshals left early, and days when the computer was down and the scouts could not work.  Andreopolos testified initially that the computers were down more than five days a year and then changed his testimony to "10, 20 times a year" until 2013.  (Id. at 517).

Based on defendants' testimony regarding Diaz's absences to attend auctions with his father, the Court finds that Diaz may have occasionally left work to go to auctions, and has considered these occasional absences in its calculations of Diaz's hours and wages.  As to the other claims regarding days missed or times when plaintiffs came to work late, the defendants' witnesses' testimony was inconsistent and thus is not capable of quantification.

iii.  <u>Amounts Paid</u>

The parties also dispute the amount each plaintiff was paid.  Bedasie claimed he was paid

$50 a day, plus $15 per car tagged, while defendants claimed that he was only paid $15 per

vehicle tagged.

Similarly, the parties disagree as to how much Diaz was paid.  While there was no dispute

that he was paid solely by the number of vehicles tagged, Diaz claimed he was paid only $20 per

vehicle, while defendants claimed he was paid $25 per vehicle.

Examining the gross pay records provided to the Court, several of the paychecks Bedasie

received support defendants' testimony that Bedaise was only paid $15 per vehicle tagged because

the values provided for the paychecks are divisible by $15.  For instance, the gross paycheck

received on January 7, 2011 of $855, when divided by $15, equals 57 vehicles tagged.  However,

if this value is deducted by either $200 for four days worked that week or $250 for five days

worked based on Bedasie's testimony that he was also paid $50 per day, the result is not divisible

by $15.  On the other hand, several of the paychecks do support Bedasie's representation that he

was paid a per diem value in addition to a commission per vehicle tagged.  For instance, the

paycheck of September 21, 2012 of $1,010 is not divisible by $15, but if a per diem rate of $250

representing five days of work is subtracted, the result is divisible by $15.  There are also about

four paychecks in 2012 for which Bedasie was only paid $200.  If, as defendants claimed, Bedasie

was only paid $15 per car, a check for $200 would be inconsistent because 200 is not divisible by

15.  One possible explanation is that Bedasie got paid the $50 per day for four days, but tagged no

cars during that time, or that defendants grossly underpaid him for those weeks.  Neither plaintiffs

nor defendants explained exactly how much Bedasie was paid nor provided a rationale as to why some checks are divisible by $15 but others are not.

As for plaintiff Diaz, most if not all of Diaz's paychecks are divisible by $25, confirming defendants' testimony that he was paid $25 per vehicle tagged. However, many of his paychecks are not divisible by $20, undermining Diaz's testimony that he was paid only $20 per vehicle tagged. For instance, Diaz's paychecks of $475 for January 28, 2011, $825 for February 3, 2012, and $250 for May 10, 2013 are all divisible by $25, but none of them are divisible by $20. The Court therefore accepts defendants' testimony that Diaz was paid $25 per vehicle tagged.

Although there remains an issue as to exactly what method was used to pay Bedasie and Diaz, regardless of the amount each plaintiff was paid per vehicle tagged, the gross pay values for the years 2011 through 2013 as reflected on the plaintiffs' pay stubs seem to fairly accurately show what they actually were paid. Therefore, because of the inability to confirm exactly what the commission paid per vehicle was, rather than using the commission per vehicle tagged, the Court has relied on the gross pay amounts listed in the pay stubs for the years 2011 to 2013 to determine the regular hourly rate of pay for both Bedasie and Diaz. As explained infra, the Court has divided the weekly gross pay by the average number of hours worked according to plaintiffs' schedules to determine an hourly rate of pay for each week that pay stubs have been provided. Thus, any determination as to what plaintiffs' commissions were does not affect the Court's calculation of the unpaid wages owed to plaintiffs Bedasie and Diaz.

iv. Days Off for Vacation, Snow, Hurricane Sandy, and Holidays

There was also a dispute as to the number of days that defendants claim Bedasie and Diaz took off from work. Diaz testified that he only took vacation once during the entire time he

59

worked for Mr. Z – when his brother died in 2011 – and that he took two to three sick days a year. (Tr. at 179). Although on direct examination, Diaz testified that he took only a "week or two" of vacation one year, in 2011, when his brother died (id. at 114), on cross examination, he testified that he took off four days from work when his brother died. (Id. at 179).

Andreopolos testified that each of the plaintiffs took off a week to ten days per year, while Mustakas confirmed Diaz's testimony that he only took off two weeks for vacation during the entire time he worked at Mr. Z. (Id. at 385, 520). Bedasie testified that he took a week or two off for vacations each year, plus, on average, three sick days per year; Mustakas confirmed that Bedasie took two weeks of vacation a year. (Id. at 28-29, 382).

Based on plaintiffs' testimony, the Court finds that Bedasie took three sick days per year. As for vacation days, since Bedasie testified that he took two weeks off for vacation every year, the Court finds that from 2007 to 2008, when Bedasie did not work on Fridays and thus only worked four days a week, he took off a total of eight workdays a year for vacation and from 2009 to 2013, when he began working Fridays and thus worked five days a week every other week, he took off a total of nine workdays over a two week period each year for vacation. (Id. at 28-29). As for Diaz, the Court finds that Diaz took three sick days per year. (Id. at 113-14). Although Diaz's testimony regarding how many days he took off when his brother died is inconsistent, Diaz is consistent in testifying that he took off for vacation only once during his entire time at Mr. Z –in 2011 for his brother's death. (Id. at 114, 179). Since the Court has the gross pay records for 2011 and since defendants claim that plaintiffs did not get paid for time they did not work, the Court accepts Diaz's testimony that he took time off for vacation only once, in 2011, and does not find that there is a need to determine how many days Diaz was out due to his brother's death,

60

since this should be reflected in his gross pay records. As for the days Diaz may have been absent to attend auctions with his father, although defendants did not provide specific days that Diaz may have been absent or left work early for the auctions, the Court estimated that he left early or did not attend work for about two weeks every year to attend these auctions. Finally, there appears to be no dispute and the Court finds that Rosario took no vacations during the time he worked for Mr. Z and only took off four days one year to recover from surgery. (Id. at 234).[39]

There were also significant inconsistencies among the witnesses regarding the number of snow days each year when the company was shut down. Andreopolos testified that there were "4, 5, 6 days a year" (id. at 516); Ali testified that the company was shut down 10 to 15 snow days a year (id. at 311-12); and Mustakas testified that in the year 2011, the company was shut down for nine to ten days. (Id. at 362). Bedasie testified that they were closed "maybe three, four days" due to snow. (Id. at 26). Only Marshal Finardo testified credibly that each year was different and he could not estimate the number of snow days that they were shut down. (Id. at 399). Since defendant Andreopolos and plaintiff Bedasie have provided similar estimates of the amount of snow days – around four days a year – the Court calculated the amount of snow days to be around four days per year. Again, the absence of records hinders the Court's ability to calculate these numbers with precision.

Similarly, there seemed to be no agreement on the number of days the company was shut down during Hurricane Sandy. Bedasie testified that Mr. Z was closed for 7 to 10 days (id. at 27); Evangelista and Mustakas testified that the company was shut for three weeks as a result of the

---

[39]However, due to the fact that Rosario did not specify in his testimony when he took the four days off for surgery, the Court has not deducted the days Rosario took off for surgery in his damages calculations.

storm. (Id. at 279, 362). However, plaintiffs also argue that no adjustments in the damages owed need to be made for Hurricane Sandy because, to the extent there was any alleged closure for an extended period of time, "the absence of pay records would reflect closure for Hurricane Sandy." (Pls.' Post Stmt. Dam. at 13). Indeed, the Court notes that there are two weeks of gross pay missing during the time Hurricane Sandy would have affected the state of New York in 2012: there are no gross pay records for the week of October 26, 2012 or for the week of November 9, 2012. Since defendants argued that plaintiffs were only paid for the time they worked and since plaintiffs do not appear to have been paid for the weeks Mr. Z was closed due to the hurricane, the Court has made no further adjustments to the damages calculations based on any closures for Hurricane Sandy.

Although the parties agreed that Mr. Z was closed for federal holidays, no one seemed to agree on which "federal holidays" were included. Ali, Mustakas, and Andreopolos agreed that the company was closed for Christmas, Thanksgiving, and Election Day, but only Mustakas and Ali testified that the company was closed for Memorial Day and Veterans Day. (Tr. at 314-15, 383). Only Andreopolos testified that the company was closed for Martin Luther King Jr.'s birthday, but he and Ali agreed that the company was closed on July 4. (Id. at 518-19). Andreopolos testified that the company was closed for two weeks every year for Christmas. (Id.) Mustakas claimed the company was also closed on President's Day, Labor Day, and New Year's Day, and that the company was closed for two weeks at Christmas. (Id. at 383). Ali made a vague reference to being closed on Jewish holidays, even though no one else mentioned that. (Id. at 314-15).

In their Post Trial Statement of Damages, plaintiffs took the position that Mr. Z was closed for about ten federal holidays a year. (Pls.' Post Stmt. Dam. ¶ 8(f)). Plaintiffs also provided a

calendar of holidays that were observed by Mr. Z each year from 2007 to 2013, showing about

five federal holidays for 2007 and about eight to ten federal holidays from 2008 to 2013. (Pls.'

Post Mem. Ex. 4). Since plaintiffs concede that Mr. Z was closed for more federal holidays than

defendants claim, the Court accepts plaintiffs' testimony as to the number of federal holidays for

which Mr. Z was closed each year. (Id.)

Plaintiffs Bedasie and Diaz testified that when a federal holiday fell on a Monday,

plaintiffs would work on Friday to make up for that federal holiday. (Tr. at 28, 174). Marshal

Finardo's testimony supported that of the plaintiffs. He stated that there were times when the

company would open on Fridays to make up for a Monday holiday or for bad weather. (Id. at

398). By contrast, defendants' witnesses uniformly testified that they never worked on Fridays to

make up for Monday holidays. Defendant Andreopolos, Mustakas and Marshal Ali testified that

plaintiffs would not work on Fridays to make up for a federal holiday that fell on a Monday. (Tr.

at 314, 384, 519). However, since plaintiffs have asked for a reduced amount of damages based

on holidays that fell on a Monday, without adding the corresponding Friday (see Pls.' Post Stmt.

Dam. ¶¶ 8(f), 37(f), 63(c)), the Court finds that plaintiffs did not work on federal holidays that fell

on a Monday and did not make up these holidays by working on a Friday.

In attempting to resolve the many discrepancies in the evidence and testimony, the Court

has considered the ways in which the witnesses' testimony was consistent or inconsistent with

each other and has considered the demeanor of the witnesses on the stand. Based on the totality of

the testimony, supplemented by a review of all the exhibits – including the pay stubs offered for

all the plaintiffs and any additional pay records provided by defendants that were admitted into

evidence – the Court credits the testimony of the plaintiffs and of Marshal Finardo.[40]  While the Court credits the testimony offered as to the days missed due to certain federal holidays (see infra in Section III(A)), the testimony offered by defendants regarding snow days, the number of days the computer was down, and the vague, often contradictory testimony about days not worked demonstrates the importance of maintaining records.

III.  Damages Owed to Plaintiffs Bedasie and Diaz

    A.  Minimum Wage Violations

        1) Liability Analysis

Defendants conceded that they had not only failed to maintain any records of the times worked by Bedasie and Diaz, allegedly because plaintiffs were paid on a commission basis, but also that they had no time records for Rosario, who was paid on an hourly basis.  Although defendants produced some pay records for the period from 2011[41] to 2013, there were no records provided showing the hours worked or the pay received by any of the plaintiffs for the period prior to 2011.  Since defendants failed to meet their burden of maintaining records showing the hours worked by plaintiffs before 2011, but conceded the periods of plaintiffs' employment in the Answer, the Court must determine plaintiffs' regular rates of pay prior to 2011 based on the

---

[40]Marshal Rose also testified credibly but since he did not know either Bedasie or Diaz, his testimony is of limited value to the questions before the Court.

[41]Andreopolos claims that all the records defendants had were destroyed by Hurricane Sandy (Tr. at 506), but defendants somehow produced pay stubs showing plaintiffs' gross pay for 2011 and the period before Hurricane Sandy hit in late October 2012.  The Court finds that this discrepancy weakens the credibility of defendants when they claim that "everything got wet" and all their documents were lost due to Hurricane Sandy.  (Id.)

limited evidence available.

Turning first to the later period where some records were available – 2011 to 2013 –  the Court calculated plaintiffs Bedasie's and Diaz's regular rates of pay for each week by dividing the gross pay reflected on the plaintiffs' pay stubs by the average total hours Bedasie and Diaz testified they worked per week.  (See discussion infra in Section III(A)(3)).  The Court then compared the resulting rates of pay to the appropriate federal or state minimum wage rate for a particular year to determine if plaintiffs were underpaid in violation of the wage and hour laws. See, e.g., Heng Guo Jin v. Han Sung Sikpoom Trading Corp., 2015 WL 5567073, *8; Caci v. Wiz of Lake Grove, Inc., 267 F. Supp. 2d at 300.

Even if plaintiffs are commissioned employees, since defendants have provided no evidence that plaintiffs were paid an overtime premium for hours worked over 40 in a week, plaintiffs' weekly commissions must be included when calculating the regular rate of pay for a particular workweek.  29 C.F.R. § 778.118.  In comparing the rates of pay that were actually paid to plaintiffs with the amounts of minimum wages that should have been paid based on federal and state regulations, the Court finds that for several weeks during the periods for which pay records have been provided, plaintiffs Bedasie's and Diaz's regular rate of pay was lower than the minimum wage applicable for those periods, and therefore, defendants violated both the FLSA and NYLL by failing to provide proper minimum wages for certain weeks of plaintiffs' employment.[42]  See 29 U.S.C. § 207.

For the years prior to 2011, where there are no pay stubs and no records at all showing

---

[42]As for plaintiff Rosario, defendants do not dispute that Rosario was paid an hourly rate; the parties only dispute the amount of the hourly rate and the number of hours worked.  Thus, the Court's analysis as to Rosario is addressed separately infra in Section IV.

gross pay or plaintiffs' regular rates of pay, the Court credits plaintiffs' testimony that their weekly schedules, with the exception of Fridays, which they began working only the latter half of 2009, and their weekly hours worked remained consistent throughout the two periods. There is no evidence before the Court that would suggest that defendants' pay practices were different during this prior period, nor is there any evidence on which to conclude that plaintiffs Bedasie and Diaz were paid at or above the minimum wage rate for every week during the prior period from 2008 to 2011. Accordingly, following the procedure outlined in Chuchuca, the Court extrapolated the gross pay values for the years prior to 2011, using the gross pay values for the years 2011 to 2013. See Chuchuca v. Creative Customs Cabinets, Inc., 2014 WL 6674583, at *13; see also Hart v. Rick's Cabaret Int'l, Inc., 60 F. Supp. 3d at 464. The Court then divided these gross pay values by the number of hours plaintiffs testified they worked each week during each particular year in the earlier period to find the plaintiffs' rates of pay for each week. The Court compared these resulting regular rates of pay to the applicable federal or state minimum wage rate for that particular year.[43]

Accordingly, the Court has determined that plaintiffs are owed damages as a result of defendants' failure to pay minimum wages during these weeks.

2) FLSA and NYLL Statutes of Limitations

The statute of limitations under the FLSA is generally two years, but extends to three years for willful violations: "every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C.

---

[43]The Court notes that the methodology used by plaintiffs to calculate damages for the earlier period prior to 2011 differs from that used by the Court. (See n.47 infra).

§ 255(a); see Guardado v. 13 Wall St., Inc., No. 15 CV 02482 , 2016 WL 7480358, at *5

(E.D.N.Y. Dec. 2, 2016), report and recommendation adopted, 2016 WL 7480363 (E.D.N.Y. Dec.

29, 2016). Under the FLSA, the plaintiff bears the burden of proving willfulness for the purposes

of expanding the statute of limitations to three years, and "[a]ll that is required is that the

employer knew or had reason to know that it was or might have been subject to the FLSA." See

Eschmann v. White Plains Crane Serv., Inc., No. 11 CV 5881, 2014 WL 1224247, at *9

(E.D.N.Y. Mar. 24, 2014).

Here, plaintiffs argue that the three-year statute of limitations for violations of the FLSA

should apply because defendants acted willfully and without "good faith" when they believed that

[their] acts or omissions did not violate the FLSA.  (Pls.' Post Mem. at 10) (citing Reich v. South

New Eng. Telecomms. Corp., 121 F.3d 58, 71 (2d Cir. 1997)).  Plaintiffs argue that defendants

also acted willfully and without good faith in failing to take "active steps to ascertain the dictates

of the FLSA and then act to comply with them."  (Pls.' Post Mem. at 9-10) (citing Herman v. RSR

Sec. Servs., Ltd., 172 F.3d at 142).

An employer's claim that it believed that an employee was exempt from the requirements

of the FLSA has been held to be insufficient on its own to show that the employer's belief was a

reasonable one.  In D'Arpa v. Runway Towing Corp., the defendants "assert[ed] in conclusory

fashion that 'the Court should apply the two year limitations period . . . because the defendants

had a reasonable belief that they were exempt from the FLSA because they were engaged in both

interstate [and] intrastate commerce and their actions were not willful.'"  No. 12 CV 1120, 2013

WL 3010810, at *5 (E.D.N.Y. June 18, 2013).  The court rejected that argument, holding that

"Defendants are not exempt from the FLSA, nor does the record contain any evidence that would

permit them to reasonably believe they were exempt." Id. (internal citations omitted). In addition, employers who have paid employees in cash and erratically issued W-2s have been found to have willfully violated the FLSA. Id. (granting summary judgment and holding that the three-year statute of limitations applied under the FLSA since "defendants' method of compensating nearly all of the Plaintiffs in cash and their arbitrary issuance of W-2s leads me to conclude, as a matter of law, that Defendants acted willfully").

Here, several factors indicate that defendants had reason to know that they were subject to the FLSA and yet they acted willfully in failing to comply with the FLSA. Andreopolos' testimony indicates that defendants engaged in haphazard record-keeping practices, including their method of not keeping records for the purposes of determining taxes owed on plaintiffs' gross pay. According to Andreopolos, at the end of each week, he would tell the accountant how many cars each scout had tagged and the accountant would then calculate the taxes and indicate to Andreopolos the amount to write on the checks to each plaintiff. (Id. at 546-47). Andreopolos' testimony indicates that while the defendants had a retained accountant who they could have consulted to certify whether they were complying with the requirements of the FLSA, it appears that they did not think it necessary to consult this accountant on either their commissioned-base payment system or their record-keeping requirements, or if they did obtain advice, they ignored it.

Moreover, Andreopolos attempted to explain his lack of records by stating that the records had been destroyed by flooding during Hurricane Sandy. (Tr. at 540). However, that does not explain why the company had no records for the period after Hurricane Sandy from late 2012 until June 2013. He also admitted that even after a former employee, Mr. Rivera, brought a wage and hour lawsuit against the defendants in August 2012, defendants did not change their record-

keeping practices.  (Tr. at 539-40).  Mustakas also testified that even after Rivera's wage and hour lawsuit was filed against Mr. Z, the company continued its prior practice of discarding all of its records at the end of the week.  (Id. at 472).

In addition, Andreopolos conceded that he never kept records or paid Bedasie or Diaz overtime, but he did not provide good cause for this failure, aside from his stated impression that they were commissioned employees and were therefore exempt from FLSA requirements.  (Id. at 543).  Of course, even if he had a good faith belief that he was not required to pay commissioned employees overtime and minimum wages, he failed to maintain records and pay Rosario proper wages as well, even though Rosario was an hourly employee and clearly subject to the wage and hour laws.

Based on the evidence presented at trial, the Court finds that plaintiffs have met their burden of showing that defendants acted willfully and did not have a good faith basis for believing their actions did not constitute a violation of the FLSA because they actually retained an accountant to assist in calculating wages, benefits, and taxes and yet they failed to keep accurate records of plaintiffs' hours and wages even after receiving notice, through another lawsuit, that there was a potential issue with their record-keeping practices.  See Perez v. Platinum Plaza 400 Cleaners, Inc., No. 12 CV 9353, 2015 WL 1881080, at *4 (S.D.N.Y. Apr. 24, 2015) (holding that "[d]efendants were on notice of the FLSA's requirements in light of the Department of Labor investigation in 2009").

Although the Court finds that a three-year limitations period applies to plaintiffs' claims, the period of plaintiffs' employment prior from October 2, 2010– three years prior to the date the Complaint was filed – falls outside the FLSA and must be analyzed under the New York Labor

Law provisions.  In contrast to FLSA claims, NYLL claims have a six-year statute of limitations and do not require a showing of willfulness from plaintiffs bringing NYLL claims for unpaid wages.  <u>Shu Qin Xu v. Wai Mei Ho</u>, 111 F. Supp. 3d 274, 278 (E.D.N.Y. 2015); <u>Gurung v. Malhotra</u>, 851 F. Supp. 2d 583, 591 (S.D.N.Y. 2012) (holding that, "the statute of limitations for NYLL claims—willful or not—is six years").  Since plaintiffs filed their Complaint on October 2, 2013, the Court has calculated damages under the FLSA owed to plaintiff Bedasie from October 2, 2010 to June 21, 2013, when he ceased working at Mr. Z, FLSA damages owed to plaintiff Diaz from October 2, 2010 to May 17, 2013, and FLSA damages owed to plaintiff Rosario from October 2, 2010 to June 28, 2013, his last day of employment.  The Court calculated damages owed under the NYLL to plaintiff Bedasie from October 2, 2007 to October 1, 2010, NYLL damages owed to Diaz from January 1, 2009 to October 1, 2010, and NYLL damages owed to Rosario from January 1, 2008 to October 1, 2010.

### 3) Damages - Minimum Wages Owed

An employer who fails to meet minimum wage obligations under the FLSA and the NYLL "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages . . . and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b); <u>see</u> 12 N.Y.C.R.R. § 143-1.3.  Under the FLSA, the applicable minimum hourly wage rate was $7.25 from July 24, 2009 onwards.[44]  29 U.S.C. § 206(1).  Under the NYLL, the applicable minimum hourly wage rate was $7.15 from January 1, 2007 to December 31, 2013.  N.Y. Lab. L. § 652(1).

Both statutes specify that, where the other statute prescribes a higher minimum wage, the

---

[44]From July 24, 2007 to July 23, 2008, the federal minimum wage was $5.85 per hour, and from July 24, 2008 to July 24, 2009, the federal minimum wage was $6.55 an hour –lower than the NYLL minimum wage of $7.15 an hour for these periods.  29 U.S.C. § 206(1).

higher wage shall control.  See 29 U.S.C. § 218(a); N.Y. Lab. L. § 652(1).  As discussed supra in Section II(F)(1), in order to determine if defendants violated the FLSA and the NYLL, the Court must compare the rate of pay which plaintiffs were actually paid with the applicable minimum wage.  Since the higher of the two statutory rates during the earlier period from January 1, 2007 to July 24, 2009 was the NYLL minimum wage of $7.15, the Court has compared the regular rate of pay which plaintiffs Bedasie and Diaz actually received to the NYLL minimum wage of $7.15 for this period.  Since the higher of the two statutory rates for the period July 24, 2009 to December 20, 2013 was the FLSA minimum wage of $7.25, the regular rate of pay for plaintiffs Bedasie and Diaz for the years following July 24, 2009 was compared with the federal minimum wage of $7.25 an hour to determine if there were any wage and hour violations.

For plaintiffs Bedasie and Diaz, the Court first calculated their regular rates of pay for the years 2011 to 2013 (the years for which gross pay information was provided) by dividing the weekly gross pay received by the average number of hours plaintiffs worked in a typical week that year:  56 hours per week from 2011 to 2013 for both Bedasie and Diaz.  This calculation yielded hourly rates of pay that changed every week for both plaintiffs, based on their gross pay for that week.  Once this hourly rate of pay was determined, it was compared to the FLSA minimum wage of $7.25 and the difference was recorded as the "minimum wage differential."  If the calculation showed that the plaintiff's hourly rate of pay for a particular week was lower than $7.25, the minimum wage differential would yield a positive value.  If the plaintiff's hourly rate of pay for a particular week was higher than $7.25, then the value recorded for the minimum wage differential would be zero, since no minimum wage would be due for that particular week.  In order to determine the wages owed, if any, for each week, the Court multiplied the minimum wage

differential for a particular week by the average number of hours worked that week – 56 for both plaintiffs Bedasie and Diaz for every week from 2011 to 2013.

As discussed, <u>supra</u> in Section II(F)(1), damages under the NYLL are calculated using the same methodology used to calculate damages under the FLSA. <u>See</u> 29 C.F.R. § 778.109; N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.16. Thus, for the earlier period – 2007 to 2010 – the court must determine the minimum wage differential reflecting the difference between plaintiffs' regular hourly rate of pay as compared to the applicable minimum wage. In this case, the calculations for this earlier period are complicated by the fact that defendants had no records even of the gross pay received by plaintiffs during this earlier period. Where no records are available to calculate damages, courts in this circuit have accepted a method of calculating damages using the available records and plaintiff's own recollection. <u>See</u> <u>Yu Y. Ho v. Sim Enterp., Inc.</u>, 2014 WL 1998237, at *14 (holding that "[w]hen plaintiffs have adequately established their claims based on their recollections and defendants failed to offer any credible evidence to rebut their claims, plaintiffs' recollection and documentation of hours worked and compensation owed is presumed to be correct").

Consequently, for the years prior to 2011, the Court has credited Bedasie's and Diaz's testimony that they received the same average rate of pay that they received in the later period and that they worked the same set schedule with the exception of the period prior to June 27, 2009 when they were not working two Fridays a month. Using the gross pay records from the later period, 2011 to 2013, the Court calculated the amount of wages owed based on the hours plaintiffs testified to working per week during this period: about 51 hours per week. In applying the gross pay values retroactively, the Court applied the gross pay for the first pay day in 2011 to

the first pay day in 2007 for which plaintiff Bedasie was awarded damages and the first pay day in

2009 for which Diaz was awarded damages.  Thus, for instance, the gross pay recorded for the

first pay day in 2011 was $855 for Bedasie; this amount was applied to the first pay day in 2007

for Bedasie.  Similarly, the second gross pay recorded in 2011 was $675; the Court applied that

same rate to the second pay day in 2007, and so on.  Since the number of weeks in the pre-2011

period exceeded the number of weeks for the post-2011 period, there were more weeks in the pre-

2011 period than gross pay values in the post-2011 period.  Therefore, the Court reapplied the

gross pay values from the post-2011 period for a second iteration.  Accordingly, the gross pay for

the first pay day in 2011 was reapplied as the gross pay for the pay day of April 9, 2010, the gross

pay for the second week of 2011 was applied to the pay day of April 16, 2010, and so on.[45]

Once the Court extrapolated a gross pay value for a particular week in the pre-2011

period, that weekly gross pay value was then divided by the number of hours plaintiffs worked on

average each week in the post-2011 period.  This was done in order to make sure that the rates of

pay for the pre-2011 period were not inflated by the fact that plaintiffs were working some Fridays

in the post-2011 period, and therefore may have had a higher gross pay for certain weeks during

this period.  Thus, the Court divided the weekly gross pay values by 56 hours, rather than 51

hours, to account for the fact that plaintiffs worked, on average, more hours in the later period and

---

[45]Although the assignment of gross pay values for a particular week in 2011 to a
particular week in 2008 appears to be random, the Court chose this methodology instead of
calculating an average amount of minimum wage owed because, for some weeks, there were no
amounts due since the regular rate of pay for those weeks was equal to or higher than the
minimum wage.  If an average derived from the later years was used, plaintiffs would have
received a higher amount than was actually owed for the earlier years because using an average
value failed to provide a mechanism to adjust for the fact that the plaintiffs worked additional
days every other Friday in the later period.  (See n.47 infra).  By calculating a week-by-week
amount, the Court was able to adjust for the difference in hours worked during the two periods.

therefore, their weekly pay during this later period when they were alternately working five days a week would have been higher on average than when they were only working four days a week.

To calculate the actual amount owed in minimum wages, the Court multiplied the minimum wage differential by the average number of hours that the Court found Bedasie and Diaz to have worked each week, depending on the year:  51 hours per week from 2007 to June 27, 2009 and 56 hours per week from June 28, 2009 to 2010 (the average of the total hours plaintiffs worked a week, which alternated between 51 hours or 61 hours when plaintiffs were working Fridays).  The resulting hourly rates of pay were then compared to the minimum wage rate under the NYLL or the rate under the FLSA, whichever was higher during the relevant period.  The difference between the applicable minimum wage and the plaintiffs' regular hourly rate of pay was then found using the NYLL minimum wage of $7.15 from October 2, 2007 to July 24, 2009, and the federal minimum wage of $7.25 from July 24, 2009 to December 31, 2010.[46]  Thus, for instance, when the gross pay of $855 was applied to the gross pay date of October 5, 2007 for Bedasie and divided by 56 hours, the hourly rate was found to be $15.27 an hour and consequently, the minimum wage differential, when compared to the NYLL minimum wage rate of $7.15, was found to be zero, meaning that defendants owed plaintiff nothing in minimum wages for that week.[47]

---

[46]The federal minimum wage rose from $6.55 an hour to $7.25 an hour on July 24, 2009. 29 U.S.C. § 206.  Since the NYLL provides that "if a higher wage is established by federal law pursuant to 29 U.S.C. section 206 or any successor provisions, such wage shall apply," the Court used the higher federal minimum wage of $7.25 to calculate unpaid wages owed from July 24, 2009 onwards.  See N.Y. Comp. Codes R. & Regs. tit. 12, § 142-3.1.

[47]The Court's method of calculating unpaid wages owed to plaintiffs for the period before 2011, for which no gross pay records are available, differs from the method the plaintiffs propose to calculate damages for this period.  For instance, to determine the minimum wage owed for

i. <u>Pre-2011 Adjustments</u>

In performing the calculations for the period prior to 2011 where no records existed, the Court took into account the need for adjustments to the hours worked by plaintiffs based on testimony that plaintiffs took a certain number of sick days, vacation days, and testified that Mr. Z was closed for a certain number of days each year. For the period prior to 2011, defendants and plaintiffs agreed that Mr. Z was closed the last two weeks of every year (Pls.' Post Stmt. of Dam. ¶ 8a; Tr. at 382, 518); that plaintiff Bedasie took one to two weeks a year for vacation (Pls.' Post Stmt. of Dam. ¶ 8b; Tr. at 28, 385); and that plaintiff Diaz took off for vacation only once in 2011 (Pls.' Post Stmt. of Dam. ¶ 37d; Tr. at 113-14, 385, 435). The Court also accepts plaintiffs' representations that Bedasie and Diaz were out sick for approximately three days per year (Pls.'

---

2007 to 2010, plaintiffs found the total minimum wage owed from 2011 to 2013 and divided this amount by the total number of weeks in this period to determine the "average minimum wage" that was owed per week from 2011 to 2013. (Pls.' Post Stmt. of Dam. ¶ 26). Plaintiffs then multiplied the value for average minimum wage owed per week by the number of weeks each plaintiff testified they worked from 2007 to 2010, less any adjustments plaintiffs made for holidays, sick days, etc. (<u>Id.</u> ¶ 27). Plaintiffs repeated this process for finding the average value owed to determine average overtime owed and average spread of hours owed for any year before 2011. However, the Court found several inaccuracies with this approach. First, plaintiffs' method of calculating minimum wage owed prior to 2011 by using an "average minimum wage" does not take into account the fact that the statutory minimum wage rate for the years 2011 to 2013 ($7.25 an hour under the FLSA) was different than the statutory minimum wage rate from 2007 to July 24, 2009 ($7.15 an hour under the NYLL). Second, plaintiffs' method does not account for the change in the weekly number of hours plaintiffs worked: 51 hours per week from 2007 to June 27, 2009 and 56 hours per week from June 28, 2009 to 2013. Accordingly, the Court employed gross pay values from the years for which records were available, 2011 to 2013, to the years for which records were not available, 2007 to 2010, in order to be able to take into account the appropriate minimum wage rate and average weekly hours worked for the years 2007 to 2010 when calculating unpaid wages owed to plaintiffs. To get a sense of the difference in these methods, plaintiffs' method yielded a total in minimum wages owed to plaintiff Bedasie of $4,496.30 from 2007 to 2013 (Pls.' Post Mem., Ex. 1); the Court's method yielded a total in minimum wages owed to plaintiff Bedasie of $2,303.64 from 2007 to 2013. For plaintiff Diaz, plaintiffs found that he was owed minimum wages in the amount of $2,096.16 from 2009 to 2013 (<u>id.</u>, Ex. 2); the Court found that Diaz was owed minimum wages in the amount of $1,409.26 from 2009 to 2013.

Post Stmt. of Dam. ¶¶ 8c, 37c; Tr. at 58, 179); that Bedasie took a day off in 2013 for a medical examination (Pls.' Post Stmt. of Dam. ¶ 8d; Tr. at 58); and that there were four snow days each year when Mr. Z was closed. (Pls.' Post Stmt. of Dam. ¶ 8e, Tr. at 26). The Court also accepts defendants' testimony that there were some days when Diaz left early or did not come to work to attend auctions with his father. (Tr. at 265, 373, 490).

In addition, the Court accepts defendant Mustakas' testimony and plaintiffs' claim in their statement of damages that defendants were closed for ten federal holidays, specifically: President's Day, Memorial Day, the Fourth of July, Labor Day, Columbus Day, Election Day, Veteran's Day, Thanksgiving, Black Friday,[48] and New Year's Day. (Pls.' Post Stmt. Dam. ¶ 8f; Tr. at 383). In addition, since both Andreopolos and Mustakas testified that Mr. Z was closed for two weeks for Christmas every year (Tr. at 518-519), and plaintiffs agreed with that proposition (Pls.' Post Stmt. Dam. ¶ 8(a); Tr. at 382), the Court found that Mr. Z was closed for two weeks at the end of the year and deducted damages for weeks where the pay day fell on: December 21, 2007; December 28, 2007; December 19, 2008; December 26, 2008; December 18, 2009; December 25, 2009; December 24, 2010; and December 31, 2010.[49]

---

[48]Although defendants do not testify that Mr. Z was closed on Black Friday, the day after Thanksgiving, since plaintiffs concede in their damages calculations that their damages should be reduced to account for Black Friday (see Pls.' Post Stmt. Dam. ¶ 8f), the Court accepts this representation and reduces plaintiffs' damages accordingly.

[49]This two-week period does not include New Year's Day since plaintiffs agreed that Mr. Z was closed for about two weeks, including Christmas, at the end of every year (Pls.' Post Stmt. Dam. ¶ 8(f)), but calculated New Year's as an additional holiday for which Mr. Z was closed and deducted this holiday from their wages owed in their damages calculations. (Pls.' Post Mem. Ex. 4). Accordingly, the Court accepts plaintiffs' reduction in wages owed for New Year's day as one of the federal holidays on which they did not work, with the exception of New Year's Day 2011, which, according to plaintiffs, was observed in December 2010 during the two-week period Mr. Z was closed. (Pls.' Post Stmt. Dam. ¶ 8(g)).

For those days when plaintiffs did not work due to a holiday, the Court adjusted the total number of hours that plaintiffs would have worked in a week that included a holiday. The Court only adjusted the total number of hours to account for the holidays; there was no need to adjust Bedasie's or Diaz's gross pay for those weeks because everyone agreed that Bedasie and Diaz were not paid for the days Mr. Z was closed for a holiday and accordingly, no reduction to gross pay would be required. However, even if plaintiffs were not paid for the days they worked during these holidays, in order for the Court to determine an accurate hourly rate of pay for those weeks in which a holiday fell, it was necessary to reduce the number of hours actually worked that week to account for the days where plaintiffs did not work due to a holiday. Even though plaintiffs testified that when federal holidays fell on a Monday, they would work on the next Friday to make up for it, the Court found that, since plaintiffs reduced damages owed based on federal holidays that fell on a Monday and since defendants testified that plaintiffs would not make up holidays that fell on an Monday, plaintiffs' damages should be reduced to include these federal holidays, as well. (See discussion supra in Section II(F)(2)).

To make adjustments for holidays, the Court first determined on what day of the week a particular federal holiday fell from 2007 to 2010, and then deducted the amount of hours a plaintiff would have worked on that day of the week from the total amount of hours plaintiff testified to having worked normally on that day of the week. For instance, for New Year's Day in 2008, which fell on a Tuesday, the Court deducted the amount of hours Bedasie and Diaz worked that week by the amount of hours they typically worked on Tuesdays, 15 hours, to account for the holiday. This reduction in hours consequently reduced the number of hours for which each plaintiff was owed unpaid wages for that week.

For days plaintiffs did not work because of sick days, snow days, or personal vacation days, the parties did not identify the dates plaintiffs did not work for these reasons. Accordingly, the total number of days each plaintiff did not work was added to find the corresponding number of work weeks plaintiffs did not work each year, based on a workweek comprised of four workdays from 2007 to 2008 and a workweek comprised of five workdays from 2009 onwards. The number of weeks for which plaintiffs were owed damages was accordingly reduced by this estimate of weeks they did not work for each year. See Coulibaly v. Millennium Super Car Wash, Inc., No. 12 CV 04760, 2013 WL 6021668, at *9 (E.D.N.Y. Nov. 13, 2013) (adopting the magistrate judge's recommendation that "one week of pay be deducted from the damages sought by plaintiff. These deductions are intended to account for holidays, sick days, vacation days, and lunch breaks likely taken by plaintiff"). Thus, for instance, in 2007, the Court determined that Bedasie was not working for a total of 15 days in 2007, including three sick days, four snow days, and eight vacation days. The Court divided the 15 days by 4 days, the number of days Bedasie worked per week in 2007, to determine that Bedasie did not work for approximately four workweeks in 2007. Accordingly, the Court reduced the amount of damages due to Bedasie in 2007 by four weeks. The Court repeated this process for 2008 and determined that Bedasie did not work for approximately four workweeks in 2008. For 2009 and 2010, the Court determined that Bedasie did not work for four workweeks in 2009 and four workweeks in 2010, representing three sick days, four snow days, and nine vacation days (since Bedasie began working every other Friday in 2009, and therefore his two weeks of vacation time represented nine total workdays). Accordingly, the Court reduced Bedasie's damages in each of these years by the number of workweeks he did not work.

Similarly, in determining the amount owed to plaintiff Diaz, the Court reduced the total damages owed from 2009 to 2010 by four weeks. These represent four snow days, three sick days, and two weeks the Court reduced to estimate the amount of days Diaz either did not come to work or left early from work to attend auctions with his father. (See discussion supra in Section II(F)(2)). Thus, Diaz's total damages for 2009 and 2010 were each reduced by four weeks.

     ii.  Post-2011 Adjustments

As for the years 2011 to 2013, the Court first made adjustments to the total number of weeks worked each year by considering the number of sick days, vacation days, and snow days that plaintiffs Bedasie and Diaz may have taken off each year based on plaintiffs' and defendants' testimony. The Court accepted plaintiffs' testimony that Bedasie took about two weeks off for vacation each year and Diaz only took vacation once in 2011 for a couple days. (See discussion supra in Section II(F)). Plaintiffs argue that vacation days should not be taken out of damages owed to plaintiffs from 2011 onwards on the grounds that "[s]ince the payroll records show the weeks worked by Bedasie, these closures were already accounted for in the 2011 to 2013 calculations." (Pls.' Post Stmt. Dam. ¶ 8(b)). However, plaintiffs did reduce the damages plaintiffs were owed in this period to account for sick days and snow days, which, if plaintiffs' logic as to vacation days is correct, should not be required because sick days and snow days should have already been accounted for in the gross pay records. In order to ensure that the damage calculations were consistent for various days plaintiffs did not work and because plaintiffs reduced their damages for some of these days not worked but not others, the Court reduced the damages owed to plaintiffs from 2011 to 2013 for vacation days, sick days, snow days, and days plaintiffs might have left work early.

As for incidental days plaintiffs took off, the Court did not reduce the damages owed to Diaz for the days he took off in 2011 for his brother's death since the pay check Diaz received on April 29, 2011 for $375 appears to be significantly lower than his average pay check, suggesting that he did not work for a full workweek this week and that he took his vacation days during this week for the death of his brother, as he testified during trial. (Tr. at 179). As for Bedasie, since plaintiffs reduced Bedasie's damages in 2013 by one day based on his testimony that he took a day off for a medical examination (Tr. at 58; Pls.' Post Stmt. Dam. ¶ 8(d)), the Court reduced Bedasie's damages by one day in 2013, the week on which a pay day fell on May 17, 2013.

Since neither plaintiffs nor defendants know exactly when Mr. Z may have been closed for a snow day, the Court was unable to determine on a week-to-week basis whether a plaintiff's gross pay was lower in a particular week because there had been a snow day or a vacation day that fell during that week, or whether the gross pay was simply lower because fewer cars were tagged. Therefore, the Court decided to account for snow and sick days by reducing the damages owed to plaintiffs by adjusting the number of weeks for which plaintiffs were owed damages in each year. See id. Since the Court found that both Bedasie and Diaz did not work for about three sick days each year and four snow days each year for a total of seven days, the Court reduced the amount of damages they were owed in the years 2011 to 2013 by two weeks to account for these days.

As for the federal holidays, the Court made adjustments in the damages calculations for weeks which fell on a federal holiday by adjusting the total number of hours that plaintiffs would have worked on that particular week, as discussed infra. To do this, the Court first determined on what day of the week a particular federal holiday fell in 2011, 2012, and 2013, and then deducted the amount of hours a plaintiff would have worked on that day of the week from the total amount

of hours plaintiff testified that he normally would have worked on that particular day of the week. For instance, to determine Bedasie's hours for the week of November 4, 2011, including Election Day, which fell on November 8, the Court divided his gross pay of $620 as reported by 41 hours rather than 56 hours for the workweek to account for the fact that Bedasie likely did not work on Election Day, a Tuesday, when he would have ordinarily worked about 15 hours.[50]

The minimum wages owed to plaintiffs Bedasie from 2007 to 2013 and Diaz from 2009 to 2013, including the deductions made for days off, are shown in the chart below:

**Chart 3: Minimum Wages Owed to Plaintiffs Bedasie and Diaz**

| Period | Minimum Wages Owed to Bedasie | Minimum Wages Owed to Diaz |
|---|---|---|
| 2007 | $0.00 | N/A |
| 2008 | $525.35 | N/A |
| 2009 | $977.29 | $106.63 |
| 2010 | $313.00 | $585.63 |
| 2011 | $257.00 | $110.88 |
| 2012 | $119.63 | $686.00 |
| 2013 | $112.00 | $81.00 |
| **Total** | $2,304.27 | $1,570.14 |

Thus, in total, the Court finds that plaintiff Bedasie is owed $2,304.27 in unpaid minimum

---

[50]Although the Court accepts Andreopolos' testimony that Mr. Z was closed for two to three weeks after Hurricane Sandy and that the scouts were not paid for that period (Tr. at 521), as discussed supra in Section II(F)(2), since two weeks were missing in the gross pay records from October to November 2012, the Court has not made any additional adjustments to the damages owed to each plaintiff for Hurricane Sandy closures, concluding that these missing weeks were the weeks Mr. Z was closed due to the storm.

wages and plaintiff Diaz is owed $1,570.14 in unpaid overtime wages.[51]

B. <u>Overtime Pay Owed</u>

Plaintiffs also claim that they were not properly paid for all the overtime hours that they worked. In comparing the overtime pay that was actually paid to plaintiffs with the overtime pay that should have been paid based on federal and state regulations, the Court finds that for several weeks during the periods involved, plaintiffs Bedasie and Diaz were paid overtime in amounts lower than what they should have been paid.

Under both federal and New York law, an employee is entitled to overtime pay, or one and one-half times the employee's regular rate, for hours worked in excess of 40 hours in one work week. 29 U.S.C. § 207(a)(2)(C); 12 N.Y.C.R.R. § 142-3.2. Under these provisions, piece-rate earnings must be converted to an hourly rate in order to determine whether the earnings comply with the overtime pay requirements. Therefore, "[i]f the employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if he receives no other form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked. He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek." 29 C.F.R. § 778.112. Accordingly, this Court has examined plaintiffs' submissions and calculated damages based on the applicable statutes.

---

[51]These numbers are lower than plaintiffs' proposed minimum wages owed, in that plaintiffs seek $4,496.30 for Bedasie and $2,096.16 for Diaz. (<u>See</u> Pls.' Post Mem., Exs. 1-2).

Under the NYLL's six-year statute of limitations, see N.Y. Lab. L. § 663(3), plaintiffs are entitled to recover overtime wages, calculated at the rate of one and one-half times their regular rate of pay for any hour worked over 40 in a given workweek.  Since plaintiffs are not entitled to recover double damages under both the FLSA and the NYLL, Janus v. Regalis Constr., Inc., 11 CV 5788, 2012 WL 3878113, at *7 (E.D.N.Y. July 23, 2012), report and recommendation adopted, 11 CV 5788, 2012 WL 3877963 (E.D.N.Y. Sept. 4, 2012); Ke v. Saigon Grill, Inc., 595 F. Supp. 2d 240, 264 n.4 (S.D.N.Y. 2008), and since the method for calculating overtime under both the FLSA and NYLL is the same, the Court has calculated overtime wages owed to each plaintiff to the extent that he was employed by Mr. Z within this six-year statute of limitations period:  from October 2, 2007 to October 2, 2013.

The FLSA provides that overtime rates shall be calculated based on the employee's regular rate of pay or the minimum wage, whichever is greater.  29 U.S.C. § 207(a); 29 C.F.R. § 778.107.[52]  Even where employees are paid at a regular rate of pay that is significantly higher than the minimum wage, their overtime rate of pay is equal to one and one-half times their regular rate of pay for all hours worked above forty hours.  See Espinoza v. Industrial Glass & Mirror Inc., No. 16 CV 0064, 2016 WL 7650592, at *5 (E.D.N.Y. Nov. 30, 2016), report and recommendation adopted, No. 16 CV 0064, 2017 WL 65828 (E.D.N.Y. Jan. 5, 2017) (holding that where plaintiff worked twenty hours of overtime per week and where plaintiff's regular rate of pay was $12 per hour, plaintiff's overtime rate was $18 an hour and plaintiff was owed an additional $6 an hour in overtime wages, or $120 per week); Chen v. JP Standard Constr. Corp.,

_____

[52]As discussed supra in n.31, under federal and state regulations, an employees' overtime compensation must be computed at a rate not less than one and one-half times the higher of his regular rate of pay or the statutory minimum.

No. 14 CV 1086, 2016 WL 2909966, at *11 (E.D.N.Y. Mar. 18, 2016), report and recommendation adopted, No. 14 CV 1086, 2016 WL 2758272 (E.D.N.Y. May 12, 2016) (holding that where plaintiff's regular hourly rate was $10.31, plaintiff's overtime rate was $15.47 and he was owed an "overtime premium" of $5.16 an hour for the hours he worked in excess of forty each week).  In addition, where employees were paid on commission, received a weekly salary, and worked more than 40 hours per week, courts have presumed that employers intended to compensate plaintiffs for all hours worked during the week.  Ayala v. Your Favorite Auto Repair & Diagnostic Ctr., Inc., No. 14 CV 5269, 2016 WL 5092588, at *23 (E.D.N.Y. Sept. 19, 2016) (holding that where plaintiffs were paid on a weekly basis, paid partly on commission, and routinely worked above 40 hours a week, plaintiff's regular rate of pay, and consequently overtime rate of pay, should be determined based on hours actually worked, rather than a 40-hour workweek).

In this case, plaintiffs Bedasie and Diaz were paid at an hourly rate that was lower than the minimum wage during some weeks and higher than the minimum wage during other weeks.  The Court accordingly calculated the overtime wages owed to each plaintiff on a weekly basis, using the higher of the minimum wage or the actual rate of pay for that particular week.[53]

_____

[53]Under circumstances where there is a fixed hourly rate and a determined number of hours worked, it is easy to calculate overtime amounts and determine if there were weeks when overtime was owed.  In this case, because the hourly rates were not set, the law requires that the regular rate of pay be determined using the available information – namely, the total amount paid and the hours worked per week.  As noted, because the total pay in a particular week might be higher and the regular rate might, as a consequence, also be higher, it is impossible to calculate on a week-by-week basis whether there may be some weeks in which there would be some number that would have resulted in a proper overtime payment.  However, because defendants have not provided any information that would allow such a calculation, the Court has calculated overtime using the regular hourly rate determined as described above in accordance with 29 U.S.C. § 207(a)(2)(c); 29 C.F.R. § 778.202; and 12 N.Y.C.R.R. § 142-3.2.

To find overtime amounts owed on a weekly basis from 2011 to 2013, the Court calculated half of a plaintiff's rate of pay for a particular week (or if the rate of pay was below minimum wage, half of the minimum wage) and added that amount to the regular rate of pay to find the overtime rate of pay, which represents the rate of pay owed to a plaintiff for any hours worked above 40 hours. That overtime rate of pay was then multiplied by the number of hours a plaintiff worked over 40 in a particular week. Thus, for example, if a plaintiff was paid $500 in a week, and worked 50 hours that week, he was being paid a regular rate of pay of $10 an hour for every hour he worked. Since he worked ten hours of overtime for this week, he was owed $15 an hour for those ten hours of overtime. However, since the Court, in calculating damages, had already determined that plaintiff was paid straight time $10 an hour, he is only owed an additional $5 an hour as an "overtime premium" for the ten hours he worked overtime, based on the law that requires he be paid one-and-a-half times his regular rate of pay in overtime wages.

To find the overtime amounts owed for the years from 2007 to 2010, the Court first found the regular rate of pay using the same method used to calculate minimum wages owed by using the gross pay values from prior years to determine regular rates of pay on a weekly basis. The Court then determined overtime rate per week taking into account the fact that during the period from 2007 until June 28, 2009, plaintiffs were working four days a week or an average of 51 hours per week, and accounting for the change in minimum wage rates that occurred during this period: $7.15 an hour until July 24, 2009 and $7.25 an hour after July 24, 2009. The Court then multiplied the approximate overtime rate times the average number of overtime hours Bedasie and Diaz worked per week – 11 hours from 2007 to June 27, 2009 and 16 hours from June 28, 2009

until the end of 2010.[54]  (See discussion supra in Section III(A)(3)).

The overtime wages owed to plaintiffs Bedasie from 2007 to 2013 and Diaz from 2009 to 2013 are summarized in the chart below:

**Chart 4: Overtime Wages Owed to Plaintiffs Bedasie and Diaz**

| Period | Overtime Wages Owed to Bedasie | Overtime Wages Owed to Diaz |
|--------|--------------------------------|------------------------------|
| 2007 | $345.95 | N/A |
| 2008 | $2,750.46 | N/A |
| 2009 | $3,586.58 | $3,345.87 |
| 2010 | $3,986.34 | $3,643.93 |
| 2011 | $4,202.00 | $4,143.26 |
| 2012 | $3,641.52 | $3,475.34 |
| 2013 | $949.15 | $710.03 |
| **Total** | $19,462.00 | $15,318.43 |

Thus, the Court finds that in total, plaintiff Bedasie is owed $19,462.00 in unpaid overtime wages and plaintiff Diaz is owed $15,318.43 in unpaid overtime wages.[55]

_____

[54]The last weeks in December of 2010 were deducted from plaintiffs' damages to account for sick days, snow days, and vacation days each plaintiff did not work.  The Court reduced damages for Bedasie for two more weeks than it did for Diaz, since Bedasie testified that he took two weeks of vacation each year, but Diaz testified that he took no vacation days, other than in 2011.  See discussion supra in Section III(A).

[55]These numbers are slightly higher than plaintiffs' proposed overtime wages owed; plaintiffs seek $19,325.11 for Bedasie and $11,981.39 for Diaz.  (See Pls.' Post Mem., Exs. 1-2).

86

C.  Spread-of-Hours Pay Owed

Plaintiffs Bedasie and Diaz argue that defendants also failed to pay plaintiffs spread-of-hours compensation under the NYLL for every day in which the spread of hours exceeded ten hours for their entire period of employment.  (Pls.' Post Mem. at 1).  See 12 N.Y.C.R.R. § 142-3.3.  In support of this claim, plaintiffs point to payroll records showing that defendants never paid spread-of-hours pay even though plaintiffs Bedasie and Diaz regularly worked more than 10 hours in a day.  (Pls.' Post Mem. at 15-17).  Under the NYLL, an employee is entitled to earn an additional hour of pay at the "basic minimum hourly rate" for each day on which that employee works more than ten hours.  12 N.Y.C.R.R. § 142-2.4.  Spread of hours is defined as "the length of the interval between the beginning and end of an employee's workday," which "includes working time plus time off for meals plus intervals off duty." Id. § 142-2.18.  Plaintiffs Bedasie and Diaz testified that they did not get a lunch break (Tr. at 25, 109), but even if they had taken breaks during the day, their spread of hours would constitute the duration of their workday, including these breaks; therefore, the Court considered their entire workday, from the time they began working to the time they finished working, to determine whether they had worked more than ten hours on a given day.

Under the FLSA, the applicable minimum hourly wage rate was $6.55 until July 24, 2009, and $7.25 from July 24, 2009 onwards.  29 U.S.C. § 206(1).  Under the NYLL, the applicable minimum hourly wage rate was $7.15 from January 1, 2007 to December 31, 2013.  Since the higher of the two statutory rates during the period from January 1, 2007 to July 24, 2009 was the NYLL minimum wage of $7.15, the Court used the NYLL minimum wage of $7.15 to calculate the spread-of-hours wages due to plaintiffs for these years.  Since the higher of the two statutory

rates for the period from July 24, 2009 to December 20, 2013 was the FLSA minimum wage of $7.25, the Court used the FSLA minimum wage of $7.25 to calculate the spread of hours due to plaintiffs from July 24, 2009 onwards.

Most courts in this circuit have ruled that New York's spread-of-hours provision applies only to employees who earn minimum wage. See Guaman v. J & C Top Fashion, Inc., No. 14 CV 8143, 2016 WL 791230, at *5 (S.D.N.Y. Feb. 22, 2016). In terms of the time period for which spread-of-hours pay is available, employees are only entitled to spread-of-hours pay for the days when they were working more than ten hours per day and making the minimum wage or less than the minimum wage. Ayala v. Your Favorite Auto Repair & Diagnostic Ctr., Inc., 2016 WL 5092588, at *25 (holding that "defendants are liable for unpaid spread-of-hours pay as to [plaintiffs] only to the extent that those plaintiffs were not making more than the minimum wage during the time periods at issue"). In addition, courts in this district have awarded plaintiffs spread-of-hours wages under the NYLL for the same periods for which they awarded unpaid wages under the FLSA. See Gonzalez v. Jane Roe Inc., No. 10 CV 1000, 2015 WL 4662490, at *4 (E.D.N.Y. July 15, 2015), report and recommendation adopted as modified, No. 10 CV 1000, 2015 WL 4681151 (E.D.N.Y. Aug. 6, 2015) (awarding plaintiff NYLL spread-of-hours wages from 2004 to 2009 and unpaid minimum wages and overtime wages under the FLSA from 2007 to 2009); Santillan v. Henao, 822 F. Supp. 2d at 296 (awarding plaintiff NYLL spread-of-hours wages from 2004 to 2009 and unpaid wages under the FLSA for an overlapping period from 2007 to 2010).

To calculate spread-of-hours wages owed for every week for the period from 2011 through 2013 in which the regular rate of pay was either lower than or equal to the minimum wage of

$7.25, plaintiffs calculated the spread-of-hours wages owed by multiplying the minimum wage by five days. (Pls.' Post Mem. Ex. 1). Plaintiffs explain that "because Bedasie worked for ten or more hours on every day that he worked, and because spread-of-hours wages only apply to an employee who is not earning more than the minimum wage, spread of hours are included for all five days worked in any week in which Bedasie's 'Rate'. . . was at or below New York statutory minimum wage of $7.25." (Id. at 7). Similarly, for plaintiff Diaz, plaintiffs calculated the spread-of-hours pay owed by multiplying the minimum wage by five days for every week in which Diaz's regular rate of pay was at or below $7.25. (Id. Ex. 2).

However, according to plaintiff Bedasie's testimony as to the schedule, he only worked more than ten hours a day for three days on any given week: on and before June 27, 2009, Bedasie worked 15.5 hours on Mondays, 15 hours on Tuesdays, 10 hours on Wednesdays, and 10.5 hours on Thursdays; after June 28, 2009, Bedasie worked 15.5 hours on Mondays, 15 hours on Tuesdays, 10 hours on Wednesdays, 10.5 hours on Thursdays, or, for weeks he worked Fridays, 10 hours on Thursdays and 10.5 hours on Fridays. (See Chart 1 and 2, supra in Section II(F)(2)(i)). Plaintiffs testified that at the end of the shift on the last day of the week, either Thursday or Friday, they would have to go back to the yard to return the computer chip used during the week and review the list of cars towed that week with the marshal's list, for an additional half an hour – resulting in a workday of 10.5 hours. (Tr. at 23, 93, 107).

Since Diaz's hourly schedule was the same as Bedasie's, and Diaz's testimony indicates that he worked more than ten hours per day for only three days on any given week, the Court adjusted the plaintiffs' calculations to award spread-of-hour wages for only three days in weeks

where Bedasie's and Diaz's regular rate of pay was less than or equal to the minimum wage.[56]

Spread-of-hours wages owed were calculated using the NYLL minimum wage of $7.15 until July 24, 2009 and the federal minimum wage of $7.25 from July 24, 2009 onwards.

To find the spread-of-hours wages owed for the years from 2007 to 2010 for which no records are available for plaintiff Bedasie, the Court calculated the spread-of-hours wages owed in the same manner that it calculated minimum wages owed and overtime wages owed in this period. Using the gross pay data provided for the period after 2011 and the weekly schedule described by each plaintiff, which showed that Bedasie and Diaz each worked for more than 10 hours per day three times each week, the Court awarded three hours of spread-of-hours pay, but only for those weeks when plaintiffs' regular hourly rate per day fell at or below below the minimum wage rate. See Ayala v. Your Favorite Auto Repair & Diagnostic Ctr., Inc., 2016 WL 5092588, at *25. For the period prior to 2011, the Court awards spread-of-hours wages based on the NYLL minimum wage rate of $7.15 per hour.

For the period after July 24, 2009, the Court awards spread-of-hours wages based on the FLSA minimum wage of $7.25 per hour. As for the hours worked, the testimony showed that

---

[56]The Court only awarded a plaintiff spread-of-hours wages for the days he worked in excess of ten hours, but not for the days he worked exactly ten hours. See Li v. Leung, No. 15 CV 5262, 2016 WL 5369489, at *15 (E.D.N.Y. June 10, 2016), report and recommendation adopted as modified, No. 15 CV 5262, 2016 WL 5349770 (E.D.N.Y. Sept. 23, 2016) (holding that, where "Plaintiff regularly worked at least ten hours per day six days a week . . . Plaintiff is entitled to spread-of-hours pay for the 12-hour shifts that he worked five days a week and 11.5-hour shift one day a week"); Coulibaly v. Millennium Super Car Wash, Inc., 2013 WL 6021668, at *14 (holding that, where plaintiff worked "ten hours a day, six days a week," but worked for twelve hours on only one of these days, "for the duration of his employment, plaintiff worked one day per week in excess of ten hours per day, for a total of 28 days at the applicable minimum wage of $7.15 per hour and 149 days at $7.25 per hour" and was accordingly awarded spread-of-hours wages for only one day a week).

Bedasie and Diaz each worked for more than ten hours a day three times each week during the entire period of their employment: on Mondays, Tuesdays, and either Thursdays or Fridays, depending on whether they worked on Friday for that particular week.

The spread-of-hours wages owed to Bedasie from 2007 to 2013 and Diaz from 2009 to 2013 are shown in the chart below:

**Chart 5: Spread-of-Hours Wages Owed to Plaintiffs Bedasie and Diaz**

| Years | Spread-of-Hours Wages Owed to Bedasie | Spread-of-Hour Wages Owed to Diaz |
|-------|---------------------------------------|-----------------------------------|
| 2007 | $0.00 | N/A |
| 2008 | $71.50 | N/A |
| 2009 | $144.20 | $43.20 |
| 2010 | $65.25 | $166.75 |
| 2011 | $43.50 | $36.25 |
| 2012 | $36.25 | $130.50 |
| 2013 | $43.50 | $21.75 |
| **Total** | $404.20 | $398.45 |

In total, the Court finds that plaintiff Bedasie is owed $404.20 in spread-of-hours damages and plaintiff Diaz is owed $398.45 in spread-of-hours damages.[57]

---

[57]Plaintiffs requested $1,195.46 in spread-of-hours wages for Bedasie and $655.07 in spread-of-hours wages for Diaz. (See Pls.' Post Mem., Exs. 1-2). As explained supra, the Court has awarded a lower amount based on the finding that plaintiffs worked greater than ten hours a day on only three days each workweek, rather than five.

IV.  Damages Owed to Plaintiff Rosario

Plaintiff Rosario only seeks overtime wages owed from 2008 to 2013 and does not seek unpaid minimum wage or spread-of-hours wages.  (Pls.' Post Mem. at 16, Ex. 3).

i.  Hourly Rate

Rosario claims that he was initially paid $10.00 per hour from when he started until the middle of 2009, which would be June 28, 2009, when he received a raise to $11.00 per hour.  (Tr. at 192).  Although Rosario initially testified that his pay increased from $11 an hour to $12 an hour in 2012 (Tr. at 192), he also testified upon further questioning that he was told that his salary went up to $12 "in the beginning of 2013."  (Tr. at 193).  Moreover, in their damages calculations, plaintiffs represent that Rosario's pay increased to $12 from January 18, 2013 onwards.  (Pls.' Post Stmt. Dam. ¶ 67).  Since plaintiffs represented that Rosario's hourly wage increased in the beginning of 2013, which provides Rosario with lower damages than he would have received if his hourly rate had risen in 2012, and since defendants have not provided any evidence to the contrary, the Court applied Rosario's wage increase from $11 to $12 from January 18, 2013 onwards.[58]

_____

[58]Defendants also question the credibility of Rosario's statements in his Amended Complaint and in his testimony regarding his alleged pay raises.  Defendants point out that while Rosario claimed in his verified Amended Complaint that he received a raise from $10 to $11 an hour in "the middle of 2011," he testified during trial that he received a raise to $11 "in the middle of 2009."  (Defs.' Post Mem. at 12-13).  As part of plaintiffs' Amended Complaint, plaintiffs state that, "During Rosario's employment at Mr. Z, he was paid $10.00 an hour from January 2008 through the middle of 2011, $11.00 per hour from the middle of 2011 until the end of that year, and $12.00 per hour during 2012 until his employment ceased."  (Am. Compl. ¶ 45).  During trial, however, Rosario was asked the question: "At any point did your pay rate change while working at Mr. Z?" He responded that "[s]ome time in 2009 it went up to $11."  (Tr. at 192).  When questioned about the inconsistency in the dates for the alleged raise, Rosario

Defendants argue that plaintiff Rosario was only paid at the minimum wage rate during his period of employment at Mr. Z. In his testimony, defendant Andreopolos explained that Rosario was paid the minimum wage because "he had no skills." (Tr. at 508). Defendant Andreopolos also explained that Rosario was paid minimum wages for the first 40 hours he worked in a week, which was $7.25, and then $10.88 for any hours after 40 (time and a half). (Tr. at 560). Mustakas testified that Rosario was never offered a salary of $10 per hour, and she denies that he ever received a raise to $11 or $12 an hour. (Tr. at 378). According to Mustakas, she was present when Rosario was offered the job at $7.25 per hour, with $10.88 per hour in overtime. (Id. at 379). She testified that he did work overtime on occasion and that he was paid for his overtime hours. (Id.) She explained that he would write down on a piece of paper the times he started and finished each day, and bring that paper to the office. (Id. at 380). Mr. Z would keep those records until the end of the week. (Id. at 379-80). At that time, the check would be issued and the records discarded. (Id. at 380-81).

The Court notes that plaintiff Diaz testified that when he was hired to work as a stager in 2008, he was paid $10.00 an hour (see id. at 102), corroborating Rosario's testimony that he started as a stager at $10 an hour. Furthermore, Andreopolos testified that he paid Diaz above

---

testified that the Amended Complaint incorrectly stated that he received $10 an hour until the middle of 2011. (Tr. at 209). When asked to explain the alleged error in the Amended Complaint, Rosario testified: "I'm not a good reader, when I read it. If I was a good reader I would have been, oh, wait a minute, this is wrong. I would have corrected it." (Tr. at 209-10). Based on the presence of an interpreter for plaintiffs during trial and plaintiffs' difficulties comprehending and reading the English language, the Court accepts plaintiff Rosario's explanation for the discrepancy between his Amended Complaint and his testimony. Since an interpreter was present at trial to explain the proceedings to plaintiff Rosario, the Court is inclined to accept Rosario's testimony over the statements in the Amended Complaint, even though they were verified.

minimum wage, even though Diaz had no skills when he started working at Mr. Z. (Id. at 483). Thus, Andreopolos' testimony that he could not possibly have been paying Rosario more than the minimum wage rate of $7.25 when Rosario started working at Mr. Z because Rosario was inexperienced is contradicted by Andreopolos' own testimony that he paid Diaz more than minimum wage despite Diaz's lack of experience.

In further support of their allegation that Rosario's pay rate was increased to $11 an hour in 2009, plaintiffs point to Rosario's pay stubs, which were introduced into evidence. If defendants are correct that Rosario was only paid at the minimum wage rate, the pay stubs show that if he was paid at the minimum rate, he would have worked as many as 79 to 82 hours on certain weeks. This contradicts defendants' testimony that it was unlikely that Rosario ever worked more than 60 hours per week. (Pls.' Post Mem. at 16-17). When asked by plaintiffs' counsel, "There's no chance in your mind that he ever worked 70 hours?" defendant Andreopolos replied, "No." (Tr., at 536). Several minutes later, Andreopolos stated, "But more than 70 hours. Who works 70 hours?" (Id.; Pls.' Post Mem. at 17).

To determine whether plaintiff Rosario could have been paid more than minimum wage based on his pay stubs, the Court examined the pay stubs that plaintiffs received from defendants. (Tr. Ex. 8). For example, the pay stub dated February 11, 2011, which represents a week of pay for days worked from February 4, 2011 to February 10, 2011, shows Rosario's gross pay to be $748.00. (Id.) Assuming, based on defendants' own testimony that plaintiff Rosario was being paid $7.25 an hour, which was the minimum wage in 2011, and an overtime rate of $10.88 an hour, Rosario would have to have worked a total of 82 hours that week to make $748.00 – 42 hours of which would encompass overtime. Based on defendants' argument that there was "no

chance" that Rosario ever worked more than 70 hours, the Court does not credit defendants'
testimony that Rosario was only being paid $7.25 an hour and $10.88 an hour for overtime wages
during his entire period of employment. Alternatively, if the Court were to apply Rosario's
testimony that he was being paid $11 an hour during the year of 2011, including the week of
February 11, 2011, Rosario would have worked 68 hours for that week, of which 28 hours was
overtime. (Tr. at 536).

Therefore, the Court finds that Rosario was in fact paid at an hourly wage rate that was
higher than the minimum wage rate of $7.25. The Court credits Rosario's testimony that he was
actually paid at the rates of $10 per hour from 2008 to June 27, 2009, $11 per hour from June 28,
2009 through January 17, 2013, and $12 per hour during the period from January 18, 2013
through June 28, 2013.

### ii. Overtime Wages Owed

Since the FLSA provides that overtime rates shall be calculated based on the employee's
regular rate of pay or the minimum wage, whichever is greater, 29 U.S.C. § 207; 29 C.F.R.
§ 778.107, the Court calculated the overtime wages owed to Rosario by using his higher hourly
rate of $10, $11 or $12 an hour, depending on the period, rather than the prevailing minimum
wage of $7.15 or $7.25 an hour.

### a) Post-2011 Period

For the period from 2011 to 2013, for which the Court had gross pay records, the Court
first determined the total hours worked per week by dividing the gross pay by the applicable pay

rate: from 2011 to January 10, 2013, the Court divided the weekly gross pay by $11 per hour and from January 18, 2013 to June 28, 2013, the Court divided the weekly gross pay by $12 an hour. The Court found that although Rosario testified credibly as to the average number of hours he worked each week, he admitted that he could not verify that he worked exactly the same hours every week. Thus, using the gross pay divided by the hourly rate provided a more accurate number of hours worked.

Based on Rosario's regular rates of pay of $11 and $12 for these periods, the Court found his overtime rate of pay, calculated as one and one-half times his hourly rate, to be $16.50 and $18.00. Since Rosario was already paid his base rate of either $11 or $12 for the hours he worked in excess of 40 hours, the Court found that he was owed an "overtime premium" amount calculated at: $5.50 an hour from 2011 to January 10, 2013, and $6.00 an hour from January 18, 2013, when Rosario claimed he received a raise, to June 28, 2013. The rates of $5.50 an hour and $6.00 an hour, or Rosario's "overtime premium," were then multiplied by the number of hours Rosario worked over 40 for a particular week to find his overtime wages owed for that week.[59]

To account for federal holidays, sick days, or vacation days Rosario may have taken in the years 2011 to 2013, plaintiffs state that they did not make adjustments in their overtime damages calculations for Rosario because they argue that Rosario was paid for every hour worked for this period and therefore, any days he did not work on a federal holiday or a sick day has already been

---

[59]In the plaintiffs' damages charts, two entries for gross pay are made for the pay date of: November 2, 2012 for plaintiff Jose Rosario. An examination of plaintiff Rosario's pay stubs shows that although he was paid twice on November 2, 2012, he was paid for two different pay periods: the period from October 19, 2012 to October 25, 2012 and the period from October 26 2012 to November 2, 2012. (Pls.' Post Mem. Ex. 4). Accordingly, the Court has included amounts of overtime wage due for both values reported for the pay date of November 2, 2012 in its damages calculations.

accounted for in these calculations.  (Pls.' Post Stmt. of Dam. ¶ 63c).[60]

In fact, when the Court divided Rosario's gross pay by his rate of pay to determine the hours worked per week and compared the hours Rosario worked on weeks which included a federal holiday with the hours worked on weeks that did not include a federal holiday, it appeared as if federal holidays were already accounted for in Rosario's gross pay.  For instance, Memorial Day, May 30, 2011, fell on a Monday.  If Rosario usually worked a total of 62 hours per week when he worked Fridays and his average workday on a Monday was 15 hours, then his weekly pay should have been lower for that week to reflect the federal holiday.  Rosario's pay stub for that week shows his gross pay was $495.  When his gross pay is divided by his hourly rate of $11, the total number of hours worked was 45 hours.  This approximates the number of hours Rosario would have worked if the 15 hours for the federal holiday was deducted from 62 hours: 47 hours.  Based on a week-by-week analysis of the total number of hours Rosario worked during weeks which included a federal holiday, the Court found that the gross pay records, as well as the total hours worked in a week, reflected a reduction for federal holidays.  From these records, the Court

---

[60]Although the Court made adjustments in the damages calculations for Bedasie and Diaz to account for federal holidays for the entire period of their employment at Mr. Z, these adjustments were made to determine more accurately the total number of hours Bedasie and Diaz would have worked in a given week in order to calculate a regular rate of pay for that week.  (See discussion supra Section III(A)(3)(ii)).  By contrast, the Court has already found that defendants paid Rosario a regular hourly rate of either $10, $11, or $12 throughout his entire period of employment and has pay stubs showing his gross pay for each week from 2011 to 2013.  The gross pay for the post-2011 period, when divided by Rosario's regular hourly rate, indicates the approximate number of hours Rosario worked in a given week, including any day of the week he may have not worked due to a sick day, vacation day, or federal holiday.  Since for the period prior to 2011, the Court did not have accurate values for Rosario's weekly gross pay, the gross pay divided by the hourly rate would not have provided an accurate representation of the amount of hours Rosario worked in a given week because it included the days Rosario did not work due to a holiday.  Accordingly, the Court reduced the number of hours Rosario worked each week that included a holiday for only the pre-2011 period of his employment.

concluded that the only reduction necessary in Rosario's gross pay was for any sick days Rosario might have taken in this period.

As for days Rosario did have to work due to Hurricane Sandy, the Court has made no further adjustments to the damages owed to Rosario based on any closures for Hurricane Sandy, since the gross pay records show weekly gaps in the months of October and November 2012, indicating that Rosario was not paid for the weeks Mr. Z was closed due to the Hurricane. (See discussion supra in Section II(F)(2)(iv)).

Since the Court has determined that Rosario's gross pay records account for any federal holidays, sick days, snow days, vacation days, and days Mr. Z was closed for Hurricane Sandy, the Court did not make any adjustments to Rosario's damages calculations from 2011 to 2013.

   b) Pre-2011 Period

To calculate overtime damages for Rosario for the years prior to 2011, for which no records are available, the Court credited Rosario's testimony that he was being paid $10 an hour from the time he started working at Mr. Z's to the middle of 2009, and $11 an hour from the middle of 2009 to 2010. (Tr. at 192).

Rosario estimated that his workweek throughout the period he worked at Mr. Z was as follows: he worked on Mondays and Tuesdays from 3:00 a.m. until 6:00 p.m. for a total of 15 hours each day. (Tr. at 195). On Wednesdays, he would start at 3:00 p.m. and work until 2:00 a.m., when he would go to the yard. (Id. at 196). He would then give the information forms to Mustakas or Andreopolos and go to the precinct, ending maybe at the latest, 3:00 a.m. (Id.) He testified that his schedule on Thursdays was the same as Wednesdays. (Id.)

Although Rosario testified that he began working Fridays in 2009, he could not specify when exactly he began working Fridays, stating that "[I] don't remember exactly when." (Tr. at 194). Plaintiffs claim, however, that "[d]efendants began to operate on Fridays in the middle of 2009." (Pls.' Post Stmt. Dam. ¶ 62). The Court therefore finds that, like Bedasie and Diaz, Rosario started working on Fridays from approximately June 28, 2009 onwards. (See discussion supra in Section II(F)(2)(i)). On Fridays, Rosario testified that he would start at 2:00 p.m. and end at 1:00 a.m. (Tr. at 197). The Court notes that there is a discrepancy between Rosario's testimony as to when he started work on Friday afternoons as set forth and when plaintiffs claim Rosario started work on Friday afternoons in their Post-Trial Statement of Damages. Rosario testified that he would begin working on Fridays at 2:00 p.m. and would work until 1:00 a.m. (id. at 197), but plaintiffs' summary states that Rosario worked from 3:00 p.m. to 1:00 a.m. every other Friday. (Pls.' Post Stmt. Dam. ¶ 62). The Court has several concerns with accepting the entirety of Rosario's testimony as to his hours worked – namely, he first testified that on Fridays he would work until "[t]welve, one. It was never a set time," and then later, he testified that the average time he would leave on Fridays was 1:00 a.m. (Id. at 197). The Court therefore accepts plaintiffs' representation that on Fridays, Rosario would start work at 3:00 p.m. and work to 1:00 a.m. for a total of 10 hours.

Accordingly, the Court finds that Rosario worked a total of approximately 52 hours per week from 2008 to the middle of 2009, and alternating hours of 52 hours or 62 hours every week from June 28, 2009 onwards. Thus, the Court awards 12 hours of overtime wages per week from 2008 to June 27, 2009, and alternating overtime hours of 12 and 22 hours per week from June 28, 2009 to 2010. From 2011 onwards, the Court calculated his hours using the gross pay records.

(See discussion supra).  The Court's findings on Rosario's hours are shown in the charts below.

**Chart 6: Rosario's Weekly Hours (2008 to June 27, 2009)**

| Day of the Week | Number of Hours |
|---|---|
| Monday | 15 hours |
| Tuesday | 15 hours |
| Wednesday | 11 hours |
| Thursday | 11 hours |
| **Total Number of Hours per Week** | 52 hours |

**Chart 7: Rosario's Weekly Hours (June 28, 2009 to 2010)**

| Day of the Week | Number of Hours Week 1 | Number of Hours Week 2 |
|---|---|---|
| Monday | 15 hours | 15 hours |
| Tuesday | 15 hours | 15 hours |
| Wednesday | 11 hours | 11 hours |
| Thursday | 11 hours | 11 hours |
| Friday (2x a month) | -- | 10 hours |
| **Total Number of Hours per Week** | 52 hours | 62 hours |

To calculate overtime amounts owed, the Court divided Rosario's hourly rates by two to find Rosario's overtime premium.  That rate was then multiplied by the number of hours Rosario worked above 40 in a particular week depending on the hours worked for that week.  Since no gross pay values were available to determine the exact number of hours Rosario worked per week, the Court accepted Rosario's testimony as to his hours worked except where Rosario's testimony

differed from plaintiffs' representation of how many hours Rosario worked on Fridays, in which case the Court accepted plaintiffs' representation.  (See discussion supra in Section IV; Tr. at 197; Pls.' Post Stmt. Dam. ¶ 6).[61]  Thus, based on his pay increases during the period of employment, the overtime premium for the overtime wages owed from Rosario's start of employment in 2008 to June 27, 2009 was found to be $5.00 an hour and $5.50 an hour from June 28, 2009, when Rosario started working Fridays, through 2010.

The Court also made adjustments to reduce plaintiff Rosario's hours based on the number of days defendants testified that Mr. Z was closed for holidays.  Since the Court accepted defendant Mustakas' testimony and plaintiffs' claim in their statement of damages that defendants were closed for ten federal holidays – specifically, President's Day, Memorial Day, the Fourth of July, Labor Day, Columbus Day, Election Day, Veteran's Day, Thanksgiving, Black Friday,[62] and New Year's Day (Pls.' Post Stmt. Dam. ¶ 8f; Tr. at 383) – the Court took account of these federal holidays in calculating Rosario's damages.  In addition, since Andreopolos and Mustakas both testified that Mr. Z was closed for two weeks for Christmas every year (Tr. at 518-519), the Court did not award Rosario damages for pay dates that fell on:  December 18, 2009; December 25, 2009; December 24, 2010; and December 31, 2010.

For days plaintiffs did not work due to a holiday, the Court adjusted the total number of hours that Rosario would have worked on a week that included a holiday, just as it did for

_____

[61]Plaintiffs represented that Rosario began work on Fridays at 3:00 p.m., while he testified that at times, he began at 2:00 p.m.  (Compare Tr. at 197 with Pls.' Post Stmt. Dam. ¶ 6).  Since plaintiffs' calculations result in a lower damage award based on the 3:00 p.m. start time, the Court awards the lesser amount as requested.

[62]See n.48 supra.

plaintiffs Bedasie and Diaz. (See Section III(A)(3)). The Court only adjusted the total number of hours to account for the holidays because even if Rosario was not paid for the days he worked during these holidays, in order for the Court to determine the exact number of hours for which Rosario was owed overtime wages during the years where there are no records, it was necessary to take into account a reduced number of hours for weeks where Rosario did not work due to a holiday. To do this, the Court first determined on what day of the week a particular federal holiday fell in 2008 to 2010, and then deducted the amount of hours Rosario would have worked on that day of the week from the total amount of hours Rosario testified to have worked on that day of the week.

However, to account for snow days, since the parties did not provide the Court with exact dates on which Mr. Z was closed for snow days, the Court determined the total numbers of snow days per year and reduced Rosario's damages by the corresponding number of days when Mr. Z was closed. For instance, for the period prior to 2011, the Court accepted defendants' testimony there were four snow days in the year for which Mr. Z was closed. (Pls.' Post Stmt. Dam. ¶ 8e, Tr. at 26). Based on the testimony, the Court reduced the number of weeks for which damages were owed to Rosario from 2008 to 2010 by one week, or four workdays to account for the days Mr. Z was closed due to snow. However, since neither the defendants nor Rosario testified that he took any vacation days or sick days during his period of employment at Mr. Z, the Court made no adjustments for vacation days.

The overtime premium and wages owed to Rosario for every year in which he worked for Mr. Z is shown in the chart below:

**Chart 8: Overtime Wage Owed to Plaintiff Rosario**

| Period | Overtime Premium | Overtime Pay Owed |
|:---:|:---:|:---:|
| 2008 | $5.00 | $2,460.00 |
| 2009 | $5.00-$5.50 | $3,156.00 |
| 2010 | $5.50 | $3,998.50 |
| 2011 | $5.50 | $2,686.00 |
| 2012 | $5.50 | $3,093.75 |
| 2013 | $5.50-$6.00 | $677.50 |
| **Total** | N/A | $16,071.75 |

In total, the Court finds that Rosario is owed $16,071.75 in overtime wages.[63]


V.  Liquidated Damages

A.  Legal Standard

In addition to compensatory damages, plaintiffs seek a finding that they are entitled to receive liquidated damages pursuant to both federal and state law.  See 29 U.S.C. § 216(b); N.Y. Lab. L. § 663(1).  Under the federal standard, the employer bears the burden of proving good faith and reasonableness.  Specifically, the FLSA states that an employer who fails to pay his or her employees the minimum wage or overtime compensation required by Sections 206 and 207 is "liable to the employee . . . affected in the amount of [his or her] unpaid minimum wages, or [his or her] unpaid overtime compensation . . . and in an additional equal amount as liquidated damages," 29 U.S.C. § 216(b), unless the employer can demonstrate that he or she acted in good

---

[63]This number is higher than plaintiffs' proposed overtime wages owed, which seeks $13,084.50 for Rosario.  (See Pls.' Post Mem., Ex. 3).

faith and had reasonable grounds for believing that the act or omission in failing to make the proper payment was not a violation of the FLSA.  Jemine v. Dennis, 901 F. Supp. 2d 365, 388 (E.D.N.Y. 2012) (citing 29 U.S.C. §§ 216(b), 260).  Moreover, the employer's burden of proving good faith "is a difficult one, with double damages being the norm and single damages the exception."  Gortat v. Capala Bros., 949 F. Supp. 2d 374, 380 (E.D.N.Y. 2013) (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999), and awarding 100% liquidated damages under the FLSA standard).  This award serves as "compensation to the employee occasioned by the delay in receiving wages caused by the employer's violation of the FLSA."  Id. (quoting Herman v. RSR Secs. Servs., Ltd., 172 F. 3d at 141-42).

Like the FLSA, the NYLL provides for liquidated damages for wage-claim violations. Prior to November 24, 2009, an employee could recover liquidated damages under the NYLL if the underpayment was found to be willful.  N.Y. Lab. Law § 663(1) (1967).  However, an amendment to the NYLL, effective November 24, 2009, "incorporated the federal standard" and shifted the burden of proving good faith to the employer for violations.  Hengjin Sun v. China 1221, Inc., No. 12 CV 7135, 2016 WL 1587242, at *3 (S.D.N.Y. Apr. 19, 2016) (quoting Galeana v. Lemongrass on Broadway Corp., 120 F. Supp. 3d 306, 317 (S.D.N.Y. 2014)).  Even so, for violations of the NYLL that occurred prior to November 24, 2009, liquidated damages are available only if the employer's underpayments were willful, and "the burden is on the plaintiff to prove willfulness in order to obtain liquidated damages under New York law."  Gortat v. Capala Bros., 949 F. Supp. 2d at 381.

Following the 2009 amendments to the NYLL, "courts have not substantively distinguished the federal standard from the current state standard of good faith."  Inclan v. New York Hosp.

Grp., Inc., 95 F. Supp. 3d 490, 505 (S.D.N.Y. 2015) (citing He v. Home on 8th Corp., No. 09 CV

5630, 2014 WL 3974670, at *7 n. 19 (S.D.N.Y. Aug. 13, 2014); Eschmann v. White Plains Crane

Serv., Inc., No. 11 CV 5881, 2014 WL 1224247, at *9 (E.D.N.Y. Mar. 24, 2014)).  In addition,

until April 9, 2011, an employee was only entitled to receive liquidated damages under the NYLL

in the amount of 25% of the total unpaid wages.  However, on April 9, 2011, the NYLL was

amended to authorize liquidated damages amounting to 100% of the total unpaid wages for

violations thereafter.  See N.Y. Lab. Law § 663(1).


    B.  Analysis

    Plaintiffs argue that they are entitled to liquidated damages under the NYLL because

defendants again failed to meet their burden of demonstrating good faith and reasonableness in

ensuring compliance with the NYLL.  (Pls.' Post Mem. at 10).  As discussed supra in Section

III(A)(2), the Court has found that defendants' mere assertions that they believed they were

exempt from the requirements of the FLSA do not establish objectively "reasonable grounds" for

believing their acts did not violate the FLSA and the NYLL.  Hernandez v. Jrpac Inc., No. 14 CV

4176, 2016 WL 3248493, at *34 (S.D.N.Y. June 9, 2016) (holding that, "[a]bsent evidence that

defendants took some concrete step to assure compliance with these laws, the Court does not

credit defendants' conclusory assertions that they 'acted in good faith to comply with the FLSA

and the NYLL'").  The Court finds that here, defendants have failed to prove that they acted in

good faith in violating the FLSA and therefore, they are liable to plaintiffs for liquidated damages

for the period for which damages are awarded under the FLSA, from October 2, 2010 to 2013.

Similarly the Court finds that, for the period beginning November 24, 2009, when the NYLL was

amended to shift the burden to the employer to prove good faith, until October 2, 2010, the

defendants have not met their burden of demonstrating good faith and thus, are liable to plaintiffs

for liquidated damages under the NYLL for that period.

However, as the employer only has the burden of proving good faith compliance for

violations that occurred after November 24, 2009, when the amendment was made to the

liquidated damages provision of the NYLL, plaintiffs have the burden of proving that defendants'

violations prior to November 24, 2009 were willful. In this case, the Court finds that for

violations of the NYLL that occurred prior to November 24, 2009, defendants willfully violated

the NYLL by not only failing to keep time records, but by actively destroying or discarding any

time records or records of checks they distributed to plaintiffs. Moreover, defendants also failed

to consult their retained accountant as to their compliance with the various provisions of the

federal and state labor laws. (See discussion supra in Section III(A)(2)). Therefore, the Court

finds that plaintiffs have met the statutory requirements for an award of liquidated damages under

the NYLL, for the period prior to November 24, 2009.

Although liquidated damages may be awarded under both the NYLL and the FLSA, courts

in this circuit have increasingly found that cumulative liquidated damages under both statutes

should not be awarded. Originally, the rationale for permitting plaintiffs to recover double

liquidated damages was that the two statutes' liquidated damages provisions served different

purposes. See, e.g., Gunawan v. Sake Sushi Rest., 897 F. Supp. 2d 76, 90 (E.D.N.Y. 2012).

Some courts found that under the FLSA, liquidated damages served as compensatory damages

while under the NYLL, liquidated damages were considered punitive in nature, and therefore it

was not duplicative to award both at once. See, e.g., Asfar v. BBQ Chicken Don Alex No. 1

Corp., 2016 WL 1276417, at *1 (citing YuG. Ke v. Saigon Grill, Inc., 595 F. Supp. 2d 240, 261-62 (S.D.N.Y. 2008) (holding that "[l]iquidated damages under the FLSA are . . . compensation to the employee occasioned by the delay in receiving wages caused by the employer's violation of the FLSA . . . . In contrast, the liquidated damages provided for in the New York Labor Law are punitive in nature") (internal quotation marks omitted))); Hengjin Sun v. China 1221, Inc., No. 12 CV 7135, 2016 WL 1587242, at *3 (S.D.N.Y. Apr. 19, 2016) (citing cases).

However, in a Summary Order issued on December 7, 2016, the Second Circuit interpreted the NYLL to preclude the recovery of double liquidated damages under both the NYLL and FLSA. Chowdhury v. Hamza Express Food Corp., No. 15 CV 3142, 2016 WL 7131854, at *2 (2d Cir. Dec. 7, 2016). The court stated that, "whatever reasons existed to award liquidated damages under the relevant provisions of both the FLSA and the NYLL before 2010, we read the subsequent amendments to the NYLL provision, which brought it into substantial conformity with the FLSA provision, as having eliminated those reasons. Today the NYLL and FLSA liquidated damages provisions are identical in all material respects, serve the same functions, and redress the same injuries. In the absence of any indication otherwise, we interpret the New York statute's provision for liquidated damages as satisfied by a similar award of liquidated damages under the federal statute."

Courts in this circuit have since relied on the Second Circuit's Summary Order to disfavor an overlapping award of liquidated damages under both the FLSA and the NYLL for the same period of time. See Changxing Li et al. v. Kai Xiang Dong et al., No. 15 CV 7554, 2017 WL 892611, at *14 (S.D.N.Y. Mar. 7, 2017) (holding that "in keeping with the Second Circuit's Chowdhury decision, the 'prevailing view' of district court decisions in this Circuit, as well as this

Court's previous rulings that plaintiffs should not be awarded liquidated damages under both the FLSA and the NYLL for the same time period, plaintiffs are entitled to single liquidated damages at the state statutory rate of 100% on their minimum, overtime, and spread of hour wage claims"); Luna v. Gon Way Constr., Inc., No. 16 CV 1411, 2017 WL 835321, at *15 (E.D.N.Y. Feb. 14, 2017), report and recommendation adopted, No. 16 CV 1411, 2017 WL 835174 (E.D.N.Y. Mar. 2, 2017) (recommending that "the District Court find that Plaintiffs are permitted to recover liquidated damages for unpaid wages and unpaid overtime under the greater of the FLSA or NYLL"); Granados v. Traffic Bar & Rest., Inc., No. 13 CV 0500, 2016 WL 7410725, at *4 (S.D.N.Y. Dec. 21, 2016) (recommending that the district judge "follow[ ] Chowdhury's teaching in this instance and disallow[ ] 'stacked' liquidated damages for unpaid wages accrued after April 9, 2011").

The law is clear that plaintiffs "may recover under the statute which provides the greatest amount of damages."  Charvac v. M & T Project Managers of New York, Inc., No. 12 CV 05637, 2015 WL 5475531, at *4 (E.D.N.Y. June 17, 2015) (quoting Jiao v. Shi Ya Chen, No. 03 CV 0165, 2007 WL 4944767, at *17 (S.D.N.Y. Mar. 30, 2007)), report and recommendation adopted as modified, No. 12 CV 5637, 2015 WL 5518348 (E.D.N.Y. Sept. 17, 2015); Maldonado v. La Nueva Rampa, Inc., No. 10 CV 8195, 2012 WL 1669341, at *5 (S.D.N.Y. May 14, 2012); Wicaksono v. XYZ 48 Corp., No. 10 CV 3635, 2011 WL 2022644, at *3 (S.D.N.Y. May 2, 2011) (holding that where plaintiffs have prevailed under both state and federal law, "the law providing the greatest recovery will govern"), report and recommendation adopted, 2011 WL 2038973 (S.D.N.Y. May 24, 2011)).

The Court calculated liquidated damages that would have been owed to each plaintiff

under both the NYLL and the FLSA.  Under the FLSA, an employee is owed, in liquidated damages, an amount equal to the amount of unpaid wages and unpaid overtime compensation.  29 U.S.C. § 216(b).  In this case, because the action was brought more than three years after the willful violations of the FLSA began, plaintiffs' liquidated damages under the FLSA are limited to three years prior to the commencement of the cause of action on October 2, 2013.  FLSA liquidated damages thus span from October 2, 2010 to the week each plaintiff received his last paycheck in 2013 and are limited to the damages awarded under the FLSA, specifically: 1) unpaid minimum wages owed to plaintiffs Bedasie and Diaz, and 2) unpaid overtime wages owed to all three plaintiffs.  See 29 U.S.C. § 255(a).  The Court calculated liquidated damages that would have been due to plaintiffs under the FLSA for unpaid minimum and overtime wages awarded under the FLSA, which are shown in the charts below.

As for the NYLL, since the Court awarded all the plaintiffs damages under the NYLL for the period prior to October 2, 2010, the Court calculated the amount of liquidated damages that the plaintiffs are owed under the NYLL for this period.  Given the amendments made to the NYLL as of April 9, 2011, the Court finds that for the entire period of their employment prior to April 9, 2011, plaintiffs are entitled to liquidated damages equal to 25% of their total unpaid wages awarded under the NYLL.  See N.Y. Lab. L. § 663(1).  These include: 1) plaintiffs Bedasie's and Diaz's unpaid minimum wages from 2007 or 2009[64] to October 1, 2010 (since FLSA damages were awarded starting from October 2, 2010); 2)  all three plaintiffs' unpaid overtime wages from 2007, 2008 or 2009 to October 1, 2010; and 3) plaintiff Bedasie and Diaz's

---

[64]The starting dates for calculating damages depends on when each plaintiff began working at Mr. Z.

unpaid spread-of-hours wages from 2007 or 2008 to October 1, 2010.  In addition, the Court awards plaintiffs Bedasie and Diaz liquidated damages in the amount of 100% of spread-of-hours wages incurred after October 2, 2010 under the NYLL, since plaintiffs did not receive a similar award of liquidated damages under the FLSA.

Since these awards for liquidated damages under the FLSA and NYLL do not award amounts for similar violations for the same period of time, the Court orders defendants to pay liquidated damages to plaintiffs in the amounts set forth in the charts below.[65]

**Chart 9: Bedasie's Liquidated Damages under the FLSA**

| Period | Minimum Wage Owed | Overtime Pay Owed |
|---|---|---|
| On and after October 2, 2010 | $0.00 | $496.09 |
| 2011 | $257.00 | $4,202.00 |
| 2012 | $119.63 | $3,641.52 |
| 2013 | $112.00 | $949.15 |
| **Total** | $9,777.39 | |

---

[65]The values for minimum wages owed and overtime pay owed in Charts 10 through 16 were split for the year 2010 on October 2, 2010, since from October 2, 2010 to October 2, 2013, plaintiffs were owed damages under the FLSA's three-year statute of limitations and were owed minimum wages and overtime wages under the NYLL's six-year statute of limitations from October 1, 2007 until October 1, 2010.  However, spread-of-hours wages were only awarded under the NYLL and therefore, the values for spread-of-hours wages shown in Chart 10 are from 2007 to 2013 and are from 2009 to 2013 in Chart 13.  Both Charts 10 and 13 also include the full year of 2010 for spread-of-hours wages owed.

**Chart 10: Bedasie's Liquidated Damages under the NYLL**

| Period | Minimum Wage Owed | Overtime Pay Owed | Spread-of-hours Owed |
|---|---|---|---|
| 2007 | $0.00 | $345.95 | $0.00 |
| 2008 | $525.35 | $2,750.46 | $71.50 |
| 2009 | $977.29 | $3,586.58 | $144.20 |
| Until October 1, 2010 | $313.00 | $3,490.25 | $65.25 (for 2010) |
| 2011 | N/A | N/A | $43.50 |
| 2012 | N/A | N/A | $36.25 |
| 2013 | N/A | N/A | $43.50 |
| Liquidated Damages of 25% before 4/9/2011 | $3,067.46 | | |
| Liquidated Damages of 100% after 4/9/2011 | $123.25 | | |
| **Total** | $3,190.71 | | |

**Chart 11: Bedasie's Total Liquidated Damages (FLSA and NYLL)**

| Liquidated Damages Owed under FLSA | Liquidated Damages Owed under NYLL |
|---|---|
| $9,777.39 | $3,190.71 |
| **Total Liquidated Damages: $12,968.10** | |

Since Bedasie is entitled to receive $3,190.71 in liquidated damages under the NYLL for the period from 2007 to 2013, and $9,777.39 under the FLSA for the period from October 2, 2010 to 2013, Bedasie's total award of liquidated damages is $12,968.10.[66]

---

[66]Plaintiffs calculated Bedasie's total liquidated damages at $26,944.37. (Pls.' Post Mem., Ex. 1). The Court's numbers are lower than plaintiffs' numbers because only single

The amount of liquidated damages due to plaintiff Diaz under the FLSA and the NYLL is shown in the charts below.

**Chart 12: Diaz's Liquidated Damages under the FLSA**

| Period | Minimum Wage Owed | Overtime Pay Owed |
|---|---|---|
| On and after October 2, 2010 | $149.63 | $435.70 |
| 2011 | $110.88 | $4,143.26 |
| 2012 | $686.00 | $3,475.34 |
| 2013 | $81.00 | $710.03 |
| **Total** | $9,791.84 | |

**Chart 13: Diaz's Liquidated Damages under the NYLL**

| Period | Minimum Wage Owed | Overtime Pay Owed | Spread-of-hours Owed |
|---|---|---|---|
| 2009 | $106.63 | $3,345.87 | $43.20 |
| Until October 1, 2010 | $436.00 | $3,208.23 | $166.75 (for 2010) |
| 2011 | N/A | N/A | $36.25 |
| 2012 | N/A | N/A | $130.50 |
| 2013 | N/A | N/A | $21.75 |
| Liquidated Damages of 25% before 4/9/2011 | $1,826.67 | | |
| Liquidated Damages of 100% after 4/9/2011 | $188.50 | | |
| **Total** | $2,015.17 | | |

liquidated damages are awarded.

112

**Chart 14: Diaz's Total Liquidated Damages (FLSA and NYLL)**

| Liquidated Damages Owed under FLSA | Liquidated Damages Owed under NYLL |
|---|---|
| $9,791.84 | $2,015.17 |
| **Total Liquidated Damages: $11,807.01** ||

Since Diaz is entitled to receive $2,015.17 in liquidated damages under the NYLL for the period from 2009 to 2013 representing unpaid wages, overtime wages, and spread of hours wages owed, and $9,791.84 under the FLSA from October 2, 2010 to 2013, representing only minimum wages and overtime wages, his total award of liquidated damages is $11,807.01.[67]

Finally, the amount of liquidated damages that is due for plaintiff Rosario under the FLSA and the NYLL is shown in the charts below.

**Chart 15: Rosario's Liquidated Damages under the FLSA**

| Period | Overtime Pay Owed |
|---|---|
| On and after October 2, 2010 | $610.50 |
| 2011 | $2,686.00 |
| 2012 | $3,093.75 |
| 2013 | $677.50 |
| **Total** | $7,067.75 |

[67]Plaintiffs calculated Diaz's total liquidated damages at $20,085.62. (Pls.' Post Mem., Ex. 2). As discussed supra in n.66, the Court's numbers are lower because the Court has only awarded single liquidated damages.

**Chart 16: Rosario's Liquidated Damages under the NYLL**

| Period | Overtime Pay Owed |
|---|---|
| 2008 | $2,460.00 |
| 2009 | $3,156.00 |
| Until October 1, 2010 | $3,388.00 |
| Total | $9,004.00 |
| Liquidated Damages of 25% before 4/9/2011 | $2,251.00 |

**Chart 17: Rosario's Total Liquidated Damages (FLSA and NYLL)**

| Liquidated Damages Owed under FLSA | Liquidated Damages Owed under NYLL |
|---|---|
| $7,067.75 | $2,251.00 |
| **Total Liquidated Damages: $9,318.75** ||

Since Rosario is entitled to receive $2,251.00 in liquidated damages under the NYLL and $7,067.75 under the FLSA, his total award of liquidated damages is $9,318.75.[68]

Accordingly, the Court awards liquidated damages under the FLSA and under the NYLL for all three plaintiffs based on non-overlapping damages awarded under each statute.

---

[68]Plaintiffs calculated Rosario's total liquidated damages at $14,133.75. (Pls.' Post Mem., Ex. 3).

VI.  Prejudgment Interest

Plaintiffs contend that they are each entitled to interest on all wages awarded, pursuant to the NYLL, calculated at a rate of 9% per annum.  Unlike the FLSA, the Second Circuit has held that, as liquidated damages and prejudgment interest are not functional equivalents under the NYLL, prevailing plaintiffs may recover both for claims brought under the NYLL.  Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d 253, 265 (2d Cir. 1999).  Prejudgment interest may be awarded under the NYLL only to amounts awarded under the NYLL that do not overlap with FLSA awards.  See Gunawan v. Sake Sushi Restaurant, 897 F. Supp. 2d at 92-93; Santillan v. Henao, 822 F. Supp. 2d at 298; see also Hengjin Sun v. China, 2016 WL 1587242, at *5-*6 (citing cases and holding that plaintiffs are entitled to prejudgment interest on their non-overlapping NYLL wage claims at a simple rate of 9% per year).

In addition, plaintiffs can be awarded prejudgment interest on NYLL spread-of-hours wages awarded during the same period for which FLSA unpaid wage damages were assessed.  See Santillan v. Henao, 822 F. Supp. 2d at 298-99 (holding that "since the spread-of-hours pay is only covered under New York Labor Law, and not the FLSA, the entire period for which spread-of-hours pay was unpaid will be subject to prejudgment interest" and awarding prejudgment interest on spread-of-hours wages awarded for three years for which FLSA overtime wages were also awarded); Gonzalez v. Jane Roe Inc., 2015 WL 4662490, at *5 (holding that, where plaintiffs were granted spread-of-hours damages for the entire period of their employment from 2004 to 2009, "[s]ince FLSA liquidated damages cover plaintiffs' causes of action for minimum wages and overtime after March 5, 2007, plaintiffs may recover prejudgment interest only on minimum wages and overtime earned during the period from March 5, 2004 to March 5,

2007, and on their unpaid spread-of-hours compensation"). Thus, this Court has included the amount of spread-of-hours wages owed to plaintiffs from 2011 to 2013 in calculating prejudgment interest, even though this period coincided with years they were awarded damages under the FLSA, which does not include a comparable spread-of-hours provision.

Here, plaintiffs were awarded damages under the NYLL for the period prior to 2011, since the NYLL's statute of limitations period of six years is longer than the FLSA's limitations period of three years. Accordingly, plaintiffs are entitled to prejudgment interest on the damages incurred under the NYLL. These include interest on: 1) plaintiff Bedasie's minimum wage claims from 2007 to 2010, overtime wage claims from 2007 to 2010, and spread-of-hours wage claims from 2007 to 2013; 2) plaintiff Diaz' minimum wage claims from 2009 to 2010, overtime wage claims from 2009 to 2010, and spread-of-hour wage claims from 2009 to 2013; 3) plaintiff Rosario's overtime wage claims from 2008 to 2010;[69] and 4) wage notice damages in the amount of $2,500 awarded to each plaintiff in Judge Amon's August 14, 2015 Order.[70]

Plaintiffs agree that where, as here, violations of the NYLL "were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." N.Y. C.P.L.R. § 5001(b). See, e.g., Wicaksono v. XYV 48 Corp., 2011 WL 2022644, at *9 (holding that "[t]he plaintiffs have

---

[69]As discussed supra Section IV, Rosario does not seek unpaid minimum wages or unpaid spread-of-hours wages for his period of employment at Mr. Z. (Pls.' Post Mem. at 16; Pls.' Post Stmt. Dam. at 17).

[70]Although Judge Amon's Order granting plaintiffs wage notice damages under the NYLL was issued on August 14, 2015, the Court has assumed that defendants have not yet paid plaintiffs these damages and has therefore included these damages in its calculation of prejudgment interest owed on plaintiffs' NYLL damages.

calculated prejudgment interest from the midway point of each plaintiff's employment, which is a reasonable approach"). Courts computing interest for NYLL violations have computed interest "from the month halfway between when plaintiff began and ceased working for defendant." <u>Pavia v. Around The Clock Grocery, Inc.</u>, No. 03 CV 6465, 2005 WL 4655383, at *8 (E.D.N.Y. Nov. 15, 2005). However, if plaintiffs only accrued damages under the NYLL for a portion of their period of employment, courts compute the midpoint between the period they accrued damages under the NYLL. <u>See</u> <u>Andrade v. 168 First Ave Rest. Ltd.</u>, 2016 WL 3141567, at *10 (S.D.N.Y. June 3, 2016), <u>report and recommendation adopted</u>, No. 14 CV 8268, 2016 WL 3948101 (S.D.N.Y. July 19, 2016) (where plaintiff asserted that he began working for defendants in November 2007, but there was no evidence that he was owed spread-of-hours wages for any time prior to October 16, 2008, the Court used October 16, 2008 as the date plaintiff began working for defendants, October 1, 2014 as the date plaintiff ceased working for defendants, and October 9, 2011 as the midpoint date for computing prejudgment interest).

Thus, for plaintiffs Bedasie and Diaz, this Court computes interest from the date halfway between when they began working and when they stopped accruing damages under the NYLL. Here, July 15, 2010 marks the midway point between October 2, 2007, when Bedasie started accruing damages under the NYLL, and April 29, 2013, when he accrued his last damages under the NYLL. March 6, 2011 marks the midway point between January 1, 2009, when Diaz started accruing damages under the NYLL, and May 10, 2013, when he accrued his last damages under the NYLL. However, plaintiff Rosario only received damages under the NYLL from 2008 to 2010, even though he was terminated from Mr. Z in 2013. Since Rosario is not due any NYLL damages for the second half of his employment at Mr. Z, from 2011 to 2013, the Court only

awards prejudgment interest for the damages awarded from January 1, 2008, when Rosario began to accrue damages under the NYLL, and the last week for which he accrued NYLL damages, November 26, 2010.  Accordingly, the midway point from which Rosario's interest accrued was May 29, 2009.

The prejudgment interest that has accrued for all three plaintiffs from their accrual date to the date of this Order is shown in the chart below.  The amount shown under "NYLL Award" represents the amount plaintiffs accrued for damages awarded under the NYLL only.

**Chart 18: Prejudgment Interest Owed to Plaintiffs**

| Plaintiff | NYLL Award | Per Diem Interest | Accrual Date | Days between Accrual and Date of Order | Total Interest to Date of Order |
|---|---|---|---|---|---|
| Bedasie | $14,893.08 | 3.67[71] | 7/15/2010 | 2,445 | $8,978.69 |
| Diaz | $9,995.18 | 2.46 | 3/6/2011 | 2,211 | $5,449.15 |
| Rosario | $11,504.00 | 2.84 | 5/29/2009 | 2,857 | $8,104.17 |

Thus, plaintiff Bedasie is owed prejudgment interest in the amount of $8,978.69; plaintiff Diaz is owed prejudgment interest in the amount of $5,449.15; and plaintiff Rosario is owed prejudgment interest in the amount of $8,104.17.

---

[71]For purposes of clarity, the Court has represented the per diem interest amount as rounded to the nearest hundredth.  However, to calculate a more accurate amount for total interest, the Court has used un-rounded values in its calculations.

VII.  <u>Total Damages</u>

   In sum, the charts below reflect the total amount of damages owed to plaintiffs Bedasie,

Diaz, and Rosario.  The charts compile the total amounts due for minimum wages, overtime

wages, spread-of-hours wages, liquidated damages, and prejudgment interest, and include the

wage notice damages that were awarded to plaintiffs under Judge Amon's August 14, 2015 Order:


**Chart 19: Bedasie's Total Damages**

| Period | Minimum Wage Owed | Overtime Pay Owed | Spread of Hours Owed | Liquidated Damages | Interest Due |
|--------|-------------------|-------------------|----------------------|--------------------|--------------|
| 2007 | $0.00 | $345.95 | $0.00 | | |
| 2008 | $525.35 | $2,750.46 | $71.50 | | |
| 2009 | $977.29 | $3,586.58 | $144.20 | | |
| 2010 | $313.00 | $3,986.34 | $65.25 | | |
| 2011 | $257.00 | $4,202.00 | $43.50 | | |
| 2012 | $119.63 | $3,641.52 | $36.25 | | |
| 2013 | $112.00 | $949.15 | $43.50 | | |
| Total | $2,304.27 | $19,462.00 | $404.20 | $12,968.10 | $8,978.69 |
| | | | | Wage Notice Damages | $2,500.00 |
| | | | | Cumulative Total | $46,617.26 |

## Chart 20: Diaz's Total Damages

| Period | Minimum Wage Owed | Overtime Pay Owed | Spread of Hours Owed | Liquidated Damages | Interest Due |
|---|---|---|---|---|---|
| 2009 | $106.63 | $3,345.87 | $43.20 | | |
| 2010 | $585.63 | $3,643.93 | $166.75 | | |
| 2011 | $110.88 | $4,143.26 | $36.25 | | |
| 2012 | $686.00 | $3,475.34 | $130.50 | | |
| 2013 | $81.00 | $710.03 | $21.75 | | |
| Total | $1,570.14 | $15,318.43 | $398.45 | $11,807.01 | $5,449.15 |
| | | | | **Wage Notice Damages** | $2,500.00 |
| | | | | **Cumulative Total** | $37,043.18 |

## Chart 21: Rosario's Total Damages

| Period | Overtime Pay Owed | Liquidated Damages | Interest Due |
|---|---|---|---|
| 2008 | $2,460.00 | | |
| 2009 | $3,156.00 | | |
| 2010 | $3,998.50 | | |
| 2011 | $2,686.00 | | |
| 2012 | $3,093.75 | | |
| 2013 | $677.50 | | |
| Total | $16,071.75 | $9,318.75 | $8,104.17 |
| | | **Wage Notice Damages** | $2,500.00 |
| | | **Cumulative Total** | $35,994.67 |

<u>CONCLUSION</u>

In light of the foregoing, the Court finds in favor of the plaintiffs and holds defendants Andreopolos and Mr. Z jointly and severally liable to plaintiffs Bedasie and Diaz for unpaid minimum wages, unpaid overtime wages, unpaid spread-of-hours wages, liquidated damages and prejudgment interest under the FLSA and NYLL.  Defendants Andreopolos and Mr. Z are also jointly and severally liable to plaintiff Rosario for unpaid overtime wages, liquidated damages, and prejudgment interest under the FLSA and NYLL.

 In addition, the Court holds that plaintiffs failed to establish by a preponderance of the evidence that Mustakas was an "employer" within the meaning of either the FLSA or NYLL, and therefore she is not liable for any violations under the FLSA or NYLL.

In its calculations for total damages owed to plaintiffs, the Court has included the additional amount of $2,500 for each plaintiff, representing wage notice violations, as per Judge Amon's August 14, 2015 Order.  If plaintiffs wish to seek attorneys' fees and costs incurred in litigation, plaintiffs are Ordered to file a motion for fees and costs by <u>May 1, 2017.</u>

The total amount due to each plaintiff is shown in the chart below:

**Chart 22: Total Damages Owed to Plaintiffs**

| Claim | Bedasie | Diaz | Rosario |
|---|---|---|---|
| Unpaid Wages | $22,170.47 | $17,287.02 | $16,071.75 |
| Liquidated Damages | $12,968.10 | $11,807.01 | $9,318.75 |
| Wage Notice Damages | $2,500.00 | $2,500.00 | $2,500.00 |
| Prejudgment Interest | $8,978.69 | $5,449.15 | $8,104.17 |
| Total Per Plaintiff | $46,617.26 | $37,043.18 | $35,994.67 |
| **TOTAL** | $119,655.11 | | |

In sum, the Court grants plaintiffs an award of $119,655.11, representing unpaid wages, liquidated damages, wage notice violations, and prejudgment interest.

The Clerk is directed to enter judgment in favor of plaintiffs and Ordered to send copies of this Memorandum and Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

SO ORDERED.

Dated: Brooklyn, New York
      March 24, 2017

                                  /s/ Cheryl L. Pollak
                                  Cheryl L. Pollak
                                  United States Magistrate Judge
                                  Eastern District of New York